UNITED STATES *v.* SAN PEDRO & CANON DEL AGUA CO.

(*Supreme Court of New Mexico.* January Term, 1888.)

1. PUBLIC LANDS—PATENTS—VACATION FOR FRAUD.

In 1844, one R. petitioned for and was granted by the Mexican government certain vacant lands, describing them, and juridical possession was given in accordance therewith. In 1859 he filed an application in the United States surveyor general's office in New Mexico for a confirmation of such grant, and the surveyor general approved the claim according to the original papers, and in 1866 the grant was confirmed by congress. About that time a company was organized to purchase the land, and, pending the negotiations, the surveyor general at Washington sent out his chief clerk to go upon the land and locate the marks; and the clerk, accompanied by the parties interested in the company, and traveling at their expense, went upon the land, took some *ex parte* evidence, and located the land east of a spring, which was described in the original papers as the east boundary of the land. Three days afterwards the land was conveyed by R. to the company by the new description, in which every call of the original description was changed. On the return of the clerk, the surveyor general directed a man who had accompanied the clerk and his party as a notary, to make a survey, which he did, locating it according to the new description. The survey was suspended by the commissioner as not corresponding with the application, and the surveyor general was ordered to give notice by publication, and take testimony. No notice was given. The testimony taken by the clerk, and also of certain witnesses produced "by the gentleman acting as agent for the claimants," was forwarded, and the commissioner approved it, directing the surveyor general to publish notice of such approval, allowing adverse claimants 60 days to appeal; which notice was not given. None of the calls in the new description correspond with the original, all of which could have been located on the ground, and none of the land in the new description was included in R.'s application, or held by him under his juridical possession and title from the Mexican government. *Held* sufficient evidence of fraud and mistake to authorize the cancellation of the patent.

2. SAME—INNOCENT PURCHASER—CORPORATIONS—NOTICE TO OFFICERS AND STOCKHOLDERS.

A corporation was organized to purchase a grant of land. Upon the making of the contract to purchase, and before all the money was paid, the president and two stockholders were sent to investigate the grant. They went upon the land claimed to be conveyed; talked with persons claiming interests in the land adverse to the patent. The patent itself called for an entirely different tract than that held by the original owner, who held under the Mexican government, and every call for courses and distances in the patent was different from those in the Mexican title, application to congress for confirmation, and the act of confirmation. The patent also recited that the surveyor general had no authority to adjudicate on claims to mines. *Held*, that the corporation took the land with constructive notice of all the facts, and was not entitled to the rights of an innocent vendee, in an action to vacate the patent for fraud and mistake, and to enjoin the company from working the mines on the land.

3. SAME—MEXICAN TITLES—MINERAL LANDS.

An act of congress confirming to a claimant his title to a tract of land granted to him by the Mexican government under the colonization laws of Mexico and Spain, and a patent issued in accordance therewith, conveys no title to the mineral lands included in such grant.

HENDERSON, J., dissenting.

Appeal from district court, First district.

Action by the United States against the San Pedro & Canon del Agua Company for the cancellation of a patent to land. Judgment for defendant, and plaintiff appeals.

*Thomas Smith,* U. S. Atty. for New Mexico, *Francis Downs,* (special counsel,) and *Fiske & Warren,* for appellants.

When, by the rules of law, the legal title must prevail, the action of the land department is conclusive. But courts of equity, both in England and this country, have always had the power, in certain cases, to correct injustice, both in judicial and executive action founded in fraud or mistake. The liability of the land-office to be imposed upon by fraud and false swearing exemplifies the necessity for this jurisdiction. *Johnson* v. *Towsley,* 13 Wall. 84. The patent is but evidence of a grant, and the officer issuing it acts

ministerially, and not judicially. Equity will relieve against the patent, not only in cases of fraud by the patentee, but where the patent is issued unadvisedly, by mistake; the officer having no authority in law to grant it. *U. S.* v. *Stone,* 2 Wall. 535; *Hughes* v. *U. S.,* 4 Wall. 236; *Meader* v. *Norton,* 11 Wall. 458; *Mowry* v. *Whitney,* 14 Wall. 440; *Field* v. *Seabury,* 19 How. 332. The fraud has been practiced upon the government, and it is the proper party to assert the remedy. *Mowry* v. *Whitney,* 14 Wall. 440. Patents for lands reserved from sale, or appropriated, are void. *Morton* v. *Nebraska,* 21 Wall. 660. The government is not estopped by the laches of its officers. *U. S.* v. *Kirkpatrick,* 9 Wheat. 736; *U. S.* v. *Hoar,* 2 Mason, 311; *U. S.* v. *Williams,* 5 McLean, 133; *Gibson* v. *Chouteau,* 13 Wall. 92; *U. S.* v. *Thompson,* 98 U. S. 486; *Gaussen* v. *U. S.,* 97 U. S. 584; *U. S.* v. *Iron Co.,* 18 Fed. Rep. 273; *U. S.* v. *Land-Grant Co.,* 21 Fed. Rep. 19. In establishing the fraudulent combination alleged in the bill, all the circumstances are to be considered. *Com.* v. *McClean,* 2 Pars. Eq. Cas. 368, 369; *U. S.* v. *Cole,* 5 McLean, 513. Fraud may consist in concealment by a party of a fact within his own knowledge which he ought to disclose. It is not necessary that all the representations be untrue. 2 Pom. Eq. Jur. §§ 873, 875, 901. In pleading the defense of innocent purchaser, the deed, date, parties, and contents; that vendor was seized, and in possession; the consideration, with a distinct averment that it was *bona fide* and truly paid,—must be alleged, and, where notice is specially charged, the denial must be of all facts from which notice can be inferred. *Boone* v. *Chiles,* 10 Pet. 212, 213. Evidence will not be permitted of matters not set out. Id.; 2 Pom. Eq. Jur. § 785. A purchaser of a title derived from the general government by patent, which contains recitals affecting the title in the hands of a purchaser, however remote from the original patentee, takes subject to such recitals, although ignorant both of such recitals and the facts recited when he purchased the title. *Brush* v. *Ware,* 15 Pet. 93; *Bonner* v. *Ware,* 10 Ohio, 465; *U. S.* v. *Iron Co.,* 18 Fed. Rep. 273. A party is charged with notice of such facts as could have been readily ascertained had he made inquiries; the facts within his knowledge being such as would lead an honest man using ordinary caution to make such inquiry. Wade, Notice, p. 9, § 11; *Hankinson* v. *Barbour,* 29 Ill. 80; *Lewis* v. *Bradford,* 10 Watts, 67; *Williamson* v. *Brown,* 15 N. Y. 354; *Fiske* v. *Potter,* *41 N. Y. 70. A purchaser who sees or might see or know of visible material objects upon or connected with land is chargeable with constructive notice of any easement or similar right, the existence of which would be suggested by the appearance of such objects. 2 Pom. Eq. Jur. § 611; *Denise* v. *Ruggles,* 16 How. 244.

*Thomas Smith,* U. S. Atty.

In England, grants are construed favorably to the grantor, and, if it is shown that the king is deceived in his grant, it will not include a subject not expressed. *Attorney General* v. *Hospital,* 17 Beav. 366; *Attorney General* v. *Almshouse,* 22 Law J. Ch. 846; *Bridge* v. *Bridge,* 7 Pick. 344; *Church* v. *Beach,* 26 Conn. 355. Public lands are to be construed favorably to the grantor, and no alienation should be presumed that is not clearly expressed. *Railroad Co.* v. *Litchfield,* 23 How. 66; *Bank* v. *U. S.,* 1 G. Greene, 553; *Taylor* v. *Galland,* 3 G. Greene, 17; *Green's Estate,* 4 Md. Ch. 349; *Townsend* v. *Brown,* 24 N. J. Law, 80. If the government discovers that in its location of lands claimed under a Mexican grant an erroneous result is obtained by imposition or fraud, it may institute proceedings to vacate its patent. *Leese* v. *Clark,* 18 Cal. 535. Where a doubt arises as to the measuring of a grant as to the quantity ceded, reference may be had to the juridical possession. *U. S.* v. *Pico,* 5 Wall. 536. The juridical possession is conclusive as to the boundaries and extent of the land granted. *Graham* v. *U. S.,* 4 Wall. 260. The survey must conform reasonably to the boundary lines in the decree.

*U. S.* v. *Halleck,* 1 Wall. 445; *Chinoweth* v. *Haskell,* 3 Pet. 96; *Blake* v. *Doherty,* 5 Wheat. 359; *Mine Case,* 2 Wall. 649; *Dehon* v. *Bernal,* 3 Wall. 774; *Ex parte Milligan,* 4 Wall. 104; *Castro* v. *Hendricks,* 23 How. 438; *Mahoney* v. *Van Winkle,* 21 Cal. 552.   A survey, to be good, must be in pursuance of an entry, (*Lindsay* v. *Miller,* 6 Pet. 666,) and cannot appropriate without authority outside the calls of the entry, (*Hastings* v. *Stevenson,* 2 Ohio, 8.)   Lines of survey actually marked, if traced and identified as calls of the grant, will control courses and distances, but these will not be controlled by a survey entirely inconsistent and repugnant to the calls of the grant.   *Booth* v. *Upshur,* 26 Tex. 64.   When a given quantity of land is to be run off on a given base, it must be included within four lines, those from the base proceeding at right angles, and the line opposite the base parallel to it, unless this form is repugnant to the entry.   *Massie* v. *Watts,* 6 Cranch, 148; *Kerr* v. *Watts,* 6 Wheat. 550; *Shipp* v. *Miller's Heirs,* 2 Wheat. 316.

*Henry L. Waldo, William Breeden,* and *Catron, Thornton & Clancy,* for appellee.

Where there is any conflict between monuments and landmarks named in the description, and the courses and distances given, the former control. *Ayres* v. *Watson,* 113 U. S. 594, 5 Sup. Ct. Rep. 641; *Barclay* v. *Howell,* 6 Pet. 498; *Preston* v. *Bowmar,* 6 Wheat. 580; *Land Co.* v. *Saunders,* 103 U. S. 316.   The surveyor having followed the directions of the surveyor general, the court will not vacate the patent, even though there be a mistake in location, in the absence of positive proof of fraud.   *U. S.* v. *Flint,* 4 Sawy. 61; *U. S.* v. *Throckmorton,* 98 U. S. 61; *U. S.* v. *Tin Co.,* 23 Fed. Rep. 280.   If it would be inequitable, from lapse of time and changed condition of the parties, and from the difficulty in obtaining evidence, the relief will be refused, even though the United States be the suitor.   *U. S.* v. *Flint,* 4 Sawy. 43, 58; *U. S.* v. *Tin Co.,* 23 Fed. Rep. 280; *U. S.* v. *Beebee,* 17 Fed. Rep. 36; *U. S.* v. *Fossatt,* 21 How. 450; *U. S.* v. *Barker,* 12 Wheat. 559; *Mitchel* v. *U. S.,* 9 Pet. 711; *U. S.* v. *Bank,* 96 U. S. 36; *U. S.* v. *Bostwick,* 94 U. S. 66; *U. S.* v. *Smith,* 94 U. S. 217; *The Siren,* 7 Wall. 159; *People* v. *Clarke,* 10 Barb. 120; *U. S.* v. *Tichenor,* 8 Sawy. 155, 156; *U. S.* v. *White,* 9 Sawy. 131.   Fraud, and not mistake, having been alleged in the bill, complainant can only succeed upon proof of fraud as charged.   *Boone* v. *Chiles,* 10 Pet. 209.   Before the court can vacate the patent it must be fully and absolutely convinced that the survey is incorrect.   *U. S.* v. *Land-Grant Co.,* 7 Sup. Ct. Rep. 1015.

LONG, C. J.   The complainants, the United States, by Wayne MacVeagh, then attorney general, and Sidney M. Barnes, at the time United States attorney for the territory of New Mexico, on the fifteenth day of September, A. D. 1881, filed in the First judicial district court of said territory a bill of complaint.   Later, Francis Downs, Fiske & Warren, and Thomas Smith, United States attorney, appeared as solicitors for the complainant.   The San Pedro & Canon del Agua Company, a corporation, was made defendant, and appeared by William Breeden, Henry L. Waldo, Catron, Thornton & Clancy as solicitors.

It was charged in the bill of complaint that the United States, by virtue of the treaty with the republic of Mexico of 1848, known as the "Treaty of Guadalupe Hidalgo," and the cession thereunder, acquired the title and ownership of a certain tract of land in the territory of New Mexico commonly known as the "New Placers," or "Tuerto Mountains," situated in Santa Fe county, and of certain mineral lands and mining regions in that locality, and also other lands in the vicinity adapted to stock-raising and agriculture; that as early as 1842 there was upon said lands, while the same were subject to the republic of Mexico, a large and flourishing town of many thousand inhabitants, known as "Real de San Francisco," which had for many years prior to that time ex-

isted as a Mexican town, with the rights and privileges under that government pertaining to such places, and, among other, with the right to the lands so occupied for such purpose, and the common grounds immediately adjacent thereto for pasturage, all of which rights are conceded by the bill; that such town has continued to exist ever since to the filing of the bill of complaint, with the rights aforesaid, and, among them, the right to the commons for a league distant from the town; that upon the said lands for many years there had been mining camps, and many rich and valuable mines of gold, silver, iron, copper, and lead, both near the town and distant therefrom, and that such mines had been, prior to the date of said treaty, occupied and worked by citizens and subjects of the Mexican republic, who thereby acquired rights which they held at the time of said treaty, and who after the cession became citizens of the United States, and with rights to protection in their said property under the treaty; that among such mines is one discovered and located by Mariano Barela in the year 1844, which it is now averred is now claimed and owned by Antonio Jacquez, Mariano Barela, and the heirs of Jose Antonio Otero. It is averred that Jacquez and Barela worked and operated said mine until the occupation of the territory of New Mexico by the American forces during the war with the republic of Mexico, and by the Oteros after that period for a long time; and that this particular mine, among others, is within the limits of the survey sought to be vacated by this proceeding. It is further averred that within the limits of said survey, long before the same was made, citizens of said town, and also other citizens of the United States, had, by virtue of continuous work upon and development therein, acquired rights to valuable mines of ore, both as to old mines, and new ones alleged to have been discovered, opened, and continuously occupied. It is alleged that the lands within the lines of said survey, since the said treaty, have been generally and publicly understood to be a part of the public domain of the United States, and not private property; and that, so understanding, many persons have entered thereon, and opened mines, and developed mineral veins, and occupied the same, intending to acquire legal title thereto under the mining laws of the United States, and under the mining laws, usages, and customs relating to mineral lands in said territory. It is alleged, further, that in February, A. D. 1844, one Jose Serafin Ramirez petitioned the then governor of the department of New Mexico for a certain tract of land described in his petition, and also described in the bill in this case; that said land was vacant land, and did not include any part of said town, but was over a league distant therefrom; that on the thirteenth day of February, A. D. 1844, the said governor granted said petition of the said Ramirez, and that the departmental assembly ratified and approved the same, and he was afterwards given actual juridical possession of the same; that the grant so asked for and so given was afterwards presented to the surveyor general of New Mexico; that it received his approval, and afterwards was confirmed by the congress of the United States; that a survey thereof was made, and a patent thereon was issued by the president of the United States. It is averred the present defendant claims title under and through mesne conveyances from the said Ramirez, by virtue thereof, and by virtue of the confirmation, survey, patent, and mesne conveyances. It is further averred that in the petition by Ramirez to the governor, in the grant by the departmental assembly, in the petition by Ramirez to the surveyor general for confirmation, that the land was described by terms slightly different in phraseology, but to the same legal effect; that, as so described, the said land could be easily found, and marked out on the earth's surface; that all the monuments and landmarks named in said description were well known, and easily ascertainable, and entirely consistent with the courses and directions named in said descriptions; that the words of description used in the petition filed before the surveyor general asking confirmation of the grant gave its description, with the following boundary lines: "Bounded

as follows: On the north, by the Placer road that goes down to the yellow timber; on the south, the northern boundary of the San Pedro grant; on the east, the spring of the Canon del Agua; on the west, the summit of the mountain of the mine known as the property of your petitioner." It is further averred that the Canon del Agua spring is and always was a well-known point, and that the true east boundary of said tract of land would be a line drawn directly north and south through said spring. It is averred further, in effect, that the whole of the land is west of such line drawn through the said spring; that there is a road leading from the town of San Francisco nearly south, which at a point about one league below said town turns to the west, and goes thence nearly west to the Palo Amarillo, or yellow timber; that this road existed there at the time of the original grant, and that it is the one described in the grant boundary; and that at the point where said road turns to the west a line should be drawn east and west for the north boundary of the Ramirez grant. It is contended by complainant that these points are easily found; that both the Tuerto mountain and mine lie west of the spring; that, by making the lines named boundaries, the whole of the land described in the grant will lie west of the spring, and its northern line be at least a league south of the town, and exclude, as outside of its boundaries, both the town and the league for commons. It is averred that such is the true and honest location of the land, and the one which should have been made in the survey complained of. It is further averred that instead of the line for the north boundary being so located, there is no north boundary as surveyed, but the lines extend a league north of the true point, and so take in and include a large part of the town of Real de San Francisco, with its public chapel; that instead of making the spring the eastern boundary and throwing all the land west of it, the survey disregards the true and honest boundary, and extends a long distance to the east of the spring, so as to take in and include the Jacquez mine, and a large and very valuable mineral region, rich in the precious metals, east and north-east of the spring, which it is averred does not properly belong to the grant as confirmed, but which it is alleged does belong to the United States. It is thus contended by complainant that by the extension of the line east of the spring, and north of the place where the Palo Amarillo road makes a turn to the west, a great wrong is done to a large number of individuals inhabiting the town of San Francisco, whose rights the government is bound to respect, under the treaty, and to others who, within the limits of the alleged wrongful extension, have opened and worked mines; and also that a great wrong has been done to the United States by appropriating, under color of the alleged wrongful survey and patent, a large region of the public domain to which neither Ramirez, nor any one claiming through him, was entitled, and which is alleged to be valuable, not only for pasturage and timber, but also by reason of the abundance and richness of its minerals. The bill asks to set aside this survey, and to set aside and vacate the patent made under it, so far as it affects the lands embraced therein lying east of the spring, and north of said point where the road turns west.

The complainant predicates the right to such relief on the allegations of fraud and mistake in the bill. These allegations are full and specific, and may be abbreviated and stated as to the following effect: That John A. Clark, then surveyor general of New Mexico, David J. Miller, his clerk, W. W. Griffin, deputy-surveyor, Serafin Ramirez, the owner of the claim, Carey, Cooley, Kitchen, and Denman, conspired together to defraud the United States out of all the lands lying east of said spring, and north of the said Palo Amarillo road, and to defraud the inhabitants of San Francisco out of their property, and the mine owners and claimants located on such alleged fraudulent extension; and, as a means to that end, they fraudulently agreed among themselves to locate the lines of said grant at a place other than that called for in the grant description, to-wit, north the said Palo Amarillo road where it turns

west, and east of the said spring, to thereby acquire said property, and get a patent therefor, and, under its color, to eject the true owners; that, as a part of such fraudulent conspiracy, they falsely pretended, knowing the truth to be otherwise, that there was no mountain, and especially none known as "El Tuerto," west of the spring, and no mine there which would answer the call of the grant, but that such mountain and such mine were far to the east of said spring, and were only named in the grant papers as being west by mistake, when they were intended to be named as lying east of the said spring; that they agreed to and did procure false and fraudulent affidavits to give color to such pretense, and that, well knowing the truth to be otherwise, they pretended and represented to the commissioner of the general land office that there was such a mistake in description, and, by means of such false representations and fraudulent affidavits, induced him to believe the El Tuerto was east, and not west, of the said spring, and that under a misapprehension and mistake as to the true boundaries, induced in that way, that he approved a survey, and ordered a patent to Ramirez, which afterwards issued, containing such incorrect and fraudulent survey and extension. Substantially the same averments are contained as to the northern extension. It is further alleged that the defendant bought with notice of the alleged fraud, and also under such circumstances and with such knowledge as to put it on inquiry, and that inquiry would have shown the facts alleged; and so it is claimed the defendant should be bound to the same extent as Ramirez would be if he held title in his own name. There is no pretense, either in allegation or proof, that the commissioner of the land-office was a party to the alleged fraud, but that he was imposed upon, and induced by it to issue the patent complained of, or to cause it to be done. The fraud charged is set out at length, and with particularity; but enough only has been stated to show the question at issue, and how it arises. The defendant denies all these averments, and also pleads that it is an innocent purchaser for value, without notice; and thus an issue is made which was presented to the lower court for determination.

Another contention was also raised by the complainant upon the averments of the supplemental matter in the bill of complaint, by leave of court, without objection, and to which his original bill was attached, and which was answered, partly by denial, and as to some matters by admission. It was averred that defendant, claiming the right so to do under the patent, was mining large quantities of ore from the body of the land, and, denying its right to do so, asked against the defendant a perpetual injunction prohibiting forever such acts. The defendant admitted the mining in what is called the "Big Copper Mine," and claimed the right to do so. In the lower court all questions at issue were decided in favor of the defendant, and from that action and judgment the case comes to this court on appeal, and the questions hereafter discussed were properly saved, and come properly before us in this court.

The record presents to us for determination, necessarily, the following questions: "Was the complainant in the court below, upon the issues and evidence, entitled to the relief prayed, or to any substantial part thereof? Incident to this, and involved in it, are three others, to-wit: *First.* Did the commissioner of the land-office commit the mistake charged in the bill? *Second.* Was he induced and caused to do so by the fraudulent collusion, conspiracy, artifices, and acts charged in the bill? *Third.* Is the defendant an innocent purchaser for value, without notice, so that even if the first two questions are held in the affirmative, no relief can be decreed? Aside from these is an additional question, presented on the supplemental averments, and answer thereto: Suppose it be held that the fraud alleged is not proven, or that the mistake did not occur, or that defendant is protected as an innocent purchaser for value, without notice, what disposition is then to be made of the application for a permanent injunction? If all the questions are decided in favor of the defendant, and the decree dismissing the bill is sustained, what effect

would such a decree have upon the matter alleged in the supplemental bill? It would seem that if the United States, denying that the legal effect of the patent is to give the defendant all the ore within the boundaries of the grant, even if it is valid and binding on the government as to all other things, should bring a bill to enjoin the defendant from its use, that it would be a complete answer to plead the supplemental bill in this case, and the issue thereon, and a decree dismissing the same for want of equity. That question would, under such a decree, be *res adjudicata.* The questions in the record will be disposed of in the order stated, and as they naturally arise.

First, then, as to the fraud alleged. An analysis and consideration of the evidence is necessary to determine that point. In the beginning, it is well to remember that this grant was made to Ramirez in 1844; that he was placed in actual possession of it at once; that in 1860 he filed his application with the surveyor general for confirmation. An examination of the acts, knowledge, and motives of Ramirez for over 20 years with respect to the lines of the grant, before his acquaintance with the alleged co-conspirators, will throw much light upon the contention for determination.

Serafin Ramirez was an officer high in authority. He was presumably an intelligent man. The mine to which he referred must have been a property well known to him. Ramirez went to the place in person; and when he stood upon the mine, and walked over the ground to take juridical possession, he must have given attention to natural physical objects, and have well known whether the mine was east or west of the Canon del Agua spring, and whether the spring constituted the boundary for his east line, as stated in the description. The decree of the departmental assembly giving him this property was an important title paper. It was his right from the crown. With it he was secure in his property within its boundaries, and without it he had nothing. It was a valuable possession, and it is reasonable to believe he gave attention to the lines named as boundaries. If he saw that the land was really east of the spring, while described as west thereof, is it to be presumed he would remain silent? Can it be believed that he never read so important a title paper? If he did read it, familiar as he was with the location, it is most strange so important a mistake as a change in the boundary lines, completely reversing them, would not impress him; and it would be remarkable if he did not read so important a document. Certainly, after the annexation, and when he began to make preparations to perfect the title to his property, the question of boundaries would impress itself upon him as of first importance. In a country like New Mexico, location is of the utmost concern. Water-rights and mineral deposits are valuable, and changes in lines affect them. No two points would have come to the mind of Serafin Ramirez with more force than the location of the Canon del Agua spring, and the mineral deposits in that region, in their relation to his grant. The spring especially, as a landmark visible and well known as a boundary line, would have been a prominent object. Imagine this high officer, an intelligent man, at the Canon del Agua spring, in the act of taking juridical possession by physical acts, pulling grass and throwing stones. Is it reasonable to believe that he was inattentive to location when it was everything to him, or that he did not know whether this landmark (the spring) was the east or west line? Again, consider, with respect to his act of possession, the northern boundary. The deed of juridical possession says: "On the north, the road of the Palo Amarillo." That act was many years ago; by date February 15, A. D. 1844. Many changes in the traveled ways have probably occurred since then. In this country, where but few roads are laid out by public authority, and where they are generally used for the public convenience by common custom and consent, the lines of travel must constantly change and vary, as particular localities become more or less prominent as agricultural, commercial, or mineral centers. But can there be any reasonable doubt that at the time of the actual delivery of pos-

session, when Ramirez was in person on the ground for the very purpose of confirming his title by the act of possession, there was just such a landmark as his deed of possession describes as the northern boundary, to-wit, "on the north, the road of the Palo Amarillo?" Can there be any doubt but Ramirez knew this road well, and knew, as his deed of possession said, that it marked the northern boundary of his tract of land? The deed from the Mexican authority is a formal document. If Ramirez ever was attentive to description, he would have been so when this document was placed in his hand as his evidence of title. That instrument recites the northern boundary of the tract in dispute in this proceeding as being "on the north, the road of the Palo Amarillo; on the west, the highest summit of the little mountain of El Tuerto." When Ramirez read over this instrument, was he in ignorance respecting this road? It was not in that solemn instrument named as the northwest boundary, but as the northern boundary, while the highest summit of the little mountain of El Tuerto was named as the western boundary. How could it be that Santiago Florez and Don Serafin could look to the north as a monument for a line to run east and west as a boundary, and intend to make that road a north-western boundary, and not a northern one, without so stating in the written description? To hold this description in the deed of May, 1866, to Cooley, Kitchen, *et al.*, to be correct, and the survey right, and the description in the deed of possession from the Mexican government, by "Santiago Flores, first justice of the illustrious corporation of Santa Fe, and judge of original jurisdiction of the ———— department of New Mexico," of February, 1844, to be wrong, is to presume, not only that the illustrious officer who signed that instrument was ignorant or inattentive, but also to presume that the man of all others interested, himself an important public officer, was also ignorant or neglectful. Ramirez, if the deed of 1844 is wrong in description, would certainly have observed it. When he read therein that the road was the northern boundary, he would have said: "No; here is a mistake. The road is not the northern, but the north-western, boundary;" and when he read, "the highest summit of the little mountain of El Tuerto" as the western boundary, he would have said: "There again is an error. This mountain is not the western, but the eastern, boundary." Ramirez must have known the points of the compass, with respect to the land, as well in 1844 as in 1866, as he is proven to have been on the land, and familiar with its topography. It is not to be presumed he was asking for land as to the qualities of which he was in ignorance, and about the boundaries of which he was uninformed. It must be remembered that Jose Serafin Ramirez was not an illiterate man at the time he received this land, and in the humble walks of life; but he was an officer of rank, an auditor of accounts, and therefore necessarily accustomed to details, and to a scrutiny of statements, and would be impressed with the importance of correct descriptions. In his petition asking for the land in controversy, he describes himself as follows: "Jose Serafin Ramirez y Cusa Noba, first auditing officer of the departmental treasury of New Mexico, and lieutenant of auxiliary cavalry, a citizen and employe of the nation in actual service for some years, and a creditor to the government to a large amount." In determining the probability of mistake, the characteristics of all persons who are parties to the transactions are proper matters for consideration. This man Ramirez was doubtless a competent man. He held a position which, in the experience of mankind, always calls for careful attention to phraseology and description. He was the first auditing officer of the treasury. The Mexican government was his debtor. While such a person might be inattentive or mistaken, it is not probable he would be in so important a transaction, and in so gross a manner as to entirely change the location of his lands. Neither is it reasonable to suppose that such a mistake would have remained for so many years without discovery.

Let us consider, for a moment, the opportunities presented for a discovery

of mistake between 1844, the date of the conveyance by the Mexican government to Ramirez, and 1866, the date of his deed to Cooley, Kitchen, *et al.*,—a period of 22 years. At the close of the war with Mexico, and the conclusion of the treaty of Guadalupe Hidalgo, in 1848, he would, as a prudent man, consider his titles, with a view to confirmation by the government of the United States; as his title papers would necessarily undergo inspection, and the lines of his lands be fixed and established by the action of this government. On the thirtieth day of December, A. D. 1859, Serafin Ramirez filed with William Pelham, then surveyor general of the territory of New Mexico, his claim to the land now in controversy, and based his claim on the grant from Mexico. This was filed as a notice to the world of his right, and of the character, limits, and lines of his claim. It was an important proceeding on his part; not less so than his original grant from Mexico. It was an act to obtain from the government of the United States official recognition of the boundaries of the land. From 1844 to the date of this application, 15 years had intervened, with Ramirez a resident of New Mexico, and in actual, physical possession of this land, and with knowledge of its location. His title papers were carefully preserved, and referred to in terms and by date in this notice and application, which is in these words:

"EXHIBIT E.

"THE CANON DEL AGUA GRANT.     CLAIM OF JOSE SERAFIN RAMIREZ.

"*United States of America.     Territory of New Mexico.*

"Notice.

"The surveyor general of New Mexico is hereby notified that the undersigned, Jose Serafin Ramirez, a resident of the county of Bernalillo, territory of New Mexico, and a citizen of the United States of America under the treaty of 1848 between the United States of America and the republic of Mexico, claims originally a tract of land that was donated by the authorities legitimately constituted, and authorized to make such donations, by the laws and government of Mexico, on the twelfth day of February, 1844, by virtue of the authority vested in the governor and departmental assembly. Said claim, as will be seen by reference to the documents, is complete. Said grant of land was made and confirmed by General Mariano Martinez, governor and commander in chief, under the authority of that government, on the thirteenth day of February, 1844, and juridical possession given on the fifteenth day of the same month. Said granting officers granted the same under the authority of the colonization laws of Mexico and the laws of Spain in force at the time the land was granted. The quantity of land claimed is five thousand varas square, making one Castilian league, and bounded on the north by the Placer road that goes down to the yellow timber; on the south, the northern boundary of the San Pedro grant; on the east, the spring of the Canon del Agua; on the west, the summit of the mountain of the mine known as the property of your petitioner,—as appears by the original title deeds accompanying this notice, numbered 1, 2, 3, 4, 5. The land claimed does not conflict with any other lands granted by the said government of Spain and Mexico; to prove which he offers the evidence necessary to prove his claim, the claimant to which is the original grantee.

"Very respectfully,     JOSE SERAFIN RAMIREZ."

Notwithstanding his familiarity with the topography of the country, his personal knowledge of the objects named as calls, his knowledge of the direction of the El Tuerto from the spring, not a hint is given of any mistake in description in his grant papers. Mark the words of the description: "Bounded on the north by the Placer road that goes down to the yellow timber; on the east, by the spring of the Canon del Agua; on the west, by the summit of the mountain of the mine known as the property of your petitioner." Ramirez does not here follow the description in terms of his grant, but uses as to the northern boundary different phraseology, show-

ing he was attentive to description. During these 15 years Ramirez reposed
in the belief that there was a road which constituted the northern, and not
the north-western, boundary. He was satisfied that his land was west of the
Canon del Agua spring. The spring and land are not far distant from Santa
Fe, being only a day's ride therefrom. During that 15 years considerable
mining was done in its neighborhood, and business transacted at the Plaza
San Francisco, in its immediate vicinity. That town then contained 2,000 to
4,000 people. Hon. Trinidad Romero—a man of much prominence, a former
delegate to congress from New Mexico, one in whose honor general confidence
is reposed, and whose statements can be taken as certainly credible—was ex-
amined as a witness in this case. · He testifies in substance as follows: "I am
well acquainted with a place by name of Real de San Francisco. I lived there
in my early days for about six or seven years. About 4,000 people were there
at that time. I went there to reside with my father in 1844. My father was
Miguel Romero. He removed from the Cerillos to the Placers. I can't tell
exactly how long I remained there—but from six to seven years,—from about
1844 to 1851. I remember the time we removed from there to Las Vegas.
My father had a little grocery store there, and hauled water for the miners.
I was at San Francisco the last time three years ago in August, and am fa-
miliar with the different localities in that vicinity. I am acquainted with the
locality called the 'Palo Amarillo.' It is about south of the Real de San Fran-
cisco. My father owned a little farm there, and planted corn and beans.
There were several old mines in the vicinity of Palo Amarillo; several shafts
in a little mountain. My father used to tell me they belonged to Serafin
Ramirez. They were there, working both mines. I know the Canon del
Agua spring. It is about three or four miles south-east from San Francisco
town." Melquiades Ramirez, a brother of Serafin Ramirez, testifies that the
latter came to Santa Fe in 1839; that he resided there until 1846, and then
moved to Real de San Francisco, in Santa Fe county; resided there about a
year more or less, and went to live at San Pedro, about nine miles distant
from San Francisco, and continued to reside there until 1865 or 1866. This
witness, on the point of the familiarity of Ramirez with the localities, is con-
clusively corroborated by others. The evidence establishes that Ramirez was
engaged in that region of country for a long time; so that, during the 15 years
between his deed of possession and the filing of his notice and claim with the
surveyor general, he became thoroughly acquainted with the country, and the
location of the road and the Canon del Agua spring. This being true, when
he came to look up his old title papers in 1859 to make out his claim for filing
before the surveyor general, and to validate his title, is it reasonable to believe
that he had not then ascertained whether his land was east or west of the
Canon del Agua spring, or that so important a fact would be overlooked?
Consider this act in the light of facts. He had lived at San Francisco, at San
Pedro; had mined and done business for 15 years in the immediate neighbor-
hood of the Canon del Agua spring; necessarily had traveled the roads, and
inspected the country, and was a man of standing and large intelligence. His
claim before the surveyor general is not signed by attorney, but by himself,
so he presumably read it over. He must by actual observation and travel
over the tract in these 15 years have been very familar with its lines and
points. If his land did in fact lie east of the spring, so that it constituted the
western, instead of the eastern, boundary line, how utterly amazed he would
have been to read in the claim he was about to sign as his boundary line:
"Bounded on the east by the spring of the Canon del Agua." Knowing the
land as the evidence proves he did, with his intelligence, it is unreasonable
in the extreme to believe such a mistake in description as to completely re-
verse the location of his land would not have attracted his notice at such a
time. It is equally unreasonable to suppose that he then knew there was a mis-
take, and omitted to state it. The petition, if he believed the description in-

correct, would have set up the mistake, and asked confirmation by correct boundaries. After so filing the notice and claim before Surveyor General Pelham, Ramirez proceeded to prosecute the same. The records in evidence from the surveyor general's office show the following:

*"Serafin Ramirez* vs. *United States.*

"This case was set for trial on the tenth day of January, A. D. 1860, and the witnesses, being present, were duly sworn; their evidence was recorded. The surveyor general makes his finding on the case so far as it relates to the land. The grant to the land situate at the Canon del Agua * * * has been proven to have been in the quiet and undisturbed possession of the applicant from the thirteenth of February, 1844, up to the present time."

This action of the surveyor general was taken January 10, 1860. It thus appears as undisputed that Ramirez made his application to the Mexican government, had granted and was placed in the actual possession of a tract of land of which the Canon del Agua spring was prominently named as the eastern boundary; that for over 15 years he had lived on and about the land, knowing the same well; that he instituted proceedings before the surveyor general by the same description, after his full personal knowledge, to have confirmed to him a tract of land lying west of the spring, and carried these proceedings to a successful termination. In all these 15 years the evidence does not disclose that even a whisper was heard that the lands were east of the spring, instead of west. Upon the proofs brought by Ramirez before Surveyor General Pelham in 1860, on the application for confirmation, that officer finds actual, continuous, physical possession in the terms before stated.

Thus it appears the grantee, in 1860, was himself engaged in placing before the surveyor general evidence to identify his possession of the grant, with its boundaries as then described. The record in this case does not contain the evidence on the point thus introduced before the surveyor general. The nature of the inquiry, however, furnishes satisfactory information as to the character of that evidence. To constitute proof of "quiet and undisturbed possession," it was necessary that the evidence establish occupancy; not of some tract—some place—in New Mexico, nor yet of a tract with different boundaries from those in the petition, nor of a tract lying east of the spring, when the claim was for land lying west of that point, but of the identical tract asked for, lying west of the spring. Proof of possession must identify the tract possessed. It is therefore fair to assume the evidence placed before Surveyor General Pelham in 1860 by the grantee was to the effect that he occupied the land described in his application, to-wit, a tract lying west of the spring. Would witnesses be found on such a hearing to swear that Ramirez exercised dominion west of the spring, if the fact was he did not so occupy; or that his dominion was west of the spring, if in fact it was east of that place? It would be a strange proceeding, in such an application, to name the spring as the eastern boundary, and then extending for a long distance west, and, to support the averment of continuous possession of such a tract, to introduce witnesses to swear to the occupancy of a tract of land to the east of such a monument. Such a line of proof would be absurd. The surveyor general finds the grantee, from the date of the grant, had been in actual occupancy of the identical tract described in his application and notice, lying west of the spring, and he finds this "*was proven.*" Did Ramirez, while he was engaged in proving to Surveyor General Pelham that his land lay west of the spring, suspect that it was east of that point? While looking up witnesses to prove 15 years' continuous possession from the spring west, did it occur to him that his land was not west of that point, but east of it? This very proceeding of Serafin Ramirez in finding witnesses, taking them to Santa Fe to prove actual and continuous possession by himself west of the Canon del Agua, not for a short time, but for 15 years, is wholly inconsistent with the theory that this grant was to the east, and not to the west. It cannot be this proof was taken

in such a loose and unreliable manner before Surveyor General Pelham as that he would find it proven by the evidence that Ramirez had been in continuous possession of a tract of land to the west of the spring, when in point of fact he had not occupied or claimed a foot of such a tract, but only another and entirely different one.   Occupancy is a physical fact, open to observation and proof, and manifested within defined lines or points.   It is established that the petition of Ramirez for the grant, the decree for juridical possession by the judge, Santiago Flores, were for land west of the spring; that the petition to Pelham, as surveyor general, was for a tract lying west of the spring; that witnesses appeared before such surveyor general and proved 15 years' possession of land lying there; and that Surveyor General Pelham recommended for confirmation a grant located there.   The description was written and considered so often by parties with knowledge of the locality, was proven before Pelham as actually occupied, that the inference therefrom is very strong that such is the correct location for the land actually conveyed in the grant.   Thus the matter rested at the time of the recommendation for confirmation in 1860; and until new developments were made, and the hand of new manipulators came to the surface, without a suggestion from any source —notwithstanding the grantee had, without doubt, often traveled over every acre of the land—of mistake in description.

In considering where the tract granted actually did lie, whether east or west of the spring, the report of Surveyor General Pelham should have great weight. His recommendation to congress is for the confirmation of a tract lying west of the spring.   There is not a line of proof that evidence on which he found possession in fact of that tract was either corrupt or mistaken.   So far as the evidence discloses, Ramirez remained content with his description up to about the time, in 1866, when he was visited by Miller, Cooley, Carey, and others on the expedition ordered by Clark.   Before this, Cooley and the parties who set that expedition on foot had prospected the country there.   They had organized a mining company, and elevated Ramirez to its presidency.   They doubtless ascertained the value of the Big copper mine and the minerals near it, and coveted such a prize.   They clearly comprehended the difference in value between a tract of land lying west of a line drawn north and south through Canon del Agua spring, and one lying to the east of such a line, and including the Big copper mine.

For a period of over 18 years, up to the time when the hand of these men first began to appear, there had been no thought, so far as appears, of a mistaken description, or of any uncertainty in location.   During that period the locality in controversy was not an unknown or obscure place.   The evidence is clearly to the contrary; that it was a place, during much of that time, of large importance, and well known.   The town of San Francisco contained a varying population, with from two to four thousand people; stores, and commercial transactions of considerable extent; planting grounds near; an organized church and chapel, where people congregated to worship; and with Ramirez one of the active leading spirits.   During all that time he made no claim to the town which this survey gives him, but, to the contrary, recognized the title of others to property there in various ways.   At this place it is well to observe, the survey complained of now is made to include a part of the town of San Francisco.   Not only does the survey extend north of a road described in the petition for the grant, and in the grant, as the northern boundary, but it includes a substantial part of the town of San Francisco. Ramirez did not ask to run his line even to the town, but asked "for a tract of *vacant land,* known as the ' Canon del Agua,' *near the placer* (or town) of San Francisco,   *   *   *   and *distant from that town* about one league, more or less.   The land I solicit is vacant and without owner."   This petition of Ramirez bears date February 12, 1844.   Nazario Gonzales went to the town of San Francisco when a young man about 23 years old.   He is a witness in

this case, and testifies: "When I went there [to San Francisco] in 1842, there was about one hundred families living there. I know how the right to locate lots for building purposes was then acquired. They applied to a justice of the peace for a lot on which they wished to build, and he would give a certificate which entitled them to a piece of ground." Was it this land on which the town was being built which Ramirez sought to acquire? He says not, in his petition. He says it was vacant land he asked for; not a tract to include in its lines a town with over a hundred families. Did it include the town? The petition he filed says "no," but that "it is distant from the town about one league;" while the survey sought to be upheld in this case says "yes; it does include a part of the town." If the land he wanted came up to the town, why did he not petition for land adjoining the said town of San Francisco? If he intended to embrace over a hundred residences in the grant he asked for, why did his petition not say, "Including the town of Real de San Francisco, with the houses and lands therein occupied by others?" The land he asked for, in the terms above, as vacant, for cultivation and pasturage, a league from the town, and south of the road, is, by the survey complained of, extended north of the road to and including the town, and actually including the chapel erected and used as a place of public worship. We are not only asked to hold that land, described as west of a given point, all lies east of it, but that the same tract, described as having the road for its northern boundary, extends far north of the road; also, that the same tract, described as being vacant, really included a town and its place of worship, and that while, by the description in the grant, it is located a league away from the town,—three miles distant therefrom,—that in fact, notwithstanding the declaration in the grant and petition that the land desired was vacant, outside of, and below the town, yet that it ran up to and included a large part of the town. If the position of the appellee be true, Ramirez for 15 years lived upon, used, and occupied a tract of land, a part of which was in the town, when he believed it was distant a league therefrom, that included houses he was asking the permission of others to occupy, the western boundary of which was located where the eastern boundary was described to be. If the survey be correct, then there was a mistake in the description in the grant as to the northern, eastern, and western boundaries; not one mistake in description, but at least three. The presentation of such a claim carries on its face the most serious suspicion. The facts apparent in the evidence respecting the location of the northern boundary are quite as interesting and important as those relating to the eastern boundary. Even if the eastern boundary is correctly located, and the northern is not, it should prove fatal to the survey. On page 654, Record, Mr. Griffin, who made the survey, said, respecting the northern boundary, in answer to a question: "You will find there is nowhere in the testimony, I don't think, or in the survey, anything called the northern boundary except the points. It is south-east and north-west boundary."

The petition of Ramirez to the Mexican government, and the deed of possession, both do fix, not a north-western, but a northern, boundary; and it is at this point the complainant in this case has reason to make serious objection. It is because there is nowhere in the survey a northern boundary fixed, when there is such a boundary named in the grant, and which the survey defines, that substantial reason is bound to question the correctness and validity of the survey. The principal part of the evidence upon which these points and lines were fixed was taken in May, 1866. On page 649, Record, Mr. Griffin says he was not then a deputy United States surveyor. He was in no sense a sworn officer. He was not at that time intrusted by the government with any duties, and his act could no more bind or preclude the government than that of any other private person. On page 643 he says: "I was out there in May, 1866, at the Cañon del Agua grant, as a *notary public*, in connection with Mr. Miller, as chief clerk of the surveyor general's office. I

was along as *notary public* simply." Page 649: "I received compensation for my services from the *owners of the grant,*—the parties who purchased from Ramirez." He was the agent of those only through whom the defendants in this case claim. The evidence in the record proves that the then claimants, after the recommendation in 1860 by Pelham, and before this evidence was taken, in 1866, visited the locality, organized companies, operated mines, became familiar with the topography and mineral deposits and resources of the locality, and that they contracted with Ramirez for the purchase of the property.

If the boundary described in the grant as the eastern boundary could be changed, and the land inverted so as to include the Big copper mine and its adjacent mineral, it would increase the value of the purchase by hundreds of thousands. The manner in which this business was clearly transacted is not creditable to any of the parties engaged in it. The period was favorable for fraud and wrong. The country was just recovering from the civil war,—a period of great agitation,—and the best thought was turned to the questions then engrossing the public attention. New Mexico was far distant from business or populous centers, away from all railroad and telegraph lines, and the scrutiny usually applied to populous centers. Under such circumstances, the then surveyor general, John A. Clark, visited Washington, the residence of some of the leading spirits in the enterprise. From there he directed a letter to one designated as "Chief Clerk and Translator." In response to that letter, a part of the evidence was taken which fixed the boundaries named in the survey complained of, and now sought to be maintained. For some reason not explained, that letter failed to find its way to the files, and is not to be found. Miller calls it a "private letter,"—possibly too private for preservation. It is at least suspicious that what was done in obedience to the instructions should be preserved, and the instruction lost or destroyed. What business has a public officer giving private instructions as to the basis of a public survey,—so private that the party to whom addressed regards them as too private to go on the public records? The evidence proves that Cooley, Carey, and others of the purchasers from Ramirez had been on the ground, and became personally acquainted, not only with Ramirez, but also with the country about his grant. It will be seen by referring to Exhibit L 3, p. 371, that a mining company had been organized to operate mines; that Jose Serafin Ramirez was the president of such company. It was called "The Mining Company of the Placer de San Francisco." A contract was entered into by Serafin Ramirez on one part, and as president of the company, and John C. McFaren, of U. S. A., of Washington, D. C., Asa B. Carey, also of the army, at Santa Fe, Charles W. Kitchen, Denmore, Hinkley, and Cooley, of the other part, bearing date October 20, 1865, whereby the grant, with some other property, was sold by Ramirez for $40,000. A prior contract had been made at a consideration of $32,000, and an increase of $8,000 on the price occurred. The parties were to pay to Ramirez the $40,000 on the first day of May, A. D. 1866. On the seventh day of March, A. D. 1866, Ramirez and his wife (see page 372, Record) extended the time for making this payment "from the first day of May, 1866, to June 1, 1866,"—just one month. Observing these dates, which are important, it is worth while to inquire, where was Clark, the surveyor general, while these important negotiations were proceeding? On page 45 it will be seen that the surveyor general, from Washington, only eight days after this extension of time, directed Miller, his chief clerk and translator, to go out on the ground, and to make an inspection thereof. It is not to be forgotten that Miller swears this letter, though from a superior officer to an inferior one, respecting an act now claimed to be public and official, was private, kept from the files, and cannot now be produced or found by its custodian. In his letter dated May 10th, reporting to Clark, surveyor general, how he obeyed the instructions, their

purport is clearly seen. The transaction is odorous with suspicious circumstances. May 1, 1866, there was due from the purchasers to Ramirez for the grant $40,000. March 7, 1866,—about 90 days before this sum became due,—Ramirez was induced to extend the time of payment to June 1, 1866. March 15th,—only eight days after this extension was procured,—Clark, the surveyor general, from Washington, directed his clerk, Miller, not to make a survey, nor to locate points, lines, or boundaries in aid of the government, but to go out on the land, and take evidence of witnesses respecting landmarks. There can be no reasonable doubt, after the careful reading of the evidence pertaining to the transaction, that the purpose of the purchasers in procuring the extension was to enable them to ascertain whether, in the meantime, these boundaries could be reversed and the location inverted, and that the direction to Miller was in aid of that enterprise. The real inducement,—the true inwardness,—to this remarkable direction by Surveyor General Clark to his clerk, Miller, and the more remarkable manner in which the thing was done, is established by the last paragraph of Miller's report of how he carried out the instructions. In that report (page 46) he says:

"As there is no fund out of which to defray my expenses in making the examination, and collecting the evidence here reported, and as, in view of a probable early survey of the land in question, it was important to *the parties interested* that the boundaries should be clearly identified, so as to enable the surveyor general to act understandingly in giving instructions to his deputy for the survey, *they furnished Mr. Griffin and myself transportation both ways, bore our necessary expenses while on the trip, and paid the witnesses* for their attendance.

"Respectfully,     DAVID J. MILLER, Clerk and Translator."

Two things are established by this quotation: *First.* A survey of this tract had not then been ordered by any official authority, and so the direction of Surveyor General Clark was extraofficial and premature, and made for some purpose outside of the line of his official duty. It is important to inquire what induced Surveyor General Clark to give such direction to Miller. There is no evidence that he was moved to do so by orders from his superiors in office; besides, up to the time when he gave Miller his instructions, nothing had occurred indicating any incompatibility between the calls and natural objects. There had not been, at the time, in the field, any surveyor to ascertain any reason why the survey could not be made by following the calls of the grant. It is an unaccountable coincidence that the contract for the extension of payment should be concluded on the seventh day of March, and on his own motion that Clark should order Miller to locate landmarks not then disputed or in controversy. *Second.* Not only was the work directed extraofficial, but it was undertaken without any public funds to meet the expense, and dependent on the private generosity of interested parties to pay the bills. It was not the government or its department which in fact instituted the taking of evidence at that time, but it was those parties who had contracted for the grant, and who had procured the extension of time for payment, that this very proceeding might be taken before they were called upon to pay. Clark and Miller had placed themselves in the hands of the men who were inspiring the transaction. It is a suspicious coincidence that March 7th the extension should occur; that March 15th the private instructions should go to Miller; that on May 10th he should go with the purchasers to the ground; May 19th, a deed should be made by Ramirez to Cooley & Co., and identical with the survey later made; and June 12, 1866, the grant confirmed by congress. There was no order for a survey; none was then, in fact, made. There was no money with which to pay expenses. What was the motive which induced Clark and Miller, forgetting their duty, to throw themselves on the charity of Cooley & Co.? Surveyor General Pelham had heard evidence, and recommended for confirmation under the description.

Ramirez for nearly a quarter of a century had occupied and roamed over the tract, without a whisper of mistake in his description. What new light flashed across the mind of Clark during this 30 days of extension to the purchasers of the claim? This was all answered by the following quotation from the report of Miller: "It was important to the parties interested that the boundaries should be clearly identified to enable the surveyor general to act understandingly in giving instructions to his deputy for the survey." There is the key to the whole transaction. It was not for the reason that it was of consequence to the government; but because it was important to the parties interested,—the claim-holders,—that this inquiry was commenced. Time, too, was the essence of the transaction. It must be done before the extension expired. It might have been the voice of Clark which directed the proceeding, but it was the mind of Cooley, Kitchen & Co. that conceived it, and their hand which manipulated and controlled it. Clerk Miller, continuing, says, (speaking of this transaction, and of Cooley, Kitchen & Co.:) "They furnished Mr. Griffin and myself transportation both ways, bore our necessary expenses while on the trip, and *paid the witnesses for their attendance.*" "Our party consisted of Colonel Carey, Senor Ramirez, Messrs. Cooley, Kitchen, Hoffman, and Mr. Griffin. Magnanimous grant claimants! Was transportation necessary, they were ready to furnish it to the government without cost or price. Was money to pay the bills needed, it was at once advanced. Did witnesses ask for pay, a generous purse was at hand at their service. What a mockery of justice! What a tribunal to protect the interest of the government, and make a fair and honest inquiry as to a disputed landmark! The men who inspired the expedition, who hired the teams, who paid the bills, who procured the order for the proceeding, had only 30 days' extension for payment, and an interest of many thousand dollars to invert the grant, and place east instead of west of the spring, and thereby make it cover a mineral tract of almost fabulous wealth. Not a man in the lot, unless, possibly, the weak clerk, Miller, was there to protect the government. Griffin, even, was hired and paid by the company as a mere "notary" to administer the oath to witnesses. No wonder an expedition so induced and inspired had its mind on a single point,—to make west east. It is not strange that the northern boundary was to it a matter of light moment, when the immense wealth was in the eastern extension. Who was there to examine or cross-examine, on behalf of the government, the witnesses produced, or to say a word in its behalf? The situation of Miller was not such as to enable him to act independently and fearlessly. On page 619 of the record the evidence of David J. Miller, taken in this cause, is set out, and it fully discloses the character of his mission. He says: "Surveyor General Clark was then on leave of absence." It is well to note this coincidence. March 7th, Cooley, Carey & Co. had procured the extension for payment. Between that date and the 15th, Clark, from Santa Fe, would have just time enough to procure from Washington his leave of absence, and reach that place. He would have eight days in which to accomplish that object. On the 15th he did write from Washington, giving Miller his secret instructions. Did Cooley also procure the extension, and report it to Clark? Did he (Clark) then write for and obtain a leave of absence, and, when it was received, hasten to Washington, have a conference with the parties in interest at that end of the line, and on the 15th write to Miller the secret instruction which took him with the grant purchasers, then in New Mexico, to the land, to pave the way for an inversion of the grant by a change in its lines? The circumstances point with great certainty in that direction. Continuing, Miller says, (page 619;) "I received a letter from the surveyor general—then on leave of absence—from Washington directing me to go upon the ground of the Canon del Agua grant. * * * I find no record of this letter. *I looked for it among the official records.* This letter, I cannot say whether it was official or not. My recollection is, I had letters from the surveyor general, and *they were usu-*

*ally private,*"—more than one it seems. "I am inclined to think this was also. I have looked in the files and records to see if it was recorded, supposing it might have been deemed official, and made a record of, but I do not find it."

Within 90 days these developments occurred: Time for payment extended, and, it is fair to presume, though the proof on that point is not direct, leave of absence procured, and a trip by Clark to Washington. Also in proof, the letter of instruction to Miller; his trip to the grounds; his reports; the deed from Ramirez to Cooley, Kitchen & Co.; and the grant confirmation. It is fair to assume that these private letters of Clark to Miller relating to the grant contained matter which it was not for the public to know, or they would have been placed on the files of the office. Miller in his evidence continues: "When the parties claiming were ready to go upon the ground, I accompanied them." It was under these circumstances that Miller went to the grant,—not favorably surrounded for independent action. He was out in obedience to private instructions. His mission was in no legal sense official. He was the guest of men whose interests were in an extension of the eastern line beyond the Canon del Agua spring, so as to include the Big copper mine, and who from actual observation on the ground were familiar with its topography. There were five of them. He stood as one to five. Why did Cooley and his partners go with Miller? Why did they not allow him to select his own notary, and proceed to the land alone, and make his investigation and take his evidence in his own way, on his own responsibility? There is usually motive in all human action. Is it to be presumed by men of experience and observation in life that these grant claimants fitted up that expedition, and went out to the land, as an act of disinterested benevolence towards the government? Not at all. They had large interests at stake. The Big copper mine and its mineral belt were in the balance. That was the stake to be lost or won on the trip. If evidence could be found or fabricated on that expedition which would form an excuse or justification for a direction from the surveyor general to his deputy in the field, a few months later, to disregard directions, and establish the eastern line east of the spring, and include the Big copper mine, the value of the grant would be immensely advanced. To accomplish that end was, as we believe, the reason why the parties in interest would not allow Miller to go alone. They went to be conveniently near him for suggestion, and to present witnesses. The inclusion of the Big copper mine, to gain legal control of it, was the central thought and inspiration of the men who shadowed Miller on that expedition. Instead of going to the town, and making public announcement of the object of the inquiry, so as to elicit information, the evidence in the record proves that they went directly to the Big copper mine, assuming in the beginning that they were at the right point, and then took evidence to support that assumption. Every lawyer and jurist knows the value of cross-examination, and the weakness of *ex parte* affidavits. Witnesses who without cross-examination state evidence with great certainty, often, upon such examination, entirely change their testimony, or break down. Miller went directly to the Big copper mine. He says: "On the following morning, our party, consisting of Col. Carey, Senor Ramirez, Cooley, Kitchen, Hoffman, and Mr. Griffin,—who accompanied with his transit, and as notary public,— most of the witnesses and myself ascended the Tuerto mountain to the spot, *'where the highest summit'* thereof was scientifically ascertained by Mr. Griffin, and thence descended to the old Ramirez mine, where the witnesses were sworn and testified."

The inquiries Miller was out there to make were: Where is the Tuerto mountain? and where is the mine described in the grant? Without swearing a witness, by some intuition, Miller, and the whole party in interest against the government, went right to the mountain which their interest required to be the Little Tuerto, and to the mine they desired to establish as the old Ramirez mine. It was worth to Cooley, Carey & Co. probably a hundred thou-

sand dollars to have that mountain the Little Tuerto, and the mine the one they sought. The inspiration of the expedition was to make that the Ramirez mine, and, without evidence, the party went direct to the spot they sought to find. Who was the pilot that guided to that point? The call they sought to find lay west of the spring. It was a curious infatuation which led them in the first instance to go east to find a call described as being west. Miller must have at least known that Pelham found Ramirez was in possession of the west; and it is strange, therefore, that Miller did not make at least some slight effort to find the landmark where the grant said it was. The evidence does not disclose the slightest search at the place where the grant designated the landmark. It is not difficult to divine the subject of conversation on the road to the mountain. What reasonable person can conclude, all the surroundings considered, that Miller's investigation is entitled to much weight, or that it should have been a controlling point in directing the future survey? On the contrary, the extension, the trip to Washington, the secret instructions from there to Miller, the expedition filled up by the grant-owners, the manner in which it was all begun and ended, furnish the strongest evidence of fraudulent collusion. Upon a careful examination of the record, it is shown that only two witnesses on that trip were examined respecting the location on the surface of the earth of either the mine or the mountain. Miller, in his record, really assumes the point in question. He dates his point "at the old Ramirez mine, in the Tuerto mountain," and then takes as to the mountain the evidence of two witnesses. Jose Serafin Ramirez, the grantee, and so a party in interest, and Juan Jose Anya, are the only witnesses whom Miller examined at that time respecting the mine or mountain. Miller was there to investigate, and a town full of witnesses. Why did he not call them? Contenting himself with the evidence, on this point, of two witnesses, he hastened to Santa Fe, and made his report. A public officer who would recommend a disregard of boundaries named in a solemn instrument on such evidence, so as to invert the grant, and change its value to the extent of hundreds of thousands of dollars, is either incompetent or dishonest; and the latter is the reasonable conclusion. It is most manifest the government was practically without representation, and the whole proceeding a private enterprise, under the color of official sanction, on the part of Cooley, Carey & Co., during the period of their extension, before confirmation of the grant, to take *ex parte* evidence to serve as an excuse for a subsequent claim for an extension to the east of the spring, so as to take in the Big copper mine and other valuable mineral tracts. It was an expedition with millions, almost, at the bottom of it; in which the government had no equal chance,—corrupt in its inception, and on its face; fraudulent in its execution. In conception and execution, we are strongly impressed, the evidence proves it was the work of Cooley, Kitchen & Co. An inquiry full of significance forces itself forward at this point: If Miller and Clark believed there was a mistake in description, at the close of Miller's investigation, why was not that fact communicated to the proper authorities at Washington? The committee of congress before whom this claim must have been pending, or congress, if the claim was there reported, must have reposed in the belief that the land they were about to confirm to Ramirez, but really to Cooley, Carey & Co., was west of the spring, and did not include the Big copper mine. Miller, and Clark, Cooley, Carey, and the rest, knew the value of the Big copper mine. They also knew that confirmation was being pushed, and that an effort would be made to claim that mine under the act of congress. It was either a deliberate attempt on their part to deceive the constituted authorities, or they did not believe the grant included the mine. What would have been the effect of a report to congress, coming from the surveyor general, that the grant about to be confirmed did not lie where it seemed to from the grant description, but it included one of the most valuable mines in New Mexico, and to make the sur-

vey would require a complete inversion of the grant from its location as described before congress? In the survey made a few months later, the northern boundary clearly ascertained by this *ex parte* proceeding was ignored. In the notes of the notary, Mr. Griffin, the following is fixed at a point where the evidence was taken: "At a point, say, two and one-half miles from the Placer del Tuerto, where the road from said place touches the Palo Amarillo Arroya, on the south side, at a bend from which the arroya turns suddenly to the west." At this place a number of witnesses gave their affidavits. Three of these, Jose Martin, Juan Jose Anaya, and Guadalupe Chavez, are appended, as follows:

Jose Martin: "I know the place called 'Palo Amarillo.' I consider that we are now at the *place most properly so called,* and it is so named from the *palo amarillo* that is found here. This tree is found more or less extensively in all the country, but abounds more at this spot than anywhere else in this section. The road which crosses the arroya for the Palo Amarillo planting ground sometimes crosses a few paces above, and sometimes a few paces below, this spot. The main road running from the Placer del Tuerto to the Palo Amarillo, I consider, comes only to this place; and from this place to the Palo Amarillo planting ground there is only a path.

his<br>
"JOSE   X   MARTIN."<br>
mark

Juan Jose Anaya: "The arroya we are now on, and the place we are now at, are called and known the 'Palo Amarillo.' I consider we are at the lower end of the Placer and Palo Amarillo road. There are *palo amarillo* through the country, but they are more plentiful here than elsewhere. To go to the planting ground of the Palo Amarillo, *the main road is left at this spot by crossing the arroya to the west and* descending to the planting ground.

his<br>
"JUAN JOSE   X   ANAYA."<br>
mark

Guadalupe Chavez: "The spot and the arroya we are now at and upon are called the 'Palo Amarillo.' The Placer and Palo Amarillo road, I consider, ceases as such at this spot. Below this place it takes the name of the 'Placer and San Pedro Road.' The trees and bushes called '*palo amarillo*' are found, more or less, over this section of country, but at this place they are more abundant than elsewhere; whence the name of the place.

his<br>
"GUADALUPE   X   CHAVEZ."<br>
mark

At the point thus fixed the road turns to the west. If the north line of the Canon del Agua grant were fixed at that place, it would much more nearly answer to the description in the deed of possession than where it was finally placed by the survey sought to be set aside. At this point the road proper leading down to the Palo Amarillo, in one sense, terminates. It turns to the west, and, if a line were drawn directly east and west through this point, then with propriety might the boundary named in the deed of possession be said to be answered, to-wit: "On the north, the road of the Palo Amarillo." A line drawn east and west to this point would exactly make that call: "On the north, the road of the Palo Amarillo." That road would be on the north of such a boundary. It would fill to a certainty the description—the same in legal effect, but different in phraseology—set out by Ramirez in his petition asking for the grant, as follows: "The boundaries solicited are, on the north, the road leading from the Placer to the *Palo Amarillo.*" This phraseology, conceived by Ramirez himself to fix his boundary, clearly indicates the northern point at which the line should be drawn from east to west for the northern boundary of the grant. It assumes there is a place known as the "Palo Amarillo." It assumes there is a road from the Placer to that point, and

makes the place where the road reaches the Palo Amarillo a boundary point. Fifteen years later, when Ramirez files his petition before Surveyor General Pelham for confirmation, he does not copy this phraseology, but expresses it in different words; showing, additionally, that he was then cautious about the description. In that petition he expresses it: "Bounded on the north by the Placer road that goes down to the yellow timber." Miller in his expedition, by the affidavits he took, definitely proved that there was a point down the Palo Amarillo road where there was a direct turn to the west, and that it constituted the northern line of the grant, which could be definitely fixed by a line drawn through that point. Griffin knew that, but discarded it in the survey, carrying the line further north, to include the town. This point, when the road branches to go west, and from which point the road going down from the Placers lies north, is from one to two miles below the town of San Francisco. Mr. Griffin fixed it at about two and one-half miles. It must be certain that Ramirez and Flores meant to fix some line as a northern boundary. The boundary line would not be a mile in width, so it could not be the whole distance in width from east to west from the Placers to the Palo Amarillo. Ramirez says the land he asks is distant about a league from town, which is a little over two miles. That would correspond to the point fixed by the evidence above set out, and be about the Placer, where the evidence on this point was taken. There could be no mistaking the northern boundary, from the evidence taken by Miller in the presence of Griffin, and no excuse for extending it nearly two miles to the north of where it should be, so as to include a part of the town of San Francisco. To do so would be to include within the line, in that direction, from one to two miles not contemplated in the petition of Ramirez for the grant, or fixed by the deed of possession, or established by the evidence. The circumstances attending the taking of this evidence are discreditable to those directing it; and the disregard of the northern point in the boundary line established by the evidence taken must have been a willful disregard by Surveyor General Clark of his official duty. Here it is pertinent to inquire, of what use was that evidence? Miller says it was to be used as a basis of instructions by the surveyor general to his deputy in making the survey. It is strange that such precaution should be taken, in the absence of any complaint as to boundaries, and more significant that the land department at Washington, and congress, about to act on the question of confirmation, should be kept in ignorance on a matter of such vital importance; especially so, in view of the fact that, while confirmed to Ramirez, it was owned in fact by Cooley & Co., and contemporaneous with which change in ownership came the claim for a disregard of the grant description. Three days after this evidence was taken, Serafin Ramirez conveyed the grant in formal terms to Cooley, Kitchen & Co., and, in 20 days after the grant was confirmed, the evidence in the record proves that this conveyance was formulated, while the parties were on the trip.

For the first time in the history of the grant for 20 years a new description was used to designate its boundaries. The transformation worked during the 30 days' extension for payment by the new company to Ramirez, and by the trip under the management and auspices of Cooley, Kitchen & Co. of May 10, 1866, can be best seen by placing the two descriptions in contrast with each other. The description asked for by Ramirez in his petition for the grant, contained, also, in the grant, in Ramirez's petition before Pelham for confirmation, referred to in the proceeding to identify the actual possession of Ramirez with the lines of boundary, contained in his written agreement of sale to Cooley, Kitchen & Co., reads, with only slight variations in phraseology: "On the north, the road of the Palo Amarillo; on the south, the northern boundary of the Rancho San Pedro; on the east, the spring of the Canon del Agua; on the west, the highest summit of the little mountain of El Tuerto, adjoining the boundary of the mine known as inherited property." As a further de-

scription of the tract, Ramirez says, in his petition in 1844, asking for the grant: "I ask for a tract of vacant land near [not to] the Placer of San Francisco, and *distant from that town* about one league, more or less. The land I ask is *vacant*, and without owner, and I solicit because I have no possession or property by which to support myself or family." The land is further identified by Ramirez in his petition before Pelham for confirmation, in 1860, in these words: "The quantity is five thousand varas square." Consider all these points of identity and description, promulgated by Ramirez himself, with the utmost familiarity as to location, mountains, and points. It was "vacant land;" not land on part of which was a town of several thousand people. It was "*near to*," not directly adjoining, nor yet embracing within its limits, the town of San Francisco. It was a tract with a defined northern, southern, eastern, and western line, with the points of the compass, and not with northeastern and northwestern boundaries. It was about 5,000 varas square, nearly square in form, and not a tract triangular in shape. It made the "road leading down from the Placer to the yellow timber" a point north of the northern boundary line, and did not extend north along that road two miles, and include the road within its extension lines, as the survey does. Contrast all these descriptive points, formulated for the very purpose of identification by Ramirez, with the description carried into the deed of Cooley, Kitchen & Co., concocted on the ground, when they were out there, as Miller says, "paying for transportation, the witnesses, the notary, and the bills;" which description was for the first time exhibited in the deed to Cooley, Kitchen & Co. from Ramirez. It was adopted by the deputy-surveyor, imposed on the commissioner of the land department by *ex parte* affidavits, inspired by the grant-owners. It is this new description, so conceived and procured, operating, as it does, to take from the government valuable property which, by mistake of facts, was carried into the patent, which this case seeks to vacate, remitting the grant-owners to the lands described in the act of confirmation. It reverses every line and call as written down in the act of confirmation. Contrast this survey with the calls of the grant, to see how completely it ignores the grant as made out and confirmed. Mark the words of the new description, thus brought into existence: "On the north and north-west, by the road commencing at the Placer of San Francisco, and leading to the Palo Amarillo; on the south, by the spring of the Canon del Agua; on the east, by the summit of the Tuerto mountain; on the west, by the Palo Amarillo." What a transformation was thus brought by the extraofficial expedition under Cooley, Kitchen & Co. during the period of suspension in payment. The northern boundary was no longer to the south of the road, "leading down from the Placer to the yellow timber," so that the road lay north of the grant; but the northern boundary was obliterated, and in place thereof a north-western boundary was substituted, including a strip of land from one to two miles wide, and running east and west, north of the spot which the witnesses examined by Miller fixed as the Palo Amarillo, and including, also, the whole of that strip of land to the east of the Palo Amarillo road,—over a mile in width; in itself a large and valuable possession instead of a northern boundary line, running east and west down through the defined point, with the road to its north, and the town of San Francisco "distant" therefrom; there was in its place a single point furthest to the north, with lines diverging therefrom, not directly east and west, but nearly south-east and south-west, as boundaries. The point as defined by the new description was not "near to," or "distant about one league from, the Placer of San Francisco;" but it was right there, including the town. The south line was not "the northern boundary of the Rancho San Pedro," but the Canon del Agua spring. That spring ceased to mark the eastern line of the grant, and, instead, the grant had no eastern line at all, but only a point some two miles distant from the spring as a mark of the extreme eastern limit. The grant ceased to be in form about "five thousand varas square," as Ramirez had de-

scribed it to Pelham after 15 years' occupancy, but in the form, nearly, of a triangle. In a word, there was a complete obliteration of boundary lines, an entire disregard of prominent landmarks, points, and directions which for 20 years had been carried into the written description of the grant boundaries, and which had in actual possession so marked the ground out on the earth's surface by visible and prominent points and objects as to make it capable of identification within such monuments by proof before Surveyor General Pelham. This court is asked to believe that such a disregard of landmarks actually marked on the ground, such a change in directions, as literally to turn over the tract from the west of a named line to the east of it, and convert a parallelogram in form to a triangular tract, was demanded for the vindication of truth, honesty, and justice, or, at least, that such a transformation was but an error of judgment. We find it impossible, under the evidence in the record, to reach such a conclusion. Many facts have been stated and reasons given which influence our minds to the contrary opinion, and others will be given. The mere statement that the survey makes a change in points, lines, and location as that before shown carries with it the probability that such a survey is grossly wrong. It is no wonder that Mr. Burdett, the commissioner of the general land-office in 1874, was compelled, by what appeared on the face of the survey, to disapprove it as being *prima facie* wrong. The commissioner of the general land-office suspended the survey, and returned it to the surveyor general of New Mexico for further investigation. His communication was as follows:

"EXHIBIT K.

"*Department of the Interior. General Land-Office.*

"WASHINGTON, D. C., September 23, 1874.

"*James K. Proudfit, Esq., United States Surveyor General, Santa Fe, New Mexico*—SIR: I return herewith a plat approved October 16, 1866, of the survey, containing 3,501 21-100 acres of the private land claim, in the territory of New Mexico, called 'Canon del Agua,' confirmed to Jose S. Ramirez as No. 70, by the act of June 12, 1866, (14 Stats. p. 588.) The boundaries of this grant, as described in the original title papers, (ex doc. No. 28, 36 Cong. 2d Sess. House of Rep. page 32,) are as follows: The 'land known as the "Canon del Agua," in the Placer of San Francisco, bounded on the north by the road leading from the Palo Amarillo; on the south, by the northern boundary of the grant of San Pedro; on the east, by the spring of the Canon del Agua; and on the west, by the highest summit of the little mountain of Tuerto, adjoining the boundary of the mine known as inherited property.' The only evidence on file in this office as to the location of those boundaries on the earth's surface is found on the plats of survey of the Canon del Agua and San Pedro grants, and, as thus indicated, the present survey of the Rancho Canon del Agua in no manner conforms to the calls for such boundaries contained in the original title papers, except as to the northern boundary, or 'road leading from the Palo Amarillo;' and with respect to that boundary it is not clear that the Canon del Agua extended further north than the southern boundary of the tract claimed to be within the limits of the Ortiz Mine grant. The Canon del Agua, as surveyed, extends between two and three miles south of the northern boundary of the San Pedro grant as surveyed; whereas the said northern boundary of the San Pedro grant is the southern boundary of the Canon del Agua, according to the original title papers in the case last named. The spring of the Canon del Agua, in the survey of the ranch of that name, is also south of the northern boundary of San Pedro as surveyed, and a western boundary of the Rancho Canon del Agua; whereas, according to the title papers of the last-named *rancho*, that spring is the eastern boundary of the Canon del Agua. The highest point of the little mountain of Tuerto, as shown on the plat of Canon del Agua, is east of the spring of the Canon del Agua, and the eastern boundary of the claim; when,

according to the original title papers, it should be west of the said spring, and the western boundary of said *rancho*. In view of these manifest differences between the calls for boundaries contained in the original title papers in this case, and their location by United States Deputy-Surveyor Griffin, I do not deem it advisable to take further action upon the survey until the parties in interest shall have had an opportunity to show by testimony the exact location of said boundaries, and such other facts relative to the extent of the place known as 'Canon del Agua' as will enable this office either to approve the survey of that *rancho* as now made, or to locate it in such a manner as to do justice to the claimants and the United States. You will therefore notify the claimants that in its present condition, and with the evidence now before this office, this office cannot approve the before-mentioned survey of Canon del Agua *rancho*. If, however, the claimants, or any other interested party, will deposit with you sufficient money to pay the expenses of an investigation as to such boundaries, you are hereby authorized to publish for four weeks, in some newspaper of general circulation near the vicinity of the land,.a notice calling upon all parties in interest to produce, within sixty days from the expiration of said publication, such exhibits, or testimony relative to said boundaries, as they may desire to submit. In the event of such deposit of money, you will transmit to this office all exhibits and testimony received in response to such notice, and also your report thereon.

"Respectfully, S. S. BURDETT, Commissioner."

Here, in 1874, was the result,—a suspended survey.

Before considering further the proceeding after this order of suspension by Commissioner Burdett, it may be well to retrace, and consider what was done after Miller returned from his expedition.。 The next step was an order from Surveyor General Clark to Griffin to make the survey. It is pertinent to inquire why Mr. Griffin of all others was selected for that work? Surveyor General Clark must have known that Griffin was one of the Cooley-Kitchen expedition. Griffin had gone out with them, had been selected and paid by them, and was necessarily on intimate terms with them. He had sworn the parties to the affidavits taken by Miller. He was with the latter at the point selected by him as the Tuerto mountain and the Ramirez mine. He necessarily heard all the talk on that trip respecting these points, and, in the nature of things, was impressed by it. Why did Clark send out a man whose mind was thus impressed,—who was a member of the expedition which had gone to the land for the very purpose of identifying the landmarks? Clark knew the state of Griffin's mind, when he sent him, respecting these monuments. It is presuming too much in favor of Clark's ignorance to believe that he knew Griffin was a member of that expedition, and yet to suppose Griffin's mind was not settled as to the location of the Ramirez mine. Under such circumstances, it must be apparent that Clark, when he started Griffin from Santa Fe to make the survey, knew that Griffin and Miller and Cooley, Carey & Co. all were of one mind as to the location of Tuerto mountain and the Ramirez mine. Consider the situation at that moment of time. The government was interested in placing that east line where the Ramirez grant described it to be,—at the spring,—and not two miles east of it, so as to save to the public a large and valuable tract of mineral land, if it could honestly and fairly be done. The grant claimants were, on the other hand, interested in carrying the line east of the spring to include the mineral. The stake at issue in the survey was not less than a hundred thousand dollars. What would an honest surveyor general do under such circumstances? Would he throw his deputy-surveyor into the company, and, under the influence of the adverse party, send him out with them to look on while the very point in dispute (assuming, for the argument, that it was an honest difference) was being discussed, investigated, determined, and reported upon adversely to the government; and then, after all that was accomplished, select him, as a disinterested

surveyor, whose mind was open to a consideration of the point, to stand fairly and evenly between the government and the claimants? Or would he say "No. Mr. Griffin must already have a fixed opinion on this question, and a surveyor shall run the lines who has not prejudged the controversy?" Who, under the evidence in contemplation, can follow Mr. Griffin from Santa Fe to the grant with Cooley, Carey & Co., taking the point he then did, and say that he was in a frame of mind, however honest, to stand impartially as to the question then at issue? Not satisfied with placing Griffin in advance, where he would naturally become impressed against the government on the point he was to determine, the surveyor general tied his hands with instructions. Why did not the surveyor general send out a deputy-surveyor whose mind was not fixed against the government, and give him the grant description, and tell him to make the survey, and find the calls, and report the result? Instead of giving an unbiased surveyor an opportunity to go to the locality, and exercise an independent judgment, he selected Griffin, who must have prejudged the point, and, by his instructions, tied his hands, and fixed the initial point of the survey. Clark says: "It is represented to me that the landmarks named in the Canon del Agua grant do not correspond in direction or position with the corners or distances." Griffin knew that, because he was out there with Miller, gathering material upon which to base such representation. Griffin is specifically instructed to take two places in the Palo Amarillo road as points in the survey; thus making the northern point in the line to include San Francisco. We believe this instruction to be utterly indefensible. It presumes against the government, and in favor of the grantees. Clark's action in sending Miller out to the grant, and in selecting Griffin, with his presumably formed opinion, was also in favor of the grantees. So, also, his confirmation of the survey. The acts of Clark respecting this grant are uniformly adverse to the government; so much so as to create a belief of his insincerity.

Griffin took, as deputy-surveyor, some evidence as to the locality of the mine. On that point his first witness is Francisco Aranda. He does not testify that the El Tuerto mountains do not extend south-west of the San Francisco. He was asked: "What is the name of the little hills or mountains on the western end of the Sierritta del Tuerto? Answer. It is a part of the Sierritta del Tuerto." He does not say, however, where this lies, but does say they lie to the east of the town; but he is not directed to another range west of the town. Jose Martin was the next witness before Griffin. He swears, in a general way, that the Sierritta del Tuerto is south and east of San Francisco. His attention was not pressed on the point whether the mountain did not also extend south-west of the town, and he was not asked whether the mine was east or west of the town or spring. Jose Guerro is the next witness. His evidence is not very full. He swears the Ramirez mine is in the Sierritta del Tuerto, but does not say where that is,—whether east of spring or town. Juan Ortega is the next witness. He does say the mountains are east of the town. He is not asked if they do not also lie south-west thereof, or if there are not other mountains lying south-west of the town by that name. Tecundo Chaves locates the Sierritta del Tuerto as commencing west and south-west of the San Francisco, and extending east. He says the mine is in these mountains, but does not say whether east or west of either the spring or town. Guilermo Roival swears that the Tuerto begins south-west of the town, and extends to the east; that the mine is in the mountain, —but does not otherwise locate it. Aban Nieto swears to the same effect. Ramirez is also sworn, and says: "The Sierritta del Tuerto commences at the Plaza del Tuerto on the west, and runs to the east one and a half leagues, more or less." That is all the evidence on this point taken by Griffin. If it would not unduly extend this opinion, it would be of interest to get out every line of evidence taken by Griffin. A close scrutiny of it will demonstrate that it is wholly insufficient to overthow the calls of the grant. And it is astonish-

ing that it ever should have been regarded as sufficient to set aside a clear description. Jose Martin's evidence was taken by Miller, and has some point to it, and, coupled with Miller's report, tends to fix the mine east of the spring; but there was no cross-examination of the witness, and his attention was not in the slightest called to any fact which might modify his evidence so far as the same is adverse to the complainant. It is remarkable that not a single one of these witnesses was asked whether or not there was an ancient mine west of the spring, and near the Palo Amarillo road. It was the duty of Griffin to survey to the call, if he fairly could. It was his duty to ascertain if there was not a small mountain to the west of the spring, generally known, or known to many, as the "Little Tuerto," and if there was not at that point an old mine which would answer the call; and yet not a question is asked on those points. Special Surveyor Treadwell, sent out to make an examination by the commissioner of the land-office, McFarland, did make such examination, and in his evidence says: "After personal examination, and carefully considering all the testimony taken, I have concluded that the little mountains south-west of the town of San Francisco are the Little Tuerto range, and the highest peak is the little mountain of El Tuerto." If diligent inquiry had been made by Griffin or Miller, they might have obtained the same, and even more, information on that point.

Analyze the evidence taken by Mr. Griffin. The witnesses are named as follows: Francisco Aranda, Jose Martin, Jose Guerrero, Juan Ortega, Tecundo Chaves, Guillermo Roival, Aban Nieto, Jose Serafin Ramirez,—eight in number. Of these eight witnesses, Aranda, Martin, possibly Guerrero and Ortega,—four in all,—in a general way fix the Tuerto as east of the Placers. Their evidence discloses nothing like a critical or careful examination. They were not asked by Griffin as to the mountains or mines south-west of the town. The other witnesses sworn by Griffin really corroborated the grant calls. Chaves swore: "The Sierritta del Tuerto commences on the west, south of and near the Placer del Tuerto." The word "near" is not very definite, and might have been used to mean a greater or less distance. The mountain, at all events, according to his evidence, began west and south of the town. How far west and how far south he does not state. Roival states: "The Sierritta del Tuerto *commences at the west,* south of and near this town, and extends east to the plain." Aban Nieto says: "The Sierra del Tuerto *commences* west, and south of and near this place, and extends east." Ramirez swears: "The Sierritta del Tuerto commences at the Plaza del Tuerto on the west, and runs to the east." His statement is not very clear. Whether he meant the Tuerto began west of the town, or east, is not certain. Three witnesses out of the eight clearly testified the Tuerto mountain was west and south of the town, and in a direction to verify the western call of the grant. Four testify to the contrary, and one, with large interest, was indefinite. Not a single man was called and examined as to mountains or mines south-west of the town, in the direction of the Palo Amarillo, in support of the grant call. The evidence that did come out on that point was not brought out by a direct reference to it. In addition, it is evidence that Cooley & Co. produced the witnesses who were examined. Aban Nieto, a witness called by the defendant, (folio 2563,) says: "Captain Carey summoned witnesses." This fact may account for the absence of witnesses to sustain the interest of the government. Tecundo Chaves also says, referring to his evidence before Griffin: "They took me from Real de Dolorez, together with Aban Nieto and Guillermo Roival, in Mr. Cooley's carriage." "Cooley came in a carriage to where I, Nieto, and Guillermo worked." As further characterizing the transaction, the wife of Ramirez says: "The grant was sold to the government company from the states. Col. Carey was one of them. We signed a contract in writing out there, May 8, 1866. Kitchen was present, and money at that time was delivered to us. A note was given to us for $1,200 the same day,—May

8th. The condition of that note is that it was to be paid when the grant was surveyed, and the title made perfect." All this is corroborated by the son. What would be the course of a fair examination? Witnesses in large numbers would have been called, and questions asked directing their minds to the point in controversy. They would have been asked as to the mountains to the south-west of the town; to the west of the spring; as to their height compared with others, so as to ascertain if they were mere hills or properly mountains; as to the names they were known by in 1844 and 1846 and 1860,—all important dates; as to the mines north-west of the spring, their extent, who had opened, and who had worked, them. It was of the utmost importance to the public to sustain the calls of the grant. Just enough evidence was taken to make a very weak excuse to disregard the call to the west of the spring. It is to be presumed that the deputy-surveyor reported all the evidence taken. The evidence reported is far short of proof upon which the calls of the grant should be rejected, and the value of the grant increased, and the complainant to that extent wronged. The direction of Clark to Miller, under the circumstances, and at the time made, to go to the land to take proofs; the manner in which he executed that direction; the influences by which he surrounded Griffin, to impress him as to the incompatibility of the landmarks with the calls; the fact that, after he had so impressed him, he selected him as the deputy to make the survey in the field; the very slight proof taken by Griffin as to the western call, its prompt approval by Clark; and the failure, in all that time, of these officials, to do any act tending to support the grant calls,—as it was clearly the right of the government to expect of them,—are badges of fraud, and full of significance, which is greatly strengthened by the fact that the identity of the grant as described by Ramirez in his title papers is totally destroyed by the survey.

Mr. Burdett, the commissioner of the general land-office, suspended this survey, and returned it back for proof, September 23, 1874. He gave his objections to the surveyor general, and made an order that would impress every honest man as just and fair; which is elsewhere in this opinion set out. It was for the publication of notice that evidence on the point might be taken. Why it was not given it is not difficult to understand. It provided for public notice in the newspapers near the land. The effect of such a publication would have been to open the door for public examination of witnesses, in the presence of all who chose to hear. Persons having interests would have appeared. Examination and cross-examination would have resulted. If the grant claimants had accepted this order, it would have been the highest evidence of good faith. It would have shown they did not shrink from a public inquiry as to the location of their claim. How was this most righteous requirement by the commissioner of the land-office met? Was it in a fair spirit, by publication to the world that there was a dispute as to the location of the Canon del Agua grant? Was the public informed that Cooley, Kitchen & Co. denied the correctness of the grant description, and were proceeding to take in the Big copper mine, and the valuable mineral grounds adjoining it; thereby depriving the government of the lands, and depriving miners of the opportunity of acquiring interests in such minerals? No; to the contrary, the evidence was taken by Miller, and Griffin was imposed upon the commissioner of the general land-office to induce him to approve the survey. The opposition of the Ortiz mine claimants, who insisted the survey included some of their grant, was also procured to be withdrawn. It appears that Mr. Elkins had an interest in the Ortiz mine, and that his wife was a stockholder in the San Pedro Company, so it would not be difficult to arrange for a withdrawal of opposition by the Ortiz mine owners; and so by the withdrawal of opposition, by concealments, and *ex parte* affidavits, the action of the commissioner was procured. The instruction of Burdett contemplated notice, and a public examination of witnesses as to the location of the Little

Tuerto and the mine. The evidence foisted upon the commissioner as a substitute for evidence of that character was *ex parte*, taken in private, without notice or cross-examination. If the commissioner of the general land-office had known how Miller was surrounded on his trip to San Francisco, and of the fact that Griffin had been led to prejudge the point of inquiry in the case before he started on the survey, and that he was not permitted to make a survey upon his own judgment, fixing his own initial point, but was limited in his power, and not permitted to act for himself, and that the evidence thus placed before him was all private and *ex parte*, he would have rejected it as outside the record, and have enforced his order for a public notice, and evidence taken under it. The additional testimony on this occasion sent forward is of a class with all the rest. It related, however, to the San Pedro grant; but it shows that the same hand which directed Miller was yet visible. Evidence not on file was needed as to San Pedro. Instead of depositing money, and making open publication as to that grant, what was done? Let the surveyor general himself speak. He says: "Having no means of determining from the records the positions of the natural objects called for as a boundary on the south side of the addition to San Pedro, I mentioned the matter to the gentleman acting here as agent of the owners of the claim; and he thereupon brought before me, and I examined under oath, witnesses to establish the localities." It is a singular fact that the name of the "gentleman acting as agent" for the grant claimants is not given. Who was he? It is very rare indeed, in a law suit, that one party goes to his adversary to produce witnesses against himself. The "gentleman acting as agent for the grant"—very smooth words—was not the disinterested person that a faithful officer would usually select to privately look up the witnesses, and present them for examination, to make out a case as to a boundary against the grant. The "gentleman acting as agent for the grant" would very naturally produce witnesses favorable to its claim; and would not very probably produce those, and pay them out of his own pocket, who would give evidence to cause the rejection of the grant claim, or to fix a monument different from the one desired by the grant agent.

Here was a survey suspended by the commissioner of the general land-office. He was not satisfied it was correct. There was a reversal of the calls. He asked for public notice, and open proofs as to monuments. These proofs would cause a rejection or affirmation of the survey. The surveyor general of New Mexico knew that this proof was asked for. Who would he go to naturally, impulsively, if honest, for proof to sustain the contention of the land-office? Would he go to those interested in defeating that contention? Would he seek out those interested against the claim of the department? Did any litigant or claimant in any department ever before do so absurd a thing? And yet that is just what was done in this case. It was not disinterested men—witnesses beyond influences—that were brought before the surveyor general, but the gentleman who was "agent for the claimants" was generously requested to bring in evidence to support his claim. That evidence was taken, and sent on to the department. The evidence thus produced was every line that found its way to Washington. From the beginning, when Cooley, Carey, *et al.* began to manipulate Serafin Ramirez, to the last act in confirmation of the survey, it was the mind of the claimants which conceived, and their hand which executed. The evidence proves conclusively that Clark and Miller were subservient to the wish of the claimants. There is not a single act shown by Clark or Miller in support of the boundaries of the grant, as contained in its written description. There is not a word by them spoken to maintain, or try to do so, the grant calls. From the day Pelham (acting, as we believe, in good faith, upon proof, and in the right) recommended the approval of the grant by the description in the grant deed, to the date of Burdett's suspension of the survey, in all that pertained to the interest of the

government in that grant it was practically without a representative. We believe if Burdett, when he affirmed the survey, had been in possession of the facts shown in the record in this case, he would certainly, and without hesitation, have rejected it, and the claimants would have been limited to the lands west of the Canon del Agua spring. It was evidence such as this, taken under the influence and in the manner stated, which Clark sent to the commissioner of the general land-office to induce him to approve the survey, when that officer called for evidence taken after the publication of notice. The commissioner expected that the inhabitants of San Francisco—the miners claiming properties to be affected; all persons who might have adverse rights—would have notice, and might be heard. Such an examination would be fair and honest, and commend confidence; not so, the *ex parte* affidavits substituted in its place. A recital of the manner in which this evidence was taken carries its own condemnation. Are the averments of the bill of complaint not fully proven, even at this point in the evidence? Here are the averments in part: "The commissioner of the general land-office taking said false and fraudulent affidavits, so as aforesaid forwarded, as a basis for his action and decision, was led into and induced, under a mistake founded upon the false survey of the said Griffin, and upon the false and fabricated affidavits returned as before stated, to approve, and did approve, of said false survey as so made by said Griffin." The theory of this part of the bill of complaint is to the effect that the real facts were not placed before the commissioner, but, to the contrary, that these *ex parte* affidavits taken by Miller and Griffin were imposed upon him as the truth, and as being honestly taken by the agents of the government, whereas they were taken by the claimants themselves, and not by the agents of the United States; and the commissioner thereby acted under a mistake, and, by reason thereof, approved a survey wrong in fact, created and induced by the fraudulent act of the grant claimants. We have no doubt the commissioner would instantly have rejected the survey if there had been before him the facts disclosed in this record. It is apparent the commissioner was in great doubt when he approved of the survey. That is evident from the terms of approval, which are as follows, (page 77, folio 370:)

"The boundaries of this grant are represented on the survey under consideration, but, as thus represented, the highest summit of the Little Tuerto mountain is the east boundary, instead of the west, and the spring of the Canon del Agua is a west, instead of an east, boundary, as described in the record of juridical possession. The spring of the Canon del Agua is also a considerable distance at the north boundary of San Pedro *rancho,* and Placer del Tuerto on the north is included within the claimed limits of the Ortiz mine, (confirmed, as No. 43, by act of March 1, 1841.) As, however, all the natural objects described in the record of juridical possession have been found, the present survey is within these boundaries; and as claimants of the Ortiz mine aforesaid have, by conveyance acknowledged March 16, 1875, released to the claimants of Canon del Agua all interest in said mine, as claimed, which appear to conflict with the survey of the Canon del Agua now under consideration, I have decided to approve said survey. You will give notice of the decision to all parties in interest, including the owners of the Ortiz mine aforesaid, and allow sixty days from the service of notice for appeal to the Hon. secretary of the interior. If, at the expiration of the said sixty days, no appeal be taken, you will so notify this office, and if appeal be taken you will also notify this office, and transmit with your notification all documents or arguments which may be filed with the parties named. Please acknowledge the receipt of this communication.     S. S. BURDETT, Commissioner.

"*Date, Washington, D. C., March* 25, 1875."

It is a most significant fact that two orders of the interior department,—one to publish notice in Santa Fe, and take public proofs as to the calls and monuments of the grant, and the one above,—both of which would have disclosed

to the public in New Mexico, and especially to those there interested adverse to the grant claimants, what they were trying in the dark to do, and which would have opened the door to an honest investigation, were utterly disregarded. The Ortiz claimants, as shown, were silenced by a purchase from them of a release, and thus their opposition before the department was quieted. Otero and the other parties in interest in the grant, were utterly ignorant of the proceeding. To publish either of the notices ordered by the department would arouse them, and so they were not notified, but kept in ignorance while the secret work of overturning the grant boundaries went forward. No fair-minded man could read this approval without at once being impressed that there was doubt in the mind of the commissioner, requiring the purchaser to look further into the title. It is not pretended that any notice was ever given of this decision. If notice had been given to the residents of San Francisco, or to the miners upon the grounds east of the spring, the light of day would have been let in on the scheme of these grant claimants to reverse the boundaries of the grant. Suppose Mariano S. Otero—who himself claimed the Big copper mine, and who had told two of the stockholders in this case before purchase that he intended to sue for it—had been notified, or that notice had been given at Bernalillo, San Francisco, or Santa Fe, who can doubt that the evidence which is in this record would have found its way before the interior department, causing a reversal of its action.

So far, we have only considered what occurred up to the time of the confirmation of the survey. Let us now consider whether the courses are incompatible with the landmarks named in the deed by which Ramirez received his land, and whether the land does not really lie west of the spring, and could not have been placed there by the survey, and at the same time every landmark, monument, direction, and call have been fully met. There is no contention as to the existence or location of the Canon del Agua spring, and that is an important landmark. The road "leading down from the Placer to the yellow timber" is also well established. Jose Martin, Juan Jose Anaya, Guadalupe Chavez, (see Record, pp. 52 and 53,) witnesses sworn by Griffin, locate this road exactly, and fix the point at *the Palo Amarillo*, where it branches to the west. That spot leaves the road north of it, is "about one league distant from the town," as Ramirez expressed it in his petition, and a line drawn east and west there would answer the call. If the spring is taken as the east point, and a line be drawn through north and south, an eastern boundary is fixed according to the description in the grant. If a line is drawn east and west through the Palo Amarillo road at a point fixed by Jose Martin and others, where that road bears to the west, until it intersects the line east, drawn north and south through the spring, the course and landmarks of the grant description are both sustained, and the east and north boundary fixed. The north boundary of the San Pedro grant constitutes the south boundary of the Canon del Agua. A line drawn along the north boundary of the San Pedro from east to west until it intersects the line drawn from north to south through the spring makes the south boundary, and follows the description in the grant. If these be taken as correct lines, then there only remains to find the west line. The deed of possession given by Santiago Flores to Ramirez describes the west line in this way: "On the west, the highest summit of the little mountain of El Tuerto, adjoining the boundary of the mine known as inherited property." Ramirez also describes the land he asks as "distant about one league, more or less, from the Placer del Tuerto." In his petition to Pelham for confirmation, Ramirez describes the tract as "five thousand varas square." In seeking a landmark, we should look west of the spring, rather than east, because the title paper says it is west. We should seek to bound a tract of land that would be about a league distant from San Francisco, rather than a tract surrounding and including that town; a tract with a north, south,

east, and west boundary, containing 5,000 varas, and square, or nearly so, in form,—for the plain reason that these are all named as prominent calls in the title paper, and they should be answered, if they fairly can be. It should also be adjoining the "little mountain of El Tuerto," as distinguished from some larger mountain not likely to be so known or called, having the east, north, and south boundaries fixed. Why not begin at the south-east corner, and measure along the south line west for a quantity, and find a point from which a line drawn north to its intersection with the northern boundary line will include and embrace sufficient to make "five thousand varas square." Doing this, the land will be the proper distance from San Francisco; it will be "five thousand varas square;" it will answer the call for the Canon del Agua spring as the east boundary line; it will meet the call for the "north line of the San Pedro as the south line of the Canon del Agua." It will fill exactly the call for the Palo Amarillo, and leave that road in the very words of the grant description: "to the north, the road of the Palo Amarillo." Quantity, form, distance from San Francisco, the spring, the north line of the San Pedro, the Palo Amarillo road,—all landmarks,—are exactly met as set out in the grant description, and, at the same time, courses and distances are preserved. Contrast such a survey with the one actually made, and can there be any reasonable doubt about which embraces the land actually intended by the Mexican government, and in fact embraced in the Canon del Agua grant? If there can be added to the landmarks met by such a survey, also, the little mountain of El Tuerto, the case will be made beyond reasonable doubt; and, if that be supplemented by the mine, it will stand almost as clear as demonstration. Keeping in mind the description of the mountain named as a landmark west of the spring, in the grant from the Mexican government, a consideration of the evidence on that point will add strength to the case for the complainant. The words of this western call, so far as they relate to the mountain, are: "On the west, the highest summit of the little mountain of El Tuerto, adjoining the boundary of the mine known as inherited property." It will be observed the term "the little mountain" is used. The term "little" is of itself descriptive, and this word was doubtless used to distinguish the mountain from some other larger one, or from a range of mountains by that name greater in extent. It is fair to assume, from the use of this word, that there were at that time other mountains of the same general name, larger than the particular one intended in this call; and so the words "little mountain" were used as of more certain description. John B. Treadwell was appointed by the land department as a special agent to proceed upon the ground, and examine into the landmarks. He obeyed his instructions, and in February, A. D. 1884, took evidence in the locality of the town of San Francisco. Among the witnesses whom he examined are the following, with their evidence on this point:

Edward J. Edgar: "I have resided in New Mexico since 1857, and lived near the town of San Francisco ever since, excepting two years. I am familiar with the names of the surrounding mountains. I know the mountain called the 'Little Tuerto.' It is situated south and a little west of Real de San Francisco, and distant about one and one-half miles from that town. I know the road running from the Real de San Francisco to Palo Amarillo. The Little Tuerto mountain is on the west side of the road. The road is about five hundred yards from the base of the mountain. I know a mountain called the 'Big Tuerto.' It is the second high peak south-west from Real de San Francisco; distance, a quarter of a mile or more. I have no interest antagonistic to the Canon del Agua patent."

Eulojia Aranda: "I was born in the town of Real de San Francisco, territory of New Mexico. I know the mountain called the 'Little Tuerto.' It is the first mountain west and south of the town of San Francisco, and the arroya passing through the town runs along the east base of the same. I have known

the Little Tuerto by that name ever since I can remember, and I am now thirty-three years of age. I have never known the Little Tuerto mountain to be called by any other name."

Tecundo Chaves: "I am sixty-nine years old. I first went to Real de San Francisco in April, 1842. That was when the mines were first discovered there. I lived there until the year 1853, and since that have lived at Real de Dolores. The mountains west of the Real de San Francisco are the Little Tuerto range. I never knew these mountains being called by any other names. I have no interest antagonistic to the Canon del Agua grant." This is one of the witnesses whose evidence Griffin also took.

Francisco Martinez: "I am sixty-nine years of age. Went first to Real de San Francisco in the year 1843, and lived there until 1854, and have visited there frequently since. I know the mountain known and called the 'Little Tuerto.' It is east of the town, and the other mountains also west of the town are called the 'Little Tuerto Mountains.' I have no interest antagonistic to the Canon del Agua grant patent."

Antonio Nieto: "I was born in Real de San Francisco, and have lived there most of my life. I do not know the mountain known and called the 'Little Tuerto.' The mountain just south-west of Real de San Francisco is called 'Sierra de la Placer.' I have no interest antagonistic to the Canon del Agua patent." While this witness does not identify the name of the Little Tuerto, he does prove there were mountains south-west of San Francisco, and about the place designated in the call.

Jose Romero: "I am over forty-three years of age. I came to Real de San Francisco when a child, and have lived there and in the vicinity ever since. I know a mountain called and known as the 'Little Tuerto Mountain.' That is the Little Tuerto mountain. [The witness here points to the mountain just south-west of this town, and adjoining the same.] It has been called the 'Little Tuerto' ever since I can remember. I have never known it to be called by any other name. I have no interest antagonistic to the Canon del Agua claim. I know where the Sierritta Padernal is from here. It is the same range as the Little Tuerto, and just south of the Little Tuerto, this side of Palo Amarillo, and just to the left of the road leading from Real de San Francisco to Palo Amarillo. Said road passes between the Little Tuerto and the Padernal mountain. I have no interest antagonistic to the Canon del Agua patent."

Bartolo Pena: "I came to the Old Placers, nine miles from here, when I was nine years old, and have lived in this vicinity ever since. The only mountain I knew as the Little Tuerto is situated north-west of here, on the other side of the second arroyo. It is about three hundred yards from Real de San Francisco. The other end (to the south-west of here) of it is called 'Palo Amarillo.' This end is called the 'San Francisco.' I have no interest antagonistic to the Canon del Agua."

Manuel Sanches: "*Question.* When did you first come to Real de San Francisco? *Answer.* I was one of the discoverers of the *placers* here. I lived here until twenty years ago. Have lived within thirty miles ever since, and have frequently visited this place." This witness here makes a somewhat confused statement, but locates the Little Tuerto south-west of Real de San Francisco, and has no interest adverse to the Canon del Agua.

Jose Manuel Guerrero: "I came to the Real de San Francisco in 1841; lived there until 1845; moved away, and returned again in 1855; and have lived there every since. I know the mountain called the 'Little Tuerto.' [Witness here points in a south-westerly direction from San Francisco.] That is the mountain, just west of the arroyo passing through the town of San Francisco. I have known it to be called the 'Sierritta del Tuerto' ever since 1841. I have no interest antagonistic to the Canon del Agua."

Juan N. Guerrero: "I was born in Santa Fe in 1824. I lived here in Real

de San Francisco from 1841 to 1847. Then I moved away, but returned here from one to three times a year. I know the mountain called the 'Little Tuerto,' [pointing to it.] That is the mountain, south-west of here, Real de San Francisco, and the first mountain west of the arroyo passing through this town. I have known this mountain to be called the 'Sierretta del Tuerto' since 1841. I have no interest antagonistic to the Canon del Agua grant patent."

Juan Guerrero: "I was born in the Real de San Francisco in the year 1847. I know the mountain known and called the 'Little Tuerto,' [pointing to the mountain.] That is the mountain, to the south-west of the town of Real de San Francisco, and the arroyo running through this town is at the eastern base of said mountain. I have known these mountains to be called the 'Little Tuerto' ever since I can remember. I have never heard them called by any other name. I have no interest antagonistic to the Canon del Agua grant."

Jose Eusebia Sanchez: "I was born in New Mexico in 1835. I know the mountain known and called the 'Little Tuerto.' I do not know one mountain as the 'Little Tuerto,' but the first range west of here, Real de San Francisco, running north and south, is called the 'Little Tuerto Range.' This range has been so called since I came here, in 1843. The mountain four miles north of here was called the 'Tuerto Mountain,' and is now called the 'Ortiz.' The Padernal, or Flint, mountain is located in the Little Tuerto range, just south of the road passing from Real de San Francisco to the Palo Amarillo. I have no interest antagonistic to the Canon del Agua grant."

S. H. King: "I am a native citizen of the United States. I came to Real de San Francisco in June, 1849, and lived here until the fall of 1850. I am forty-seven years of age. I returned here in the fall of 1879. I know the little mountains known and called the 'Little Tuerto.' They lie west of here. I have known them for the past three and a half years to be called the 'Little Tuerto.' I have known this by conversing with the old Mexican settlers. As near as I could ascertain, the summit of the Little Tuerto is about one and a half miles south-west from Real de San Francisco. I have no interest adverse to the Canon del Agua patent."

This witness makes thirteen in number who were examined under oath by Special Agent Treadwell. Every one of them in effect denies the Little Tuerto to be south-east of San Francisco, where the survey in dispute places it, but fix it south-west of that town, and generally from one to two miles,—about where the western call of the grant is. Twelve of this thirteen have not the least interest in the result of this proceeding, and may therefore be presumed fair and disinterested persons. Those examined by Treadwell were upon interrogatory, but for convenience their evidence is here condensed, and the questions are omitted. J. B. Treadwell on the 14th day of December, A. D. 1883, was appointed by N. C. McFarland, then commissioner of the general land-office, to visit the ground, and make examinations respecting the calls of the grant, as the department was not satisfied with the survey made by Griffin. Commissioner McFarland says, in his letter: "It is desirable the examination be made under the immediate direction of the department, and, being in the vicinity, you have been selected for the work." Treadwell swears he did not consult or talk with any attorneys or parties in interest, but proceeded to the ground, conversed with the people, and took the evidence. His proceeding is in every way creditable, and, contrasted with Miller's examination, is like the brightness of day to the darkness of midnight. He is sworn as a witness in this case, and, as such, states: "I proceeded to the town of Real de San Francisco, now Golden, about the 21st day of January, A. D. 1884. I proceeded to take the testimony of every person I could find who was familiar with the country, and competent to testify. I also made examinations and surveys of the surrounding country in question, when not taking testimony. After carefully considering all the testimony I had taken

and from my personal examinations, I have concluded that the range of mountains south-west of Real de San Francisco are the Little Tuerto range, and that the highest peak in this range is the little mountain of El Tuerto. It is designated on the map filed herewith, marked 'Exhibit B.' " Mr. Treadwell, from surveys and personal observation on the ground, was able to find mountains to the south-west of the town, 'which would be west of the spring, and answer the western call. His name makes 14 witnesses whose evidence sustains the grant, and identifies the western call, and which disputes the survey of Griffin, and proves it to be radically wrong. Here is also further evidence to the same point:

Felipe Delgado: "Live at Santa Fe. I am fifty-three years old. Lived in Santa Fe since 1853. Real de San Francisco is about thirty-five miles south of Santa Fe. I at one time lived there. Began to live there when I was about eight years of age. I went to school at that place. I remained there until 1849. There were many people there at that time. I know the mountain there called the 'Sierra del Tuerto.' I know it. It is to the west of the *plaza* of Real de San Francisco. The Tuerto mountains are to the west of the San Francisco *plaza*. They were called the 'Little Tuerto Mountains.' Not by any other name."

Juan Delgado: "I am twenty-nine years old. I am acquainted with the Real de San Francisco. It is about thirty-five or thirty-six miles south of Santa Fe. I went there to that town in 1877 and resided there a short time. In 1878, I had a store out there in charge of another man before I went there to live. I am acquainted with the different localities in that region, and know the names by which they were generally called when I was out there, and when I lived there. There is a chain of mountains to the south-west of Real de San Francisco,—to the south-west of the town. They were called the 'Sierritta del Tuerto.'"

Felipe B. Delgado: "Am a merchant, and live in Santa Fe. I am forty years old. I was born at the *placer* of Real de San Francisco, which is about thirty-six miles south of Santa Fe, and continued to reside there about seven years, and up to the time when the United States forces occupied this territory. I recollect something of the mountains then. There are some ridges or mountains there to the south-west of Real de San Francisco. They are mountains. The last time I went there I saw them more distinctly. On the west side there are high mountains."

Vicente Garcia: "I am fifty-five years of age. Live at Santa Fe. I first knew the place called 'Real de San Francisco' in 1840 or 1841. My parents resided there at that time at the Real de San Francisco. I was occupied at the parochial church at Santa Fe, but was often at San Francisco. I was there frequently, visiting my father, to 1846, and then went to live with my father. I then knew, and yet do know, the location about the Real de San Francisco. There are mountains west and south-west of the town. They had different names. They were generally called the 'Mountains of San Francisco of the Tuerto.' The Real de San Francisco is situated on a hill. There is a *canon* or creek right west, which runs down from the San Francisco Mountains to the Una de Gato. At a great distance from that *canon* west is the Sandia mountains. You can stand on a hill on the west side of San Francisco, and, far to the west, see the Sandia mountains. The Sandias are to the west of the town fifteen or twenty miles, possibly thirty. It is a long distance. From that point where you look to the west, and see the Sandias, there are some mountains between the town and the Sandias, but they are much lower than the Sandias. There are some mountains near the town, where the mountain commences. The Sandia is a long range of mountains." The cross-examination of this witness was very searching, to induce him to state something whereby it could be argued no mountains were west of San Francisco until the Sandias are reached, fifteen miles distant; but the witness lo-

cates mountains, notwithstanding a very close cross-examination, west of the town, and near there, over which the Sandias could be seen.

Jose Henriques Guerrera. This witness was called as to other points on his original examination, but was taken in hand by the defense, and critically cross-examined about locality, and corroborated the calls of the grant. As to the mountains southwest of the town on cross-examination, he said: "*Question*. Were there any mountains west of the town of San Francisco, or southwest of it? *Answer*. The San Francisco mountain is to the west of San Francisco. The mountain I know as San Francisco is very near to the town, and west of it." He was also pressed further to locate the Sandia mountains far to the west, and to say no mountains were between the Sandias and the town. He did so locate the Sandias, but did also place mountains to the south and west of the town, between the town and the Sandias, and near the town. He said, further: "The country to the west of the *canon* that runs by San Francisco is broken. There are some small mountains there. They are not hills, ·but small mountains." This witness was an old man, seventy years of age, and savagely pressed on cross-examination. At times he became somewhat confused, but he held quite persistently to the point that there were small mountains south-west of the town. All this was evidence brought out by the defense on cross-examination.

Jose Maria Samora. This witness is examined at great length, but the substance of his evidence as to the mountains south-west of San Francisco is that the Sandia range of mountains is many miles distant to the west of the town, and runs a long distance from north to south; that it is a high, well-known range; that near, and to the west and south, of San Francisco, is also a range of small mountains, which witness designates by name as the "Palo Amarillo." He says: "The mountain that is near San Francisco disturbs the view of the Sandias, and that continues up to the Palo Amarillo. This is a tolerably high, small mountain. There is only one well-known peak in these worth a name. It is called the 'Palo Amarillo.' This mountain, just west of San Francisco, was very well known. It is a long range,—about five miles,—and was called the 'Palo Amarillo Ridge.' There was no mountain in there called the 'El Tuerto.'" This witness clearly identifies a long range of small mountains extending from near San Francisco to the south-west about five miles. It is true, he does not identify the name "El Tuerto," but he places the mountains there, and it may be he never heard any part of it called by that name; but a cloud of other witnesses not only swear also to those same mountains, but have heard them called by the name of "El Tuerto."

Samuel H. King: "My age is forty-six. I live at Oak Grove ranch. I am acquainted with Real de San Francisco. It was my former residence until within the last four months. I first became acquainted with that place June, 1849. I lived with my father, who was engaged the principal part of the time in mining. I am familiar with the principal places in that locality. In 1849, I was over those mountains nearly every day. I knew pretty much all the mines that were being worked. *Question*. You speak of a small range of mountains lying in the south-west of this town. Do you know the name of that range? *Answer*. All the name I ever knew or heard to it was the 'Sierrittas de la Plazas,' and I never heard that until I came back here. *Q*. Never heard it called the 'Palo Amarillo?' *A*. No, sir. *Q*. You do not know, then, whether that range of mountains extending south-west is ever called the 'Palo Amarillo Mountains' or not? *A*. No, sir. *Q*. Do they run along by the side of where this planting ground is? *A*. They terminate at this planting ground. The planting ground is at their foot." It will be observed this witness clearly defines mountains from the town running down south-west to the Palo Amarillo, but does not fix their name, either as "Palo Amarillo Mountains," as one or two other witnesses did, nor as "El Tuerto," as very many state. On the substantial point that there was something more than mere foot-hills—in

fact, mountains—south-west of San Francisco, he is clear, from years of personal observation.

Stephan White: "*Question.* Is there a little range of mountains running south-west from the Placer de San Francisco? *Answer.* Yes, sir; it extends down to the Palo Amarillo planting ground. They run from San Francisco down to the Palo Amarillo, on the west side of the road that goes down there. From the town the road runs about south-west. In going from the Real de San Francisco to the Palo Amarillo planting grounds, these mountains lie to your right hand as you go down. *Q.* What is the character of the country between this town (Real de San Francisco) and the Sandia mountains? *A.* Where I went over, it seems to be a rolling country,—a kind of grazing country. *Q.* Are there any distinctive mountains there? *A.* Not between them. *Q.* There are no distinctive mountains, as I understand you, between this town and the Sandias? *A.* Not west, there is not. *There is south-west.* There is a little range of mountains runs right along west of Real de San Francisco. I never knew the name of them. They are three or four hundred feet high. They are not as high as the mountains to the south-east. I should say the mountains to the south-east are not 2,500 feet high, but about eight or nine hundred feet. The mountains to the south-east are the highest."

John U. Talbot: "I am fifty-three years old. I met Mr. Ballou. My understanding is he was president of the San Pedro & Canon del Agua Co. I met him early in 1880, and, along with Colonel Grafton and others, went out there to the town, and looked around some three or four days. I had been there before,—first, in September, 1879; and was there frequently, two or three times a year, after that, until I moved to that place. I had some interests there. I am tolerably familiar with the different localities in the vicinity of Real de San Francisco. I surveyed a line out there. There is quite a hill, you might call it, or a small mountain; comes right up to the town. It is an elevation of probably three or four hundred feet high. It is on the west and south-west side of the town. These mountains extend from the town south-west,—the first one about a mile, probably, to where the Palo Amarillo road goes through between that and another one. Then there is another one joins in a sort of little chain of hills there, that is lower than the other mountains a good deal."

Richard W. Webb: "I am forty years old. Live at Golden. Have lived at Real de San Francisco for two years. I had visited there before. I have taken occasion to look up the landmarks,—to go over the ground." This witness, under a long examination, fixes mountains south-west of the town, and also south-east, and says both have been called the "El Tuerto;" and designates a little mountain south-west of Real de San Francisco which would answer the grant call. He says: "There is a main road going near due south from Golden, that is known as the 'Albuquerque Road' until you reach a point about three-quarters of a mile from Golden, where, as I understand it, the Albuquerque road branches to the west. I understand it to be the Palo Amarillo road, as told me by residents there,—people that have cultivated the land. I have been over the road. When I saw it, it was an old road, very little used. It took more the appearance of a trail, though you could see it had been used as a road. I have been to one mine or shaft in that vicinity. This lies south of the road leading to the Palo Amarillo, and at the base of a little mountain. At the time I was there, I should think it was twelve or fifteen feet deep. Had the appearance of containing mineral all the way down from the surface. There is a small mountain lies right to the west of it. This mine has an arroya at the eastern base. It is south-west of San Francisco."

Henry Yates: "Am thirty-six. I am acquainted with Real de San Francisco. So became acquainted six years ago. I engaged in mining there, and became familiar with the locality. I know where the Big copper mine is situated. The mountains at that place are called the 'El Tuerto.' There are

also, besides them, other mountains in that vicinity called the 'El Tuerto.' There is a little mountain—it runs north and south—right west of the town, always called the 'Little Tuerto Mountain;' also two little mountains which stand off to the north-west of the plaza, called the same name."

Nasario Gonzales: "My age is sixty-four. I first became acquainted with Real de San Francisco in 1842. I have lived there at different times, but when I first went there I lived at the place for seventeen months. I lived there afterwards about six months in 1846. I am more or less familiar with the localities there, and became so at that time. There are some small mountains to the west and south-west of that town. I do not know the particular names given to these small mountains, but I know they were there. These are small mountains some three miles south-west of the town. Where the mountains leave off, the hills begin."

Trinidad Romero: "I am forty-seven years old. Formerly a delegate in congress from this territory. I first went to Real de San Francisco to reside in 1844. Remained there six years to 1851. I am acquainted with and familiar with the localities in the vicinity of that town. My father had a little farm at the Palo Amarillo, and cultivated there corn and beans." He also places mountains to the south-west of the town. He says: "There was a spring north-west of the Real de San Francisco, and a mountain there of that same name, and a whole range of small mountains extended from that point south. Between the town and the spring the whole range was called the 'Tuerto Mountains' in the early days, from the spring."

The defendant called the following witnesses to the point under consideration, to-wit, mountains south-west of Real de San Francisco:

Francisco Aranda: "There are small mountains to the west and south-west of San Francisco. They are called the 'Small Mountains of the Ojo Valverde.' Never heard mountains in that vicinity called 'Palo Amarillo' or 'El Tuerto.'"

Abad Nieto also fixes small mountains there, but never heard them called the "Tuerto."

Francisco Martinez calls them "ridges" to the west and south-west.

Jose Martinez swears he is well acquainted near San Francisco. "I do not know of any little mountain on the west side of Real de San Francisco by the name of 'Sierritta del Tuerto.' I do not know of any other mountain, except where the mine is called the 'Sierritta del Tuerto.'" On his cross-examination, he admits there are elevations south-west of Real de San Francisco, but designates them as "foot-hills," not mountains. This witness says he is some distracted and out of his mind.

Tecundo Chaves does not know any mountains west of San Francisco by the name of "El Tuerto."

Juan Nieto: "Well acquainted in the vicinity of Real de San Francisco from having lived there. Know of no mountains called 'El Tuerto' except those east and south-east of the town. Am well acquainted with the planting grounds of the Palo Amarillo. *Question.* Do you know whether there are any little mountains right in the immediate vicinity of the Palo Amarillo? *Answer.* No, sir: there is not one. There is only the *sachila* [ridge] that commences at the Ojo Valverde, and runs up to the Palo Amarillo." This witness does not dignify the elevation which other witnesses have called mountains by that title. He calls them "ridges." His evidence, however, proves an elevation there; the same that others call mountains.

Ventura Chavez. This witness shows knowledge of the locality. "*Question.* Is there a mountain where the mine is [referring to one south-east of the town] generally known as the 'Sierra del Tuerto,' or 'La Sierritta del Tuerto?' *Answer.* It is so called. *Q.* Do you know a point there called the 'Palo Amarillo Planting Ground'? *A.* Yes, sir; I do. *Q.* Do you know any other mountain in the vicinity of Real de San Francisco called 'La Sierritta del

Tuerto,' except the one in which this mine is situated? *A.* Yes, sir; *there is a little mountain just this side by the same name.* *Q.* Where is that little mountain? *A. That is called the ' Mountain of the Palo Amarillo.'* *Q.* Then it is not called 'Sierritta del Tuerto,' but the Mountain of the Palo Amarillo'? *A.* It is 'divided. One is called the 'Sierritta' or ' Palo Amarillo,' and the other is called the 'Sierritta del Tuerto.' *Q.* Then it is not called the 'Sierritta del Tuerto,' but the ' Palo Amarillo?' *A.* It is divided. One is called the ' Sierritta,' or 'Palo Amarillo,' and the other is called 'Sierritta del Tuerto.' It is divided. *Q.* Now, which way from the town of San Francisco is the one called the ' Sierra ' or 'Sierritta del Tuerto' ? *A. In this direction,* [pointing southeast.]" It is clear that this witness had in his mind that there were mountains south-west of the town from the. Palo Amarillo planting grounds, running north and east to the vicinity of San Francisco, and on the west of that town. He agrees with the witness who preceded him, except the former modified the extent of the elevation to ridges, while this witness named them mountains. Even a rigorous cross-examination by defendant of his own witness produced but little modification in his statement as to the name these mountains bore.

Mariana Antonio Sandoval was the wife of Serafin Ramirez, and shows an intimate knowledge of the locality. She places the El Tuerto mountain southeast of the town, and says she never knew any other mountain of that name in the locality. This witness also shows that she has an interest of about $2,000 in the result of the proceeding,—a payment of that amount if defendants get title. Although foreign to the point just now being considered, she also knows that, when Griffin was out with Miller, the contract of sale was made definitely, and money was paid.

Jose Augustin Ramirez, son of the grantee. On his original examination he says: "The El Tuerto mountains are south-east of the town of San Francisco." On his cross-examination, this evidence appears, (page 580, Record:) "*Question.* Are there not little mountains west of the Albuquerque road, and near the Palo Amarillo planting ground? *Answer.* Yes, sir; there are. *Q.* What are they called? *A.* They are called the ' Small Mountains of the Palo Amarillo.'" This witness also states $4,000 is due from defendants if their title is sustained, and to that extent both himself and mother are interested witnesses.

Nasario Lopez: "There are no mountains or peaks west of Real de San Francisco. From my infancy I have known of none west." On further examination, however, this witness joins the rest in placing mountains west of the Canon del Agua springs, which would fairly answer the grant call as to that point. He states: "*Question.* Do you know any mountains in the neighborhood of the San Pedro ranch known as the ' San Pedro Mountains '? *Answer.* Yes, sir, I do; some on the eastern side,—that is the old San Pedro. *Q.* Do these mountains lie east or west of the Canon del Agua spring? *A.* They remain to the west and the Canon del Agua spring to the east. *Q.* Are there any little mountains right near to the Palo Amarillo planting grounds? *A.* There are some very small mountains. They are not high mountains. They are hills near the valley."

W. W. Griffin: "*Question.* Are there not near the Palo Amarillo planting grounds, and lying between the forks of the road and that ground, two or three little mountains? *Answer.* There are two or three little hills or elevations,—gravelly elevations. They are not high. They would be called 'hills,' calling the others 'mountains.' " This is the last witness called; and he, the very last one, describes elevations south-west of the town, and north-west of the spring, but he does not designate them mountains.

It is worthy of note that not over three or four witnesses in all have denied absolutely the existence of such elevations. The large majority have called them mountains, a very few have named them hills, but they have not de-

fined just how high elevations must be to cease to be hills and begin to be mountains. It is possible a witness who did not want to discover mountains, might quiet his conscience by requiring the elevation to be quite great before it passed from a hill to the mountain stage of existence. On this point, the evidence of the witnesses has been quoted to demonstrate the correctness of the analysis thereof. It proves, by witnesses called by the defendant, that Francisco Aranda, Ventura Chavez, Jose Augustin Ramirez, Abad Nieto, Nasario Lopez—five in all—place little mountains to the north-west of the Canon del Agua spring. Jose Martinez, Juan Nieto, W. W. Griffin, Francisco Martinez,—four in number,—admit that at the point named there is a ridge or elevation, but they do not think it is made sufficiently large to be technically termed a small mountain. Tecundo Chaves, Mariano Sandoval, do not speak as to the existence of mountains south-west of the town. Their examination was as to mountains there bearing the name of "Tuerto," or "El Tuerto," but not as to the existence or otherwise of mountains; their attention being directed rather to the name of the mountains there, than to the point whether there were or were not mountains there. It is thus seen that a majority of the defendant's witnesses place well-defined small mountains south-west of the town, leading down to the Palo Amarillo, and so north-west of the spring, and that all of them who speak on the subject recognize high elevations there; so, upon this evidence alone, the court could safely believe mountains there which fairly might answer the calls of the grant, except as to the mere matter of name. The defendant's witnesses who say the name "Tuerto" or "Little Tuerto" was never to their knowledge applied to those south-west of the town give evidence negative in character, as those mountains might have borne such a name, and yet the witnesses might not have known it. There was no great significance at that time attaching to the name of these small mountains. The name would be only a matter of custom. A very great many people may have called them "Little Mountains of the Tuerto," and these witnesses who are called by the defendant not have heard such a name. They are generally persons of humble stations in life. If, however, they did not hear such name applied, it does not prove that others may not have done so. A large number of witnesses testified, on behalf of the complainant, that they did know such mountains were there, and did know they were called the "Little Tuerto." This is an affirmative fact, and such witnesses either have seen the mountains there, and have heard such names applied, or they are willfully false. Others who testify negatively may be equally honest, but yet never have heard such name applied. It would not follow that witnesses who did hear such name were either false or mistaken, because other witnesses, less observant, had not heard what complainant's witnesses testify they did hear. The negative evidence would not overthrow the affirmative. What is the weight of such testimony, and what does it prove? It has been copied into this opinion that it might be classified, and thereby the more easily be weighed and comprehended. There will be found hereinbefore, on this point, set out the evidence of the following witnesses: Edward J. Edgar, Antonio Nieto, Bartolo Pena, Jose Manuel Guerrero, Juan Guerrero, S. H. King, Vicente Garcia, Jose Maria Samoza, John M. Talbot, Nasario Gonzales, Juan Delgado, Eulogio Aranda, Tecundo Chaves, Jose Romero, Manuel Sanchez, Juan N. Guerrero, Jose Eusebia Sanchez, Felipe B. Delgado, Jose Henriques Guerrero, Stephan C. White, Henry Yates, Trinidad Romero, Felipe Delgado, R. W. Webb. This is a list of 24 witnesses, each and every one of whom testify clearly and distinctly to the existence of well-defined little mountains to the north-west of the Canon del Agua spring. Of this 24 all but 5 testify they have no interest whatever antagonistic to the defendant in this action. The fact, then, that there are mountains, just where the grant boundaries locate them, in size and name to correspond exactly with the call of the grant, is fully proven beyond a reasonable doubt. The evidence which

these witnesses give on this point is not assumed, but it is quoted from the record. A reference to their evidence, set out, will prove that Edward J. Edgar, Eulogio Aranda, Tecundo Chaves, Francisco Martinez, Antonio Nieto, Jose Romero, Bartolo Pena, Manuel Sanchez, Jose Manuel Guerrero, Jose Eusebia Sanchez, S. H. King, Felipe Delgado, Juan Delgado, Vicente Garcia, R. W. Webb, Henry Yates, Trinidad Romero, each and all in their evidence state that the name of the "Little Mountain of the Tuerto," or "Little Tuerto Mountain," was applied to those south-west of Real de San Francisco. These witnesses are 19 in number; 14 of whom have not, so far as appears, a dollar of interest in the action. Are small mountains to be found south-west of Real de San Francisco? Twenty-five witnesses answer yes, and only four answer no. With such proof, can there be much uncertainty of the fact? Was this range known as the "El Tuerto," and one of them known as the "Little Tuerto Mountain?" Refer to the record for the answer. Nineteen witnesses answer yes, while but nine at furthest say no. As to the fact of there being mountains there, the evidence of twenty-five, yes; and four, no. As to the the name being "El Tuerto," and a mountain there known as the "Little Tuerto Mountain," the proof stands nineteen in favor, to nine against. With such proof, there is added to the other calls heretofore referred to as established, by following the description of the grant, the addition of the Little Tuerto mountain, north-west of the Canon del Agua spring. Thus the evidence clearly proves that the grant description can be followed, and landmarks and description as written in the grant deed be found easily, unless it be the mine therein described. With every other boundary line, direction, and landmark clearly proven in accordance with the Ramirez deed, if some uncertainty does exist as to one single point,—the mine,—that should not operate to set aside every other landmark, and reverse the location of the grant. That survey should be made which will meet most of the calls. Is there any reason why the mine should be given prominence over all other landmarks? Is not the Canon del Agua spring just as prominent a point, and, in the nature of things, better known? Is not the Palo Amarillo road, traveled then daily, as certain as the mine? Distances, directions, lines, spring, roads, farms, should not all be disregarded to give prominence to a single point.

An examination of the evidence, however, will show that the mine also can with reasonable certainty be located where the grant boundary fixes it,—to the west of the spring,—and every point definitely settled. A consideration of the evidence relating to the mine shows that it is at least as likely to be west of the Canon del Agua spring, where the grant description places it, as east, where the survey locates it. The one known now as the "Big CopperMine," sometimes also called the "Ramirez Mine," is a prominent point in the defendant's contention. In fact, defendant so magnifies this one point as almost to obscure others of equal or greater importance. Whether this mine is the one referred to by Santiago Florez in February, 1844, in the description to the grant, or not, will now be considered. The burden of proof on that point is upon the defendant. The presumption must be in favor of the grant description. It will not be presumed that the judge, FLOREZ, in his official act evidenced by the deed, and placing in possession, made a mistake; and so the question must be whether the evidence proves a mistake.

Antonio Jacquez, a witness called by the defendant, is the central figure in the case on this point. When his evidence was taken he was 68 years old, and a resident of Chihuahua, Mexico. He says: "My profession is that of a lawyer. I have been engaged for the last thirty years in the discharge of public offices, and have been for over twenty years a magistrate of the supreme court of Chihuahua, and several times have been president of the court, by appointment of the other judges." This witness, just before his evidence was taken, went to the Big copper mine, and again looked over the ground. He

did this that he might refresh his memory and testify understandingly. He says that he came to the territory on business for Antonio Otero and his brother and copartners in claiming, acquiring, and working a mine called "Our Lady of Dolores;" first in company with Don Antonio Jose Otero, Mariana Barela, and Don Luis Aguilar. That with his associates they denounced the mine according to the law of the country, and posted notices thereof both at Santa Fe and San Francisco, and within 90 days sunk a shaft to the depth of 10 varas, and were put in possession thereof by Albino Chacon, judge of the first instance, who gave them a certificate; and that it was placed on file by the judge. That, the day before he testified, he went to the office of the surveyor general, and there saw, read, and examined that identical paper, and identified it as the one given him by Chacon. That the paper was also signed by attesting witnesses. He swears he worked in that mine himself, sinking the shaft; that it was worked for gold, but showed signs of copper; that they first established an *arrastrar* at Canon del Agua, and, the water not being sufficient, that they established one at San Antonio; that, when he and his associates began first to work the mine, there was nothing but a very small prospect hole there,—not over half a vara in depth at most; that, while he was working this mine, many persons were engaged working out gold at the placers; that he then knew Jose Serafin Ramirez; and that he at that time saw him at Santa Fe, the Placers, Perelta, and Albuquerque; that he saw Serafin at the Tuerto Placers there; that Mariano Barela was at the time superintendent of the working of the mine and reduction of the ores; that they (Jaques and his associates) had eight blasters, men engaged in hauling ore in wagons to the furnaces, all kinds of workmen employed—hoisters, wagoners, and other necessary employes; that Mariano Otero is the son of Juan Otero, and Jose Antonio Otero is the uncle of Mariano. He swears, further, that during all that time Serafin Ramirez made no claim whatever to the mine. He identifies clearly this mine as being the Big copper mine, and as the one of which defendant is in possession, and as to which the supplemental bill seeks injunction. He says himself and his associates were working this mine when the American forces came in; that Jose Antonio Otero and Juan Otero remained, and were partners in all their business, and, as such, acquired the interest in the mine which Aguilar held. He goes into the details quite minutely relating to the discovery, and shows much familiarity with the situation at that time, and impresses us as a truthful witness. The title papers to this mine, connected with the evidence of Jaques, constitute a chain of record evidence of great strength, and, that its force may be seen, they are here copied in full:

"EXHIBIT B.

"*The Deeds of Varela et al., Year* 1846.

"Legalized testimony of the registration and grant of the mine Nuestra Senora de los Dolores, situated in the Real del Tuerto mineral district, to the owners of the same, Licentiate Antonio Jaques, Mariano Varela, Antonio Jose Otero, and Luis Aguilar. [Seal.] Third seal. (Four reals.) Eighteen hundred and forty-six and eighteen hundred and forty-seven.

"On this day, at about ten o'clock of the seventh day of April, 1846, Mr. Luis Aguilar has appeared at this office under my charge, showing that he has discovered a mine [*cata*,] of gold, which he states is found in the Bonancita mountains, which registry he has made verbally in the presence of Messrs. Nicolas Pino, Jose Abreu, and Jose Salazar; he having to do so in accordance with the law on this subject within the term of ten days, in the manner by it prescribed, leaving deposited in the office a specimen [*piedra*] which he declares is from the said mine, the weight of which is twelve ounces; and for the proper evidence this entry is made, which I sign, with the witnesses of my attendance. I certify.          JOSE ALBINO CHACON.

"Attending.  TELESFOR SALAZAR.
"Attending.  FELIPE SANDOVAL."

"*To the Justice of the First Instance:* We, citizens, Mariano Varela and Luis Aguilar, both natives of the department of Chihuahua, by occupation miners, and now residents of this department, and living in the mineral district of Dolores, appear before you in due legal form, and state that we do in the name of the supreme powers of the nation, and of the local ones of the department, make formal registry of the mine which is situated in the Placer del Tuerto mountains, belonging to this precinct, which mine has a small excavation, and it is unknown who may have been its owners, it having been open from time immemorial, its courses being from north to south, and which we bind ourselves to work for gold, silver, copper, or what God shall be pleased to give us therein, giving it as a name ' Nuestra Senora de los Dolores;' for which purpose we ask that you be pleased to return to us, acted upon, this registry for our security, allowing us the time fixed by the ordinances on the subject for sinking the shaft of possession, and in due time to return and apply for possession.

"*District of Dolores, April* 12, 1846.

"Mariano Varela.
"Luis Aguilar."
"Santa Fe, April 13, 1846.

"All that is due under the law for the purpose being presented and admitted according to the requirements [circumstances] of the ordinance on this subject, *entry is made in the book of registrations of this office* of first instance *of the mine* mentioned in the foregoing petition, discovered by citizens Mariano Varela and Luis Aguilar, to whom is conceded the term of ninety days, counted from this date, for them therein to notify this office of the said registered mines, then having a shaft a vara and a half in width or diameter at the mouth, and ten varas in depth, for the purposes contemplated; the citizen Jose Albino Chacon, first constitutional alcalde of the illustrious corporation of this capital, financial justice of the department, and *ex officio* judge of the first instance of the Central district thus provided, acting with attending witnesses. I certify.                    Jose Albino Chacon.

"Attending.   Felipe Sena.
"Attending.   Narciso Cardinas."

"*To the Justice of the First Instance:* We, Antonio Jacquez, Antonio Otero, Mariano Varela, and Luis Aguilar, all shareholders in the mine Nuestra de los Dolores, the former of twelve shares by donation which the latter have made to them gratuitously, as will be accredited, if necessary, with the proper document, which they do not present now, so as not to expose it to loss in the transit from this point to the capital, appear before you in due legal form, stating that having *denounced* the said mine you granted in your decree of the thirteenth of April ninety days to sink the possession shaft on the terms prescribed by the ordinance on the subject, and the same being finished, we apply to you that you be pleased to come to give us possession thereof, or to direct that the justice of this mining district do so, being pleased to concede to us for that purpose the measurements and appurtenances corresponding to us as a company mine under article two, title 11, of said ordinance; wherefore we request that you be pleased to provide accordingly, this being justice, and we declare as is necessary, etc.

"*District of San Francisco del Tuerto, July* 12, 1846.

"Antonio Jacquez.
"Antonio Jose Otero.
"Mariano Varela.
"Luis Aguilar."
"Santa Fe, July 14, 1846.

"As I understand that I am not authorized to delegate this authority that is conferred upon me by law to the justice of the peace of that district, to order him to place in possession of the mine of Nuestra Senora de los Dolores

the solicitors in this petition, I will proceed myself formally to do so at the earliest opportunity. JOSE ALBINO CHACON."

"DISTRICT OF EL TUERTO, July 21, 1846.

"As it is required by the mining ordinance that, in order to execute the possession asked for by Messrs. Jacquez, Otero, Varela, and Aguilar, an expert should be appointed to examine the declivity or incline of the vein, the direction in which it runs, the hardness, softness, or quality of the ores, etc., and there not being in this department any professor, and it appearing to me that citizen Julian Tenorio is the most proper person, I appoint him to discharge the duty of expert in the possession that I should give to-day to the aforesaid gentlemen of the mine Nuestra Senora de los Dolores, for which purpose they shall be summoned, and this decree made known to them, as well as the citizen appointed expert, so that he may accept and be sworn; as so ordered, decreed, and signed, with my attending witnesses, for the lack of a secretary. JOSE ALBINO CHACON.

"Attending. ANTONIO CHAVEZ.
"Attending. FRANCISCO SARRACINO."

"Messrs. Jacquez, Otero, Varela, and Aguilar were immediately notified of the foregoing decree, and said that they heard the same, and signed it with me, and those of my attendance. JOSE ALBINO CHACON.

"Attending. ANTONIO CHAVEZ.
"Attending. RAFAEL CHACON."

"Immediately, the citizen Julian Tenorio was notified of the foregoing decree, and said that he heard the same, accepted the appointment, and swore to faithfully perform his duty as expert in the possession that will be given of the mine Nuestra Senora de los Dolores, according to his best knowledge and understanding, and that he will act without injuring any of the parties, without being influenced by gift, bribe, or other passion, and signed the same with me, and those of my attendance.

"Attending. ANTONIO CHAVEZ. JOSE ALBINO CHACON.
"Attending. RAFAEL CHACON. JULIAN TENORIO."

"I proceeded immediately, accompanied by my attending witnesses, the appointed expert, and the interested parties, to the mine called 'Nuestra Senora de los Dolores,' and, finding ourselves there, I ordered the expert to examine the same, and he, having done so, said that the shaft of possession had the ten varas in depth, and the vara and a half in diameter, as required by the mining ordinances; that the vein is of gold; that it runs from north to south. Its inclination is horizontal. Its declivity lies in the lower part of the hill. Its walls show the greatest solidity. And, the expert not having anything else to say, his statement will be recorded upon the corresponding record book. And according to him there were given to the parties interested, and measured from the mouth of the mine to the east, one hundred and ninety varas, and to the west ten varas. After this they proceeded to measure six locations upon the line or direction of the vein pertaining to them as discoverers and partners, and consequently they were measured from the mouth of the mine to the north eight hundred varas, and four hundred varas to the south, at which limits were placed the corresponding stakes; and I ordered them to build their mounds at said limits. This being concluded, I ordered the interested parties to walk over the surface of the mine, and to throw stones in all directions, in sign of possession, that by this writing I grant to them, in the name of the supreme powers of the Mexican nation to the citizens Don Antonio Jacquez, Don Antonio Otero, Don Mariano Varela, and Don Luis Aguilar; giving to them for their security and protection for all time certified and authorized copies, signing myself, with the appointed expert and my attending witnesses, for the lack of a secretary, there being none in this department. JOSE ALBINO CHACON.

"JULIAN TENORIO.

"Attending.  ANTONIO CHAVEZ.
"Attending.  FRANCISCO SARRACINO.
"Fees, eighty dollars.  I swear it.        [Rubric.]
"In the first page and in the first line is interlined 'Juzgado:' **Valid.**

"This is a copy of the original, faithfully and legally made, compared, legalized, and authorized by me and my attending witnesses, with whom I act as special justice for the lack of a secretary.  I certify.

"JOSE ALBINO CHACON.

"Attending.  TELESFOR SALAZAR.
"Attending.  FELIPE SANDOVAL."

This record evidence is very impressive, when the seven witnesses who attest as being present at the various acts are considered; for it proves actual possession by Jacquez and his partners, by seven witnesses to the various legal steps, and is record evidence of the fact.

Melquiades Ramirez was called as a witness by the complainant.  He is a brother of Jose Serafin Ramirez, the grantee, and was 52 years of age at the time he testified.  He came to New Mexico first, to reside, in March, 1845,— about one year before Jacquez and his associates discovered the mine.  He swears José Serafin Ramirez came to New Mexico in 1839, and was residing in Santa Fe in 1845, when he (Melquiades) came, and they went together to the place in 1846.  He says Serafin went to San Pedro, and he went there, and lived with him; that he (Melquiades) lived there until 1863, when he left, and went to the county of San Miguel.  He says: "Serafin lived in that vicinity till 1865 or 1866, and then he moved away."  He continues, in answer to interrogatories: "In 1846, I knew Mariano Varela, Luis Anguilar, and also Antonio Jacquez, from Chihuahua.  They were engaged in 1846 in mining near Real de San Francisco.  They worked their ore at that time in San Antonio.  I have seen the mine they got their ore out of at that time.  That mine lies about a mile and a half south-east of San Francisco.  I can't state distance exactly.  It is in a mountain.  That mountain was called the 'Mountain of the Placer,' and some times 'Del Tuerto.'  The first mining work my brother and I engaged in was in working in the Una de Gato, assaying ores, about the year 1852.  We got the ores at that time from the Huertas mine, then so called, and also ores from the Cerillos.  In 1846 my brother and I had nothing whatever to do with this mine, which Barela and Luis Aguilar were working there in 1846.  After that time we did have something to do with that mine.  In the year 1854, more or less, we were taking out ore, crushing and working ore, from that mine.  *We then claimed it by denouncement as an abandoned mine.*  I do not know of any other claim except by denouncement made to it.  I, at least, made no other claim.  I never heard my brother make any other.  My brother and I continued to work that mine from 1854 up to 1863, when I moved to the county of San Miguel to reside.  I do know that between the time that Jacquez and Aguilar worked it, and the time when my brother took possession of it, that other persons did work that mine.  In that time Tomas Valencia worked it.  I do not know how long he worked it, but he commenced working it in the year 1846 and a part of 1847.  I have seen that mine since then.  I saw it the last time in December, 1881, and have heard it called by the name of 'Copper Mine.'  *That Big copper mine is the same one that was worked in 1846 by Mariano Barela and Luis Aguilar,* and the same one my brother took possession of in 1853 *and* 1854 *under a denouncement.*  It is all the same mine.  It was never claimed by me or my brother as having belonged to our grandfather or grandmother or great-grandfather or great-grandmother or any of the family.  I have lately seen a paper on the files purporting to be a claim by my brother Jose Serafin Ramirez, and also an oath indorsed on another paper."  The oath to which the witness evidently refers is in the record.  It seems to be on file in the surveyor general's office, and indorsed, as would ap-

pear from this witness' evidence, on some of the grant papers. In what way it relates to the grant, who procured it, or who filed it, does not appear, that we can find from the evidence. This oath was not filed prior to its date, but it seems then to have been indorsed on the papers previously on file. It reads as follows:

"*Territory of New Mexico, County of Bernalillo:* Before me personally appeared the undersigned, requesting that the oath might be administered to them, they declaring, under the responsibility of that oath, that Francisco de Moradillos is their great-grandfather and that this is the truth.

"Parties sworn.
"Jose Serafin Ramirez.<br>Melquiades Ramirez.<br>"Serto Ramirez."

The witness continues, as to this paper: "I have examined that paper. I never made any such oath or statement. I never appeared before a justice of the peace and made such an oath. I never signed that paper. I understand Serto Ramirez never signed it. He does not know how to write. I never made any claim myself, nor did I ever know of any of my brothers to make any claim, to the mine Barela worked, by virtue of any inheritance from my father or great-grandfather. The mountain in which this mine is situated was called by different names. It was called the 'La Sierritta del Tuerto,' the 'La Sierra de Bonanza,' and 'La Sierra del Placer.' I saw that mine before Barela worked it. It had been an abandoned mine before that. It was a shaft about two or three varas deep. I had a grandmother whose name was Dolorez Diaz. I know Tomas Valencia, and that he was working there, but do not know my brother was working or interested with him. I arrived in this territory in 1845. Stayed in Santa Fe from 1845 until 1846. I came in March. I went to the Placer, and stayed a year. I stayed then at San Pedro three or four years. In November, 1846, I went to the Placers, and stayed about a year, and then went to San Pedro, and stayed until 1857, and then made a visit to Old Mexico, and returned. Stayed there a month, and then came back. My brother was engaged in assaying ores in Una de Gata about 1852 or 1853. I know Juan Jose Jarmillo. He was a justice of the peace at San Antonito in 1853, and *that was about the time my brother Serafin commenced* to work this Big copper mine. I was under his control at that time, and of course had to work for him. We *denounced* this mine, I think, in the year 1854, *as an abandoned mine.*"

Bartolo Pena, 61 years old when examined: "I am a miner and laborer. Resided at Real de San Francisco since 1845 or 1846. I know the mine now in the possession of the San Pedro & Canon del Agua Co. called the 'Big Copper Mine.' I heretofore worked in that mine, and again lately. I know who first discovered the Big copper mine. It was discovered by two men, Mariano Barela and Antonio Jacquez, and they were partners in working mines. I saw Mariano Barela twice in the mines. I know about the time when he discovered the mine, but can't state it. I know a man living at the town called King. He worked that mine also. I know Jose Serafin Ramirez personally. King worked the Big copper mine; so did Serafin. Lately I have worked for the San Pedro & Canon del Agua Co. I do not know how long Mariano Barela and Antonio Jacquez worked that mine. They did not work it much. I was there twice at the time when Mariano Barela was working it. When I first saw them they were at work there. Barela and Jacquez first worked the mine, afterwards King worked it, and *after that Serafin* also worked it. I worked also in the Campbell mine. The Campbell mine and the Big copper mine are both in the same mountain. One is on this side, and one is on the other. When I first knew the mine now called the 'Big Copper Mine' they were working it very little. Serafin Ramirez was not a partner with Antonio Jacquez and Mariano Barela. Mariano Barela worked that mine for gold. He worked it in San Antonito."

Vicente Garcia: "I first knew the Real de San Francisco about the years 1840 and 1841. My parents lived there at that time. I was there visiting my father frequently until 1846, and that year went there to live with my father. I was acquainted with Mariano Barela, Luis Aguilar, and Antonio Jacquez. All three of them worked mines there. I also knew Jose Serafin Ramirez. He moved out there in 1846. Before that, he resided at Santa Fe. Jose Serafin Ramirez was my teacher. There was a great deal of work done in mining in the vicinity of that town from 1841 to 1846."

Nasario Gonzales: "Age 64. Lived at Real de San Francisco. First knew it in 1842. Lived there in 1846, about six months. Was more or less familiar with the different localities. While I lived there, I knew Mariano Barela and Antonio Jacquez. They were working mines. I also knew Jose Antonio Otero. I was informed they were working a mine in the little mountain south-east of the town. Before the settlement of the town, that mountain was called the 'El Tuerto;' afterwards it was called the 'Little San Francisco Mountain.'"

Eusebio Sanchez: "I live in Real de San Francisco. First came there to live in 1843. I know a mine now called the 'Big Copper Mine' in that locality, and now in the possession of the San Pedro & Canon del Agua Company. I know it by sight, but have never been in the mine. I do not positively know who discovered it, but I have heard ever since I was very young that it was a man by the name of Mariano Barela. I never knew of Ramirez claiming it until he made the sale to Col. Carey, and I knew of others working it before that."

Trinidad Romero: "I first went to the town in 1844. I know the Big copper mine. I was there about three years ago. I knew that mine from the time we were living there. I was there at that mine at the time Mr. King, an American, who was an immigrant from the state of California, stopped there, and took hold of the mine, and worked it some. I don't remember King's first name. He had a son, S. H. King. I remember their working that mine before King did, but do not remember the names of the parties. I knew Antonio Jacquez, and that he was working a mine, but don't remember whether or not he worked that mine. I think King worked the Big copper mine along from 1847 to 1848. I believe about that time Serafin stopped with my father every time he came to town. During the time we lived there I never knew or heard of his working the Big copper mine, or claiming it. I did not hear of his working that mine until after we left there; then, in 1854, I heard of his working it. I think we left in 1851, and Serafin moved into our house."

Francisco Perea: "Fifty-two years old. A member of congress in 1864 and 1865. Returned to New Mexico from college at St. Louis in August, 1845, and up to 1847 went once a month to Real de San Francisco on a business trip to a store my father had there. Antonio Jose Otero was my uncle by his wife, and afterwards my father-in-law. When I was at the Placers in 1846, I knew my uncle was engaged in mining operations there. In going there one time, my father sent a peon with me. When passing by San Pedro we saw some wagons coming, and the peon said to me: 'There goes the wagons of Oteros, bringing ore from the mines.' I know where the mine was situated which he was working at that time. I was near enough to the mine to see where it was located. I saw the wagons coming down the mountains on the south-western part of it. There was a train of wagons coming down, right from the mine, at the time; and I knew where the mine was, more or less, then, and I know where it is now. I did not until late years know any one was asssociated with Otero in working that mine. The Mexican people called it the 'Otero Mine.' This mine was east of the Canon del Agua spring. I have been at that place in later years. In the year 1865 no one was in possession of that mine."

The foregoing recital contains, as to the Big copper mine, the evidence of Antonio Jacquez, Melquiades Ramirez, Bartolo Pena, Vicente Garcia, Nasario Gonzales, Eusebio Sanchez, Trinidad Romero, Francisco Perea,—eight witnesses in all,—corroborated by the official papers filed by Jacquez, Barela, and Aguilar, and being the title papers identified by Jacquez, and copied herein.

The evidence in the case proves, to our entire satisfaction, that Barela, Aguilar, and Jacquez, in 1846, discovered what is now known as the "Big Copper Mine." The papers filed by Barela, and the action of the authorities thereon, are conclusive on this point. The papers speak louder than any living witness can. They fix the date, and the evidence which identifies that as the Big copper mine is satisfactory. That Jacquez, Barela, and Aguilar did work that mine is proven by at least seven witnesses; and Jacquez, who worked there, identifies it as the Big copper mine. Francisco Aranda, a witness for the defendant, testifies that it was said that Jose Otero and Juan Otero were furnishing wagons to Barela with which to haul his ore down to the springs at Antonito. He is corroborated by Perea, who swears he was there in 1846, and saw these same wagons coming down the mountain from the mine, loaded with ore. They were pointed out to him as the "wagons of the Oteros." This work was so publicly known that, as he says, the mine was generally spoken of as the "Otero Mine." The evidence is so strong that it cannot be doubted that Barela claimed to have discovered a mine, which is none other than what is known now as the "Big Copper Mine." This was not an original discovery, but the rediscovery of an old abandoned mine. The papers filed before Judge JOSE ALBINO CHACON prove that Luis Auguilar appeared before Chacon on the seventh day of April, 1846, and claimed the discovery of a mine, and made verbal registry of the mine April 12, 1846. Himself and Mariano Varela, sometimes called Barela, filed formal written application for its possession. On the same date a formal paper was filed, showing that Varela, Aguilar, Jose Otero, and Antonio Jacquez joined in the enterprise. An expert was appointed, and formal proofs made. The justice of the first instance, Jose Albino Chacon, recites in the title papers held by Barela, Jacquez, and Otero: "I proceeded immediately, accompanied by my attending witnesses, the appointed expert, and the interested parties *to the mines*, * * * and, finding ourselves there, I ordered the expert to examine the same. * * * After this, they proceeded to measure six locations upon the line or direction of the view pertaining to them as discoverers and partners, and consequently they were measured from the mouth of the mine. * * * This being done, I ordered the interested parties to walk over the surface of the mine, and throw stones in all directions, in sign of possession." There was present, as shown by the papers, Antonio Jacquez, Antonio Jose Otero, Mariano Varela, Luis Aguilar, as discoverers and partners, Jose Albino Chacon, justice of the first instance, Julian Tenario, interpreter, Anton Chaves, Francisco Sarracino, as witnesses. Eight witnesses attend this formal act of delivering the possession of the very mine in controversy. Antonio Jacquez in 1883, standing at the mouth of the mine, identifies it as the one named in these papers. Antonio Jacquez, as a witness, proves actual possession and work on the mine in 1846. He says Juan Antonio Otero was an uncle of Maranio Otero, the son of Juan Otero. He says Juan Otero and Antonio Jose Otero were partners in the mine; that they got the interest Aguilar held originally, and when the American forces came in they (the Oteros) remained there, and the mine was then over ten varas deep; and that San Francisco contained 2,000 people. He says: "I worked in sinking a shaft as required by law, and from the time possession was given to me I worked it until the United States forces came into the territory. I had eight or ten blasters at work taking out ore, and men employed hauling ore in wagons to the furnaces. We had all kinds of workmen, wagoners, blasters, hoisters of the metal, and other employes. *Serafin Ramirez made no claim to the mine.* Notices were posted up, both

at Real de San Francisco and at Santa Fe, that we had denounced the mine, in order that, if any other persons had any claim, they could appear and manifest it." This witness comes with the very highest evidence of character. In his country, he has been continuously for 20 years trusted as a member of the highest court in the state, and occasionally its presiding officer. The facts he narrates are corroborated by the witnesses heretofore named, nine in number,—some of whom knew Barela to work there; and others, of the Otero wagons hauling the ore away. The Oteros remained, and continued the work. After Aguilar went back to Mexico, as Perea and Aranda fully prove, Jacquez and his associates, in the most public manner, took possession and worked the mine. Where was Serafin Ramirez during this time? Whether at Santa Fe or Real de San Francisco, he would get notice, as it was posted in both places. Where was he during the public act of taking possession; during the previous work to sink the shaft, as the law required; while the blasters and hoisters were taking out ore; while the Otero wagons were hauling it to Antonito? So far as the evidence shows, he was utterly silent. Had he, *two years before*, procured his grant, to claim thereunder this mine? If so, would he have stood by without protest, and see Jacquez (known as a profound lawyer) with his associates denounce the mine, work it, receive juridical possession, and build up against him legal titles thereto? The acts done by Jacquez and the Oteros were on so large a scale, they must have been notorious; and, in addition, notices were prominently posted in both towns, so, if he had lived at either, he would have known of this occupation hostile to his claim, if he had any. He was a prominent and influential man. The posted notices at the two towns would have come to some of his friends, and they would have informed him, (Don Serafin.) If Jacquez tells the truth; if, as Perea says, in 1846 and 1847, the wagons of the Oteros were hauling ore from this mine; if Barela had the ore from the mine taken down in wagons and carts belonging to the Oteros to the spring at San Antonito, before Serafin began work,—it is wholly unreasonable to believe that Ramirez would have stood by without a word. If, in 1843, 1844, or 1845, Ramirez had sent out his peons to clean out the mine, it would not have been an old abandoned mine, as Barela and Aguilar put it on record, as Jacquez and others also swear, but one showing work newly done. There is one reasonable theory upon which the evidence in this case can be only reconciled and one which is probably the truth. If, however, Serafin Ramirez had no claim at that time to the mine, but began his claim later, in 1852 or 1853, as his brother swears, by a denouncement, and not under a claim through his great-grandfather, his silence while Jacquez worked the mines would be accounted for, and his omission to object to such occupation by Jacquez and Barela and Otero be consistent with his claim in 1852, but not with the one he now sets up.

Appellee, in his brief, says: "We suggest, however, that all statements by witnesses as to matters accruing nearly forty years since are to be received with a great deal of caution; at least, so far as exact dates are concerned." That statement is very creditable to the learned counsel, Mr. Thornton, who evidently prepared the able brief in which it occurs, and who has deeply impressed this court, not only with his ability, but as well with his fairness in argument. It is exactly at the point suggested by this quotation where the case of the appellee is weak. The complainant presents the petition of Ramirez to the Mexican government; the solemn written deed of possession made by the judge, and the record therein; the no less formal petition to Surveyor General Pelham, with proof of actual possession under the grant description then made; two petitions; two records, each one undergoing the scrutiny of different officials at different periods; also the title to the mine, with the certificate of the attending witnesses. All this the appellee seeks to overthrow and set aside as incorrect, and substitute for this written record, made at the time of its date, the failing memory of a few old men as to events, names

that mountains bore, dates, transactions, 40 years ago; and this evidence sub-
ject to those feelings and interests which are necessarily a part of human nat-
ure. The character of such evidence proves its inherent weakness. Where
so large a stake is involved, there is also the temptation to corrupt witnesses,
—to shadow them, as Davis and Hart did Aranda. There is, in addition, the
liability on the part of the witnesses, in speaking of so remote a time, to be
inaccurate where certainty is important, and forgetful or visionary respecting
dates or events. All this, and much more which might be added, shows that
evidence depending on memory is not in any degree so reliable as what has
been so often solemnly reduced to writing and made a matter of record. Here
it is well to observe, there is another record as to the location of this grant,
which in a high degree corroborates the deed of Ramirez. This is set out in
Exhibit H of the record. It is the petition for the same land by another
claimant:

"*To the Judge of the First Instance:* I, Jose Terran del Balle, native of
the department of the east, and established here in this territory for eight
years, present myself before your honor, stating that having examined a
tract of unoccupied land, which is known by the name of the ' Canon del
Agua,' which in the name of the sovereignty I register and solicit, as much
for the purpose of encouraging the pursuit of agriculture, although with im-
mense labor which it needs, as for the purpose of keeping some animals on its
summer pasturage. * * * Said tract has from north to south 4,300 varas
on the east; 5,000 from east to west on the north; from north to south on the
west, 4,300; from east to west on the south, 5,000 varas. * * *

"*Real de San Francisco, February* 15, 1846.

"JOSE TERRAN DEL BALLE."

The record in writing recites that the judge, TRINIDAD BARCELO, actually
went with Del Balle onto the ground, found it vacant, and gave formal pos-
session. Here is a date fixed by writing and record, and a written recital of
the fact, which shows that at the date February, 1846, the tract known as
"Canon del Agua" was vacant. If the Big copper mine had been a part of
that tract, and then occupied, no such certificate could have been made. If it
was not a part of the tract, but was far to the east of it, and occupied, it
would not have been in the way of such a recital. The description used is
strong evidence to corroborate the description of the grant to Ramirez. It de-
fines the boundaries as being from north to south, and from east to west,
with the points of the compass. So, also, does the description in the grant to
Ramirez, in effect, as recited in the original grant. Del Balle's petition and
grant give the length of each of the boundary lines, which corresponds ex-
actly with the description used by Ramirez in his petition in 1859 before Pel-
ham, to-wit: "The quantity of land claimed is five thousand varas square."
Ramirez himself regarded the Canon del Agua, as described in Del Balle's
petition, as the same owned by him, and granted; because on the seventh
day of December, A. D. 1887, he procured for him a conveyance of the grant.
In that instrument Del Balle recites that he conveys to Ramirez because the
latter has a *prior title*, and has given him 500 varas of the land. Later,
August 7, 1866, after Cooley, Kitchen & Co. had received their conveyance
from Ramirez, Del Balle is again called upon for further conveyance to this
same grant. At that date he makes a second conveyance, for which $100 is
paid. This conveyance is witnessed by Ramirez. Here, then, is an addi-
tional record, dated only two years later than Serafin's grant, in which the
idea is clearly conveyed that the lines are direct north, south, east, and west,
and the form about square. From the fact that exact distances are named, it
is probable that measurements were made. This shows that there was a well-
defined tract of land known there as the "Canon del Agua." This record is
also sought to be overthrown by the same class of evidence. Contrast this
description with a diagram showing the lines made by the survey sought to be

upheld, and it reveals such a departure from the description as at first sight to condemn the survey. It is also written in the record by the justice of the first instance, CHACON, in writing, proven by eight witnesses, that on the twenty-first day of July, 1846, Jacquez, the Oteros, Varela, and Luis Aguilar were in actual possession of the Big copper mine. Which shall prevail,—this record, thus attested and preserved, or the infirm memory of a few witnesses?

Holding fast to these papers written, and records made and attested, by so many different men, safe anchorage is found upon which to establish the truth; turning away from this safe and reliable proof to "evidence which should be received with caution," nothing can be certain or reliable. No public official, with a merely executive duty to perform, should permit himself to be drawn from positive, reliable, certain written evidence, to rest upon that which is uncertain and visionary. There is no one fact about which men are more liable to be honestly mistaken than as to dates; and, respecting Ramirez's claim, dates are of the utmost importance. If it be true that he made no claim that the Big copper mine was the one referred to in his papers until years after the grant, then there is no reason why that mine should be taken as a land mark more than the one west of Canon del Agua spring. It is not so important what Ramirez claimed *after* 1848, in ascertaining the boundary point,—although such a claim would have its weight,—as what he claimed prior to 1844, the date of his grant. We believe the evidence does prove with certainty that, early in 1846, Jacquez and his associates had actual possession of the mine, and that the Oteros continued to work it. It also proves that at occasional intervals, at a later period, Ramirez also occasionally worked the mine. There is an entire failure of the proof as to a continuous claim by Ramirez, or continuous work. The written evidence which Ramirez placed on file as to the mine west of the spring described it as "ancient." The evidence proves that he worked that mine quite as early as the other, and the evidence as clearly indicates that as a call in the grant as the one to the east. Here it may be well to consider the evidence relating to that point. The following evidence tends to show a mine south-west of the Real de San Francisco, and north-west of the Canon del Agua spring, at a point where a large majority of witnesses place the Little Tuerto mountain, and a point corresponding with the call of the grant.

Bartolo Pena, in his examination taken before Treadwell, says: "The mine on the left side of the arroyo, just at the foot of the Padernal mountain, was discovered by Ignacio de Geboro. Do not remember the year, but it was the first mine discovered and worked in this section. It was an iron mine. It was afterwards located and claimed by Jose Serafin Ramirez. He called it his own mine. There is also another mine in that section of the country, the Big copper mine. It was discovered by Mariano Varela and Antonio Jacquez. After it was discovered, Serafin Ramirez worked it."

Trinidad Romero: "*Question.* Do you know, during the time you were first residing at San Francisco, there were any old mines in the vicinity of the Palo Amarillo? *Answer.* Yes, sir; there were several shafts there in a little mountain, but I do not now remember what they called the little mountain. My father used to tell me they belonged to Serafin Ramirez. They were then working those mines. I first went to Real de San Francisco, to reside, in 1844, and lived there six or seven years. My father had a planting ground at the Palo Amarillo, and I herded the cows and goats near there. Near the roads over there, close to the Palo Amarillo, I have seen two shafts there,—maybe more; two I remember well. I know Serafin Ramirez very well. My father was personally well acquainted with him. He was his ' compadre,' and used to stop with my father every time he came to town." Again, speaking of the old shafts to the south-west of the town, the following is in his evidence: "*Question.* From my recollection of your testimony,

you mentioned that the people went sometimes on one side of the mountain, and sometimes on the other, when the road was bad. It was in that little mountain, was it? *Answer.* Yes, sir; it was on the Albuquerque road. They had some particular name for that little mountain at that time, but I have forgotten it. It was close to the place called 'Palo Amarillo.'"

Mariana Antonio Sandoval, (folio 2819:) "Was the wife of Don Serafin. *Question.* In 1864, and the early part of 1865, did not your husband make locations of new mines, many of them near the town of San Francisco,—some in the mountains, and some of them near the Palo Amarillo? *Answer.* What mines are to be found in the Palo Amarillo? You are asking so many questions I have become confused; there are so many mines over there."

Jose Augustin Ramirez: "Son of Don Serafin. Was born in 1845. I know the place known as the 'Palo Amarillo Planting Grounds.' My father worked a mine close to the Palo Amarillo. I do not recollect the exact time. He generally took me along with him. My uncle Melquiades Ramirez lived with my father at that time, but did not work in that mine. He did not discover the mine. This mine is a little south-west of the town of Real de San Francisco. It is between the two roads that go to San Pedro; that is, the old and the new road,—about half way between them. It is an *old lead*, probably five or six feet deep. It was discovered and prospected by my father. I can remember when he discovered and prospected it. At the time I was justice of the peace, in April, 1865, my father, Jose Serafin Ramirez, Melquiades Ramirez, Manuel y Lopez, and Juan Ortiz made a petition to me as justice of the peace to register a mine of lead and silver at the Palo Amarillo. It is the mine I have just spoken of, and the shaft is five or six feet deep." Consider this evidence of the son in connection with the paper to which he refers, and it proves conclusively that this mine is not a new discovery, but an "ancient mine." The following, in evidence, is the paper to which the witness refers:

"TERRITORY OF NEW MEXICO, COUNTY OF SANTA FE.
" *Claim of a Mine at the Palo Amarillo.*
"PLACER, March 28, 1865.

"*To the Honorable Augustin Ramirez*—SIR: Your petitioners, proprietors and owners of a lead and silver mine at the placer of the Palo Amarillo, *and within* the location of the tract of the Canon del Agua, within the district of the Placer de San Francisco, state that as members of the New Mexico Gold and Copper Mining Company, at the placer of San Franciso, and in its name, we register and claim a mine of one thousand five hundred feet on the direction of the vein. The *said mine is ancient*, and known as 'Antonio Salazar's,' of whom it was bought by your first petitioner in the year 1848, and the assessment work done according to the old laws, and now it is registered as a part of the company, by halves with your first petitioner. * * *
"JUAN ORTIZ.
"JOSE SERAFIN RAMIREZ.
"MANUEL C. Y LOPEZ."

A certificate is attached to the foregoing, dated March 28, 1865, signed by AUGUSTIN RAMIREZ, justice of the peace, certifying that Jose Serafin Ramirez, Melquiades Ramirez, and Manuel C. y Lopez came before him, and declared "that everything contained in the preceding instrument is the truth." Augustin Ramirez identifies the mine named in this instrument as the one near the Palo Amarillo. Augustin was born in 1845; so in 1848, when this paper recites this mine was bought by Ortiz, Augustin was only three years old, and could not have known about it. It was a mine as early as 1848, so he is mistaken about its being discovered by his father, unless it had fallen into disuse, which is likely, and was again owned by Don Serafin. This mine was of sufficient importance to buy and sell in 1848. Its history prior to that date is not very clearly disclosed. It is about the place where Bartolo Pena locates

a mine, which he says was the first one discovered in the country, and which he says Ignacio Gebere discovered, and which he says was afterwards located and claimed by Serafin Ramirez, and which Pena calls an "iron mine." Unless these two mines are the same, then there are two very old mines there. Serafin Ramirez and his associates no doubt regarded the mine described by Augustin as a very old one, for they described it as an "ancient mine."

Felipe Delgado, (folio 713:) "*Question.* In your testimony yesterday you stated that Ramirez was working a copper mine situated in the Canon del Agua. What direction was this mine from San Franciso? *Answer.* I heard the mine was to the west of the Canon del Agua. *Q.* The question is, what direction was it from the town of San Franciso? *A.* To the south. *Q.* Was it south or east? *A.* To the south directly. There was one other copper mine that I heard of in that district. I heard it was near the Canon del Agua to the west." "The Canon del Agua runs from the south to the north. I heard it was on the west side, but whether above or below the spring I do not know. This copper mine was not in the same mountain in which the mines known as 'Bonanza' and 'Bonanzito' were situated. That mountain is separate from the Canon del Agua. The Canon del Agua mountain is south-west of the mountain where the Bonanza mine was. San Francisco mountain is the name where the Bonanza was. When I went out there it was not known there was any mineral this side of the mountain." This gives a strong indication that, at the time, there was a mine to the south-west, that it was a copper mine, and worked by Ramirez.

Juan Delgado: "I have seen some old mines near the road that goes down to the Rio Grande, a little to the south-west of San Francisco."

Stephan C. White: "*Question.* Do you know whether there are any old shafts—mining shafts—around anywhere in the vicinity of this Palo Amarillo planting ground? *Answer.* Yes, sir; there is one old shaft,—an old mine out on this road we are speaking of, [the road going down from San Franciso to Palo Amarillo,] to the right of the road before you turn off to go down to the Palo Amarillo,—to the west of the road. There is an old shaft there. More iron, it appears to me, in the shaft than anything else, with some copper to the west of it. The shaft is probably five or six feet deep. They call it a mine. It would be called a mine if it showed a big body of mineral. There is a good body of mineral in it."

John M. Talbot: "There is a road leads from San Francisco directly down to the Palo Amarillo. There is one mine south of this Palo Amarillo road, about a mile and a half from Golden, in a south-westerly direction, on the east side of a small mountain,—an old mine that had been worked there; a good deal of rock thrown out; about eight feet deep. Showed a good deal of mineral, iron, and galena ore."

Eulojio Aranda: "I heard White testify. I heard all the people say Ignacio Vara sunk that shaft, but I do not know him, or see him do the work. I do not know when it was sunk. When I saw it, it was old, and about six feet deep."

This proves that as early as 1848 this was then an old mine. Who Ignacio Vara is, the evidence does not disclose. Another witness does speak of him as having discovered the first mine in that country. It will be observed that the word "discovered" is used both to apply to a mine never before worked, and also to one commenced and abandoned; so it would not result from the use of that word that this mine might not have been very old. R. W. Webb testifies also to a mine in the same locality.

Although we have compiled a statement of the evidence given by the defendant's witnesses as to the Big copper mine, its location, and Ramirez's relation to it, yet this opinion has extended to such length that it is deemed advisable to omit such detailed statement. It is, however, our belief that such evidence in no way overturns that of Antonio Jacquez, or the record

above referred to, and the witnesses who support it, and that it is not sufficient upon which to hold it proven that the mine mentioned in the grant description lies east of the Canon del Agua spring, rather than west of it; especially in view of the other evidence in the record. With the overwhelming weight of evidence proving the Little Tuerto to be just as the petition of Ramirez fixes it,—north-west of the spring,—with mines there fairly meeting the description in the grant in that particular, it does seem that the lands granted should not be inverted so as to make such a radical change in location, even if it were uncertain as to the exact locality of the mine. If all other calls in the grant description—the landmarks—can be found, and there is uncertainty as to one only, that should not operate to disregard all others.

THE NORTH BOUNDARY LINE.

Let us now examine the evidence as to the foregoing line, and it will be plain that such line is wrong beyond all doubt, as fixed by the survey. The evidence which shows an absolute disregard of the northern boundary, as recited in the grant description, is to our minds perfectly conclusive. It will not be necessary to add to the length of this opinion by quoting all the evidence, but a careful reading of it demonstrates that San Francisco at the date of the grant was a town of about 2,000 people. The survey includes a substantial part of that town. It is not to be believed that Ramirez asked, or that the judge of the first instance granted and turned over to him, possession of such a town. It was a flourishing mining region, and the vacant lands adjoining it would be reserved for commons to actual residents, as by the Mexican custom at that time; besides, the evidence conclusively fixes a line east and west, near a mile and a half south of the town, as the correct northern boundary.

Juan Delgado: "Going down the Palo Amarillo about two and a half miles, the Palo Amarillo road forks to the right,—to the west."

Jose Maria Samoza: "The road from San Francisco to the Palo Amarillo goes about two miles almost directly to the south, and then changes to the west."

Samuel H. King: "I know the Palo Amarillo. A road went down there from Real de San Francisco. It was a plain road. The whole produce raised on the Palo Amarillo was hauled over that road to the Real de San Francisco. The Palo Amarillo at that time was cultivated by different people from the new places. You went from San Francisco down on that road some mile and a half or two miles, and then the road breaks off to the right, to the Palo Amarillo."

Stephan White is to the same effect. He says: "The Albuquerque road runs about south-west from the town, and then the *Palo Amarillo road branches off to the west*. The first three-quarters of a mile (from the town) is south,—a very little west of south; then *you turn west*."

R. W. Webb: "There is a main road going nearly due south, known as the 'Albuquerque Road' until you reach a point about three-quarters of a mile from Golden, where, as I understand, the Palo Amarillo road branches to the west. I have been over that Palo Amarillo road. In a short line it would be almost an easterly and westerly course."

Henry Yates says: "The direction of the Palo Amarillo road, from where it branches off from the Albuquerque road, is nearly east and west."

Trinidad Romero: "In going from Real de San Francisco to the Palo Amarillo planting ground, you went down south on the Albuquerque road. I used to walk it two or three times a day, and then turn off the Albuquerque road to the west from the main road, and this road which turned off went to the Palo Amarillo planting ground."

Francisco Aranda: "To go to Palo Amarillo, you went down from San Francisco on the Albuquerque road about one league. There we turned off to the west from the main road, in going to the Palo Amarillo. That is the

way I left with my wagons of corn to go down to the wells from the Palo Amarillo.   It passes in the direction of the west, and between two little mountains there."

Juan Nieto: "The road going from San Francisco to the Palo Amarillo goes south a distance, and then turns west.   The arroyo of the Palo Amarillo runs to the west."

Jose Aguilar, who swears he was present when possession was given to Ramirez, says: "The northern boundary of the grant was fixed from three-quarters of a mile to a mile from the town."

Nazario Lopez: "I know the boundaries pointed out to Ramirez when he took possession.   They were, on the west, the old road leading to the Palo Amarillo and San Pedro; on the north, I do not recollect exactly, but I believe it was the foot of the same mountain."   If that is so, why is the north line carried a mile and a half north of this point, so as to include the town?

Mr. Griffin, in his evidence, says (folio 3245) that it was right where these roads forked, going down on the Albuquerque road from San Francisco, and turning west to the Palo Amarillo, that a point was fixed.   He gives no satisfactory reason, nor does any occur in the evidence, why a line east and west was not there established for the northern boundary.

Jose Augustin Ramirez.   This witness, who was a son of Serafin, was present at the survey with Mr. Griffin, Serafin, and others.    His evidence, with what has already been given, fixes the point for the northern boundary so clearly there should be no doubt about it.   See folio 2874.   "*Question.* Is there not about a mile and a half south from the town of San Francisco, on the road leading to the San Pedro ranch, another road turning off to the right, towards the Palo Amarillo?   *Answer.* Yes, sir.   *Q.* Do you know, or were you present, when Mr. Griffin, with some other parties, took testimony at the forks of that road on the seventh of May, 1866?   *A.* Yes, sir.   On the old road leading to the San Pedro there is a monument placed near the Palo Amarillo.   *Q.* I ask you, on the seventh day of May, 1866, whether, when Mr. Griffin and your father was there at the forks of that road with your father and other parties, was there anything said about that point being one of the boundaries of the Canon del Agua grant?   *A.* Yes, sir.   *Q.* What was said?   *A.* That was the boundary of the grant; that Serafin Ramirez had sold it.   There are little mountains west of the Albuquerque road."

If it be said the presumption of law is in favor of the survey, it may well be asked if this evidence does not completely overthrow that presumption.   Here was Serafin himself and Griffin.   Before them was the road coming down south,—the Albuquerque road,—with Real de San Francisco a mile and a half to the north, and at this point the road branched to the west, and went out to the Palo Amarillo, and right there a monument was placed.   According to the evidence of Griffin and Augustin Ramırez, Serafin Ramirez right then and there said: "*That was the boundary of the grant.*"   This point answered exactly the call in the description.   There is no satisfactory reason found why, exactly at this point, Griffin did not obey Serafin, and establish a line east and west through that point as the northern boundary.   This evidence alone brings to our minds full and complete conviction that this survey is radically wrong.   The doctrine of the supreme court in the *Maxwell Case* is accepted by this court, and also regarded with great satisfaction on this point.   *U. S.* v. *Land-Grant Co.*, 7 Sup. Ct. Rep. 1015, 1271.   Surveys should not be overturned for light causes, or on uncertain evidence, or by reason of merely suspicious circumstances; but in a case where it is most conclusively and satisfactorily proven that a boundary line is pointed out by the grantee to the surveyor and the purchaser, and such line is entirely consistent with the courses, distances, and calls of the grant, and such boundary is utterly disregarded, and extended a mile and a half to the north of the honest line, and so as to include a large part of a populous town, the case stands on different grounds, and it becomes

the highest duty of a court of conscience to set it aside, unless the rights of innocent purchasers for value, and without notice, intervene.    Such proof should completely overthrow every presumption in favor of the survey.    The importance of the land thus unlawfully included is seen by the statement that, to the north of such a boundary,—estimated, but not calculated,—there seems to be about one-third of the land included within the survey, so that, regardless of any question respecting the Big copper mine and the extension to the east, that to the north is wholly wrong.    The manner in which this survey was ordered is shown by the following from Mr. Griffin's evidence, (folio 3263:) "*Question.* In the survey of private land grants, when a point is given—a single point—as a boundary,—either northern or southern boundary, or an eastern or western boundary,—what is the rule observed by surveyors fixing that boundary?  Is it by drawing a line, either north or south or east or west, through that point till it intersects the other boundaries, or what is the rule? *Answer.* Well, that is what I hold to be the correct rule; but in this case the instructions of the surveyor general forbade that method of survey, and directed otherwise.  But the other I hold to be the correct rule; and if I had been sent out there to survey that or any other grant, without specific instructions, *I should have so surveyed it.*"    Here is the deputy surveyor himself condemning that survey,—his own.  If it be said the presumption is that his survey was correct, the answer is that the survey is not correct in that particular.  He says: "The other, the one I did not follow, I hold to be the correct rule."   Then the one he did follow was incorrect.   If Griffin had been sent out, not tied down by instructions, he would not have located the lines where this survey places them.   That he says, plain enough.   After stating the rule which was not followed, mark his words: "If I had been sent out there to survey that or any other grant, without specific instructions, I should have so surveyed it."   And, if he had done so, the north boundary line would never have gone north of the point fixed by Ramirez, and designated to Griffin, as the northern line.  Griffin should have communicated to the surveyor general the information given to him by Serafin Ramirez.  He should have reported that Ramirez fixed the point for the northern line a mile and a half south of where it was placed by the survey.    Turning to the instructions given to Griffin by Clark, they are utterly indefensible.    Miller had reported to him affidavits which fixed the point where the Amarillo road turns to the west from the Old Albuquerque road.    This exact boundary was before him when in effect he instructed Griffin to disregard it.    After designating how to survey the San Pedro grant, he says to Griffin: "You are, directed to establish the initial point of the survey in the established boundary of the San Pedro grant at the most westerly intersection of the two lines."    He says the entire road from the placer seems to have been intended as a boundary.    The *termini* of the road will therefore be taken as two points in the survey.    It is difficult to conceive how Clark honestly believed that whole road to be a boundary line. The initial point he fixed was where the road and the northern boundary of San Pedro intersected.    If he wanted an honest survey, why did he not direct Griffin to draw a line along that boundary east from this initial point for the southern line of the Canon del Agua?    Griffin says that the correct rule, if this were done, would cut off one-third of the grant as surveyed.

While the evidence in this case does compromise Surveyor General Clark, we do not think, as to Mr. Griffin, it proves anything wrong in intent.  A reference to Clark's instructions to Griffin shows that, as to the San Pedro grant, he ordered the latter to apply the principle which, if let alone, he says he would have acted on in making the survey of the Canon del Agua.   As to San Pedro, Clark instructs Griffin: "The north and south boundaries will be east and west lines run through the points named."   Now, why did he not permit Griffin to ascertain on the earth's surface the point which Ramirez pointed out as the northern boundary, and there draw a line east and west for

the northern boundary line? Griffin swears that is what should have been done, and what he would have done but for his instructions. Such a line, as a northern boundary, would have obviated any contest as to that point. Not a single item of evidence in this case, not a fact in it, will carry that line a foot north of that point; and yet it is said the rule of surveying must be violated, and the evidence disregarded, to uphold the survey made in disregard of correct rules. To us it is a perfectly plain case, as least as to this northern line. If it be objected that, by fixing the northern boundary line at the place where Ramirez pointed it out to be, it will have the effect to reduce the quantity of land which otherwise might be included in the grant, it is to us a satisfactory answer that there is no obligation on the part of the government to carry the boundary line north of the place fixed by the Mexican government, so as to increase the quantity of land, when it cannot be had within described boundaries. The people of Real de San Francisco have a right to say that land used by them as commons, and not claimed by Ramirez, shall not wrongfully be included in the survey, only to make up quantity, or, if such strip is public domain, the United States has the right to object to its being thrown in as a gratuity to Ramirez, so as to increase the number of his acres. The same survey fixed the lines of both the San Pedro and Canon del Agua Grant; and if within the exterior lines of these two grants, as described in their grant deeds, enough land could not be found to make the quantity of both, that would afford no reason for carrying the Canon del Agua survey where it should not be, so as to make up from the government the quantity lost, if any, because the grants either overlapped each other, or because there was less in quantity than the grantee supposed within the outside lines described in the grants.

There are other things in the record which point with great force and directness to the conclusion that at the time of this Canon del Agua grant there was a mountain, or series of them, known as the "Little Tuerto," constituting a western call for the grant. These cannot very well be classified so as to be presented in an orderly arrangement, but will nevertheless be given. Mr. Griffin, on page 650, testifies: "*Question.* Please state what was designated to you by the surveyor general as being the eastern boundary of the San Pedro grant. *Answer.* The eastern boundary of the *San Pedro* grant was a little mountain at the west end of the Tuerto mountains." Mr. Griffin's memory failed to serve him so as to enable him to state in exact terms. Instead of naming "a little mountain at the west end of the Tuertos," which might imply it was not a part of the Tuertos, the surveyor general, as will be seen on page 70, (instructions,) describes the boundaries of the San Pedro, "on the east, the little mountain of the Tuerto;" showing clearly it was a part of the Tuerto mountains. Mr. Miller in his report of May 10, 1886, to Clark, (page 46, Record,) after he and Griffin and Cooley & Co. had been on that expedition, says: "In the case of the San Pedro grant, the little mountain of the Tuerto, cited as the eastern boundary, is fully identified, as the depositions will show. It is a part of the Tuerto mountain, though the official translation describes it as a little mountain on a line with the said Tuerto."

Jose Aguilar, a man of 60 years, whose evidence is in this opinion also elsewhere referred to, and who swears he was on the grant with Serafin Ramirez and Santiago Florez when juridicial possession was given to the former, swears that the boundaries were pointed out to Ramirez, and further says, speaking of the Canon del Agua grant: "*Question.* What was the western boundary of that grant given at the time of the possession? *Answer.* The San Pedro grant."

Nazario Lopez testifies also that he was present when juridical possession was in fact given to Ramirez, and when the boundaries were pointed out to him. Both this witness and Aguilar are called by the defendant. See page 609. "*Question.* Were you present at the time Santiago Florez placed him

[Ramirez] in possession of this [Canon del Agua] grant? *Answer.* I was, sir. I was there, and knew the boundaries pointed out to him, and the landmarks. *Q.* Give them. *A.* On the west, the old road leading to the Palo Amarillo and the old San Pedro grant."

With what weight this evidence comes! There stood Ramirez, the judge, Flores, in the prime of life, vigorous, and with minds alert to the importance of the act being done. There was Aguilar, Lopez, and others. It is not an overdrawn imagination which, coming to that moment and place, sees Santiago Flores take Ramirez by the hand: "Turn your face to the west. There stretching out before you, and to the west, is the San Pedro grant. Its eastern boundary is your western line;" and then, taking up the title papers for the San Pedro grant: "See, here it is written down in this deed, the little mountain of the Tuerto is the east boundary of the *San Pedro* grant." It is true, no voice from the past has in words made such expressions; but if the description written down in the San Pedro grant is true, and the evidence of Aguilar and Lopez called by the defendants is also true, just such an event must have occurred right there on the land when possession was given. It must be remembered that the delivery of possession was a very solemn and formal act, under the Spanish system. The party receiving possession was taken by the hand in a formal way, and walked over the land, and he then pulled the grass and threw stones, crying, "God save the king," and it is this formal act which those two witnesses are describing. If this did occur, then Florez and Ramirez both believed the San Pedro grant was to the east of the Canon del Agua. It is written in the San Pedro papers that the little mountain of the Tuerto is its eastern boundary. It is written in the grant of the Canon del Agua that the same mountain is the western boundary of the Canon del Agua, and further written that such mountain is west of the spring. It is pointed out to Ramirez, on the ground, that the point thus described is his western boundary. Can any man doubt there was in the mind of Florez the little mountain of the Tuerto marking the eastern boundary line of the San Pedro, and the western of the Canon del Agua, and that he actually pointed out this same San Pedro as west to Ramirez, as these men swear that he did? How could Ramirez, standing thus with his face to the west, looking in the direction of San Pedro, be mistaken?

Take Griffin's instructions, and the evidence of those two old men, and it is almost conclusive against the survey. Here are his instructions from Clark, (see page 70:) "The boundaries of the San Pedro grant are as follows: On the north, the outlet arroyo of Chimal; on the east, the little mountain of the Tuertos; on the south, the outlet of the arroyo of San Antonio; and on the west, the Sandia mountains, to which is added one square league on the south. The calls of the grant as above are said to be well-defined land-marks, and easily identified. The eastern base of the Sandia mountains forms a complete boundary on the west. The north and south boundaries will be east and west lines run through the points named, and the east boundary will be a north and south line run along the western base of the little mountain of the Tuerto." Bearing in mind that Florez pointed out to Ramirez the San Pedro as lying *west* of the Canon del Agua, and taking these instructions, how plain the problem. The little mountain of the Tuerto, the Canon del Agua spring, the relative positions of the two grants, are all important descriptive points. The survey should have been so made as to fill all these calls, if it could fairly be done. Over 25 witnesses have been quoted proving conclusively that the Tuerto mountain lies west of the Canon del Agua spring, and south-west of Real de San Francisco. If the survey had made that little Tuerto mountain the eastern line of the San Pedro, then the San Pedro would have been west of the grant in controversy. That would have located it just where Aguilar and Lopez swear Florez pointed it out to Ramirez as lying. Griffin did not do that. He ran a line, as shown by the plat in evidence, from north to south

through the Canon del Agua spring, and marked that line as the east line of the San Pedro. Estimated by the plat of Griffin's survey, the northern line of San Pedro marks the southern line of the Canon del Agua grant for 80 chains only, where it should mark the whole south line. A line drawn north and south through the east line of the San Pedro, according to Griffin's survey, would cut the Canon del Agua into two parts; one of which would be east of such east line of San Pedro, and the other west, instead of the whole of it west, as Florez pointed out to Ramirez in the presence of Aguilar. A line taking, as surveyed by Griffin, the north boundary of San Pedro as a point, and drawn east and west, would sever the Canon del Agua into two parts; one of which would be north, and the other south, of the San Pedro, instead of all being north, as described in the grant boundary. If the evidence of the cloud of witnesses which has been already quoted fixing the Little Tuerto mountain south-west of San Francisco, and also west of the Canon del Agua spring, is true, and Griffin's plat correctly exhibits his survey, then he has made the eastern boundary of San Pedro 80 chains east of where it should be, and thereby to that extent overlapped onto the Canon del Agua grant. He has also made the eastern point 290 chains east of where it should be. What strange infatuation operated to draw the lines of both these grants east of the real positions, and thereby to embrace the valuable bed of mineral around the big copper mine? The survey sought to be set aside is utterly inconsistent with the act of Florez in pointing out the San Pedro grant as marking the western boundary of the Canon del Agua; and that he did so point it out is proven by the defendant's own witnesses already quoted. Fix the Little Tuerto mountain where the evidence in this case places it,—south-west of San Francisco, and north-west of Canon del Agua spring,—and draw a line from north to south through that mountain, and at once the whole evidence falls into perfect harmony; the calls of both grants are perfectly answered and preserved. With such a point fixed, and such a line drawn, the Little Tuerto mountain becomes the east boundary line of the San Pedro, as called for in the grant, and also west of the spring. It also becomes the western boundary call, as described in the grant in controversy. San Pedro grant marks the west boundary of Canon del Agua, as Aguilar and Lopez swear Florez pointed it out to be, and all the other calls are met. But depart from this established truth,— this landmark, proven to exist on the surface of the earth just where these men in the early days knew it was,—and at once there is a medley of confusion, entirely irreconcilable with established facts. Place the Little Tuerto mountains where God put them, and the old inhabitants named them, and the evidence proves them in fact to be, and every line and its direction can be located, the description in both grants sustained, form preserved, quantity secured, and the relative directions of the grants with respect to each other will be correct. Place the Little Tuerto, to serve a personal interest, where it is not, and nothing but uncertainty results.

In this connection, it may be well to consider the evidence of Miller, the clerk of Clark, and who was called by the defendant. He is directly at variance with Griffin as to the location of the old mine spoken of in connection with the Little Tuerto mountains, (see page 622:) "*Question.* Now, were you at the mine that Ramirez claimed was the old Ramirez mine inherited from his grandfather? *Answer.* We were at the mine that was said to be that. I do not know, of course. *Q.* Well, now, was that mine at that time to the east or west of the Canon del Agua spring? *A.* I think it was north-westerly; in a north-westerly direction from the spring." Later in the examination, after the witness had opportunity to think over the matter and refresh himself, his mind was brought back to the same point, as follows, (see page 629:) "*Question.* You are satisfied, then, that this morning you made no mistake in saying that the mine that was established as the old Ramirez mine was north-west from the Canon del Agua spring? *Answer.* I said it was north-

westerly, I thought; more of that course than any other course approximately. I meant approximately and it seems so to me." Although abundant opportunity was offered the witness, he made no withdrawal or retraction of this evidence. If he is correct in his statement, then a mine was found at that time corresponding with the calls, and west of the Canon del Agua spring. If it be said that other parts of this witness' testimony are inconsistent with the statement quoted, or in that respect that he is contradicted by other witnesses, then it may well be replied that such a contention by defendant only tends to prove the contradictory character of his own evidence, and the caution which the court should exercise in weighing it. This same observation will apply with equal force to the witness Francisco Aranda, who, under oath, denied his own statement.

It is manifest, in the evidence of Jose Augustin Ramirez, son of Don Serafin, that a mental struggle was continuously present in his mind during his evidence. He had an interest with his mother of $3,250 in an unpaid note and contract to sustain the survey, and press the boundary to the east and north, and yet to do so was so far inconsistent with real facts that his evidence is inconsistent in many particulars with that theory. On page 579, folio 2873, this occurs in his evidence: "*Question.* Do you know at that time, May, 1866, [referring to the time when Griffin, Miller, Carey & Co. were out on the ground,] what point your father claimed was the northern boundary of the grant of the Canon del Agua? *Answer.* The Tuerto mountain. *Q.* On the north? *A.* On the north, yes. It is to the north of the San Pedro. *Q.* But I ask you what it was that he claimed was the northern boundary of the Canon del Agua when they were out there in May. *A.* Up to the Tuerto mountain, in front of the Real de San Francisco, and it is to the north of the old San Pedro, which is about ten miles from the Real de San Francisco. *Q.* Is there not, about a mile and a half south from the town of San Francisco, on the road leading to the San Pedro ranch, another road turning off to the right, towards the Palo Amarillo planting ground? *A.* Yes. *Q.* Is it not true your father insisted, at the time, that point was the northern boundary of the grant, and that they had no right to go further north than that? *A.* I do not recollect that. I was present when Mr. Griffin, with some other parties, took testimony at the forks of that road, May 7, 1866. *Q.* Was there anything said then, at that time, about the forks of that road being the northern boundary of the grant? *A.* On the road leading to the San Pedro there is a monument placed, and near the Palo Amarillo. *Q.* But I ask you whether upon the 7th day of May, 1866,—the time Mr. Griffin was there at the forks of that road with your father and other parties,—was there anything said about that point being one of the boundaries of the Canon del Agua grant? *A.* Yes, sir. *Q.* Well, what was said? *A.* That was the boundaries of the grant. Serafin Ramirez had sold it. *Q.* Are there not little mountains west of the Albuquerque road, and near to the Palo Amarillo planting grounds? *A.* Yes, sir; there are. *Q.* What are they called? *A.* They are called the 'Small Mountains of the Palo Amarillo.'" It required, evidently, tenacious cross-examination to bring the witness to this point. Two things are made apparent, if this witness on this point speaks the truth: *First.* That Serafin Ramirez pointed out to Griffin the very point of the northern boundary. The witness says there a monument was placed. In this he is fully corroborated by the other evidence. The point thus pointed out is also about one and a half miles down on the road leading to Palo Amarillo, meeting the very words of Santiago Florez and Serafin Ramirez, as distant from Real de San Francisco. With this place definitely fixed for Griffin by Ramirez himself as the northern boundary, and a monument placed, why was the line carried north a mile and a half beyond the place Serafin said it should stop, and so include the town? Is such an act, done with such light, to meet the approval of a court of conscience? *Secondly.* This evidence of the son proves that the father recog-

nized the little mountain at that point as the Tuerto mountain. He fixes that as the boundary point for the north line, and says a monument was placed there for the north line, and that his father claimed the Tuerto as the north boundary. A line east and west there would mark the Tuerto as a northern point on the boundary, and one north and south would mark it as a point in the western boundary; making the Little Tuerto to the south-west of the town, north-west of Canon del Agua spring, and the north-west corner landmark of the grant, where the grant description says it is.

A further very strong reason for disbelieving the claim that there is a mistake in the deed to Ramirez is found in the fact that, if such mistake be admitted, then there is no western boundary at all named in the deed. The only western boundary attempted to be named in Ramirez's deed from the Mexican government is: "On the west, the highest summit of the little mountain of El Tuerto. * * *" For the purpose of the argument only, concede the word "west" was used here where the word "east" was intended, and substitute the intended word for the one really used, and the absurdity of the claim is seen at once. If the mistake contended for occurred, the description as corrected would read: "With boundaries as follows: On the north, the road of the Palo Amarillo; on the south, the boundary of the Rancho San Pedro; on the east, the spring of the Canon del Agua; on the east, the highest summit of the little mountain of the El Tuerto. * * *" Where is the boundary line on the west? Which of the two points east is to be taken as the point through which the eastern boundary line shall extend north and south? This unreasonable position cannot be bettered by assuming the spring to be intended as the western boundary, because in the survey it is not made that line. If the description preserve the words of the grant, only substituting the words claimed to be intended for those used, on the theory that the spring is to be on the south line, then there is no west boundary, and no way to find one.

Another circumstance tending to show that the Big copper mine is not the one referred to in the grant description is found in the evidence of Bartolo Pena before Treadwell, elsewhere set out. In that evidence he speaks of a mine at the foot of what he calls the "Padernal Mountain," but which others call the "Little Tuerto," south-west of San Francisco, at a place where the grant call describes, being the western boundary, and west of Canon del Agua. He says this mine was discovered by Ignacio Gebare, and was the first one discovered in that country. That fact would make it the oldest mine in that region. He further says: "This mine was afterwards located and claimed by Serafin Ramirez. He called it his own mine." This corresponds well with the words used by Ramirez in his petition for the grant, when he says of the mine, "known as the property of your petitioner." It was evidently a mine in existence before the grant, and, if located and claimed before that date by Ramirez, would be as likely to be the one referred to in his petition as any other. This view of the question is strengthened by the fact that it is located to the west of the Canon del Agua spring, and at the right point to meet the direction named in the grant.

There has been considered so far the matter of fraud and mistake alleged in the bill of complaint. The evidence compiled and analyzed, relating to that subject, is so clear and convincing that there can be no reasonable uncertainty but the allegations are substantially proven. The evidence makes it very clear that the Canon del Agua spring should mark the line for the grant boundary on the east, and that the point where the Amarillo road turns to the west should mark the northern boundary line. An overwhelming weight of the evidence places the little mountain of El Tuerto to the west of the spring, and as the point and place for the western line. This being true, and the fraud and mistake alleged being fully and clearly proven, it remains to be considered whether the defendant occupies the position of an innocent purchaser, so that

there can be no relief against him on the ground of fraud and mistake. This branch of the question must be considered and settled in the negative, before the complainant can have any relief on such allegations. Even though fraud and mistake be proven, yet, if the defendant is an innocent purchaser for value, equity will not interfere with his title.

Is the defendant an innocent purchaser? The fraud charged being fully proven, the inquiry remains whether the defendant is an innocent purchaser for value, so as to estop inquiry as against it, and to enable it to hold notwithstanding the fraud and mistake. The complainant contends that the defendant had, through its president, Ballou, and its stockholders Grafton and Welch, of whom Grafton was its attorney, actual notice of the fraud charged in the bill of complaint, or at least sufficient to put it upon inquiry, and to bind it to whatever such inquiry would have disclosed. The evidence proves the defendant corporation paid $500,000 for the property, and put into it in improvements $500,000 more in cash; the investment including the two grants of San Pedro and Canon del Agua. So it is clearly a purchaser for value. The evidence also proves (folio 1859) that the stockholders were as follows, with the shares of stock named: George W. Ballou, Boston, Mass., 100,000 shares; Solon L. Wiley, Greenfield, Mass., 100,000 shares; Benjamin T. Grafton, Washington, D. C., 50,000 shares; James P. Welch, Santa Fe, N. M., 100,000 shares; Frank Morrison, Boston, Mass., 49,600 shares; David H. Darling, Boston, Mass., 100 shares; George E. Beatty, Boston, Mass., 100 shares; Taster Shores, Boston, Mass., 100 shares; Thomas Ewing, Lancaster, Ohio, 100 shares. The certificate of association bears date March 22, A. D. 1880. The name George William Ballou appears to this certificate as president, and therefore we conclude that he was elected at the date of organization. The evidence in this case proves that Grafton is a lawyer, residing in Washington, D. C.; that Welch, another stockholder, who resided in Santa Fe, was much of his time in Washington; that Mariano Otero was a delegate in congress from the territory in 1879 and 1880; and that both Grafton and Welch knew him there. Ballou testifies: "The San Pedro and Canon del Agua Company acquired title to most of the property *through* B. F. Grafton." This statement is indefinite. If he meant that Grafton was the attorney for the company, and was engaged as such in securing the title for the company, and in that way the defendant procured its title through him, the defendant would be charged with whatever facts respecting infirmity in the title came to his knowledge while he was engaged as the attorney for the company in prosecuting its business. Otero swears that one evening Mr. Welch called Otero to his room, and said to him that he wanted to introduce Otero to Mr. Grafton, and did so introduce him. That Grafton then and there asked Otero about the grant in question,—what the witness knew about it; and that he told Grafton that he had heard it said by people on the grant that it was a fraud, or a great deal of it was a fraud. That he told Grafton that he (Otero) had a claim for a mine that was said to be on the grant, and that he had at one time shown the papers by which he claimed the mine to Mr. Welch. That Welch had taken the papers to a lawyer, and had him examine them. He told Grafton, further, that he intended to see if his papers were not sufficient to hold the mine. That Welch and Grafton were together, and heard this talk. That he had heard before this that Grafton was making negotiations respecting the grant. That he learned, the night of this conversation, that Grafton had, or was about to take, an interest in the grant. He says, further, that he told Grafton in Welch's presence that people on the grant said it was a fraud, and that the witness himself believed it was a fraud all the way through; that Welch and Grafton had called upon him at his room at the National Hotel, but he was having so many callers that they all then left, and went to Welch's room, so as to have a better opportunity to talk. He says he told them he had a claim to what the witness identifies to be the Big cop-

per mine. After this conversation, he saw Grafton at Lamy, New Mexico, which is not far distant from the mine. He testifies, further, that Mr. Welch was in Bernalillo county, New Mexico, and that Welch went out there, looked at the grant, and talked about buying it; and that witness told him he had a claim on that property. That, if he thought of buying, he had better first look at the papers which witness held, in which he based his claim to the mine. He (Welch) asked of witness to see the papers, and that he let Welch have them, and Welch took them off, and had a lawyer examine them for him. That he (Welch) had these papers three or four days. That when he returned them the witness told him (Welch) that the property belonged to the Oteros, and sooner or later they would sue for it. Neither Grafton nor Welch were called by the defendant, so we are bound to accept the facts stated by Otero as true. George William Ballou was a witness, and from his evidence it appears that on the twentieth day of February, A. D. 1880, himself, Mrs. Ballou, E. L. Motte, Dr. Little, M. G. Gillette, (a mining expert, who afterwards became superintendent for defendant in conducting its mineral operations,) B. F. Grafton and Dr. Welch, (the persons who had talked with Otero in Washington,) and Mr. Chittenden, all visited New Mexico, and went out to the property for a day or two, and looked it all over; that they saw the mines, talked to the miners, and had the fullest opportunity to see the various mining claimants, and did see many of them. They were at San Francisco, and had an opportunity to talk to the people. It appears by the evidence of the witness Yates that he showed Ballou a number of lines which had been claimed as grant lines; and that he told him of one line in particular, and said to him that was the line which Welch claimed now as the boundary line. Ballou could see by this that it took in a substantial part of the town. Yates testifies further as follows: "He [Ballou] told me he had come there to invest in this grant, and I went around with him for two days, and showed him the country as much as I could. I told him we were working the Delgado mine; that it was in dispute; that I had worked there a long time, thinking it was not in dispute. He said, if he bought the mine, he would do a good part by me, and by Hart and Brown (both miners) also. He said he wanted to see us have our rights. Brown and I were interested in a number of mines; in the Keystone, Ora Cash, and the Romero. Johnny Hart was also interested in mines. Ballou saw all that belt of country around there. I went all through the placers with them. There was conversation between Ballou and the miners. *I told him we claimed those mines, and had them located,* and were working them under the *United States laws.*" White testifies, in substance, that at this time Ballou and his party were stopping at the hotel in Real de San Francisco, and that himself and four or five other miners went to the hotel to see him, and to tell him about their claims, and did so tell him; and that he replied, if he bought the property, he would do what was right by the persons claiming the mines, and would buy the mines, and not bother the miners. It appears, further, that three or four mines were being worked there east of the spring at that time.

This evidence establishes most conclusively that the party made a trip from Massachusetts to examine the property; that Ballou, Grafton, and Welch, who represent 250,000 shares of the stock in the defendant company, spent two days on the ground for the very purpose of looking it over. In the very nature of the transaction, they must have traced lines, observed the spring, and the direction of the mines therefrom, and have seen that the lines included a part of the town. The information traced directly to them, the purpose of the inspection, all forbid the conclusion that they did not fully understand the situation. They thus saw and knew a part of the land pretended to be covered by the grant was actually in the physical possession of other persons, claiming to have the legal right thereto, and claiming that the lands were mineral lands, subject to the laws of the United States. The president recog-

nized all this, and said they would buy their claims. If these three persons were defendants in their capacity as individuals, no court would have the slightest hesitation to charge them with notice. Mr. Ballou also testifies that he did in fact examine the patent, and rely upon it. It is fair to believe that he heard these statements, saw the occupancy by others, and examined the patent and record; and with notice the company determined, no doubt on consultation, to take the chances. He says: "The purchase of the said grant was made some time in January, 1880, previous to my first visit to New Mexico, although some of the payments were made, and transfer of the title to the property was not completed until after my return. The San Pedro and Canon del Agua Company was organized on the twenty-eighth of January, A. D. 1880. I am one of the incorporators of the company, and now its president."

The evidence quoted, with that in the record, proves that on the twenty-eighth day of January, 1880, the San Pedro & Canon del Agua Company, the defendant, was organized, and made a contract for the purchase of the Ramirez grant, and paid some money down,—but how much the evidence does not disclose; and that Ballou, as president of the company, was sent out to New Mexico by the company, with Grafton and Welch, altogether representing 250,000 shares,—a large majority of the stock,—as agents to make examination of the property, and ascertain all about it; that they came, and did go upon the property and look over it; that they learned that miners were occupying parts of the property, claiming it to be a part of the public domain, and claiming the right to locate mines, under the laws of the United States, and claiming thereby to own the mines within the claimed lines of the grant. The persons so inspecting saw the town of San Francisco within the lines, in part, and people living there, and thus had notice of an adverse claim by such people. They saw from the location of the spring, and of the eastern point of the line, and by reading the Ramirez description, that the grant was inverted. They saw, instead of the grant being either grazing or agricultural lands, that it was one of the largest known and most valuable mining camps in the territory, and knew the land was well-known mineral land. With this notice, they were bound to look further into the record, and bound to take notice of all the proceedings in the progress of confirmation, including the action by the surveyor general on Moradillos mining claim. The evidence discloses that it was not until after this visit that the title was conveyed to defendants as a corporation. Who can doubt that upon the return of Ballou, the president, Grafton, the lawyer, with Welch active in the purchase and creation of the organization, that they reported to the board of directors, and, the report being satisfactory, the title was conveyed to defendants?

The certificate of association bears date March 22, A. D. 1880; but Ballou, the president of the defendant company, swears (folio 3490) that "the San Pedro and Canon del Agua Company was organized on the twenty-eighth day of January, A. D. 1880." As he speaks with certainty, and fixes unhesitatingly the exact date, his statement is taken as accurate, although the certificate of organization bears date March 22d afterwards, and shows the corporation then already existing. These three dates are significant,—actual organization, and contract for the purchase of the property, January 28th; the visit of the president, Ballou, also Grafton and Welch, to the grant, February 20th; the return and certificate of organization, March 22d following. According to the evidence of President Ballou, the title during this *interim*, from January 28th to February 20th, was not yet conveyed to the defendant company, nor had the purchase money yet been fully paid. Payment and conveyance of the legal title stood suspended between those periods of time. The transaction about to be undertaken was a large one, involving the expenditure of a million dollars. The contracting parties were in Boston, and the grants were in New Mexico. The enterprise about to be entered upon was the working and development of the mines on these two grants; the Big copper mine

being the basis of operation. Every consideration of business prudence would have led the company, before finally concluding its purchase, making full payment, and receiving conveyance of title, to dispatch an agent to the ground with an expert to make an actual examination of the extent, character, and value of the ores; to ascertain whether the mineral wealth actually existing would justify such an immense expenditure. The evidence proves there was, on and after the visit of February 20th, unpaid purchase money in the hands of the defendant enough to give it full protection. Through its president, agent, and attorney, full notice was received while on that trip to have enabled the defendant, by withholding the purchase money, to protect itself; so that, in buying and receiving title, it was after notice, upon a full consideration of all the chances; and, if defendant took the risk under such circumstances, it cannot thereby place upon the complainant an estoppel against inquiry into the truth. Situated as stated, Ballou, the president, bringing with him Mr. Gillette, a mining expert from California, who afterwards became superintendent, and Mr. Grafton, the attorney, and Mr. Welch, who had worked the Big copper mine, visited, February 20th, the grant. Bearing in mind that these men represented over one-half the shares; that, according to Ballou, the company had been organized only 20 days; and that neither conveyance had yet been made, nor payment occurred,—the conclusion is to our minds irresistible that they were there as representatives and agents of the company, to examine the title, to inspect the mines, to view the lines and boundaries, in order to report on their return to the company; and, if it was deemed advisable, then to conclude the purchase, receive the conveyances, pay the purchase money, and set in operation the mills and smelters. The central point in this position is the evidence of the defendant's president that January 28th was the date of organization, and that conveyance of title and full payment of purchase money was not made until after his return from this trip of examination and inspection. It is unreasonable to believe that the defendant would undertake so large an enterprise, without just such an inspection and examination. To conclude otherwise is to believe the company a reckless adventurer, investing hundreds of thousands of dollars without examination or inquiry. Capital is conservative, and would demand just what was here done. The information, notice, and knowledge, hereafter considered, was thus, through its president and agents, brought to the notice of the defendant company. It was not bound thereafter to pay. It could pay or not as it chose, on its own discretion. It was not bound to receive title, with a town holding and claiming to own part of the land; with miners working upon well-known and long-existing mines, claiming to do so by virtue of the laws of the United States, and notifying the defendant's president and agents that this land was public domain. It is true that the defendant might make a calculation of the benefits it could receive; of the ores, and their value, that it might extract; of the advantages of the purchase,—and then, with eyes wide open to the record from Ramirez's grant to the patent, to the change in the boundary lines, to the assertion of title in the United States notwithstanding the survey and patent, to the occupation and claim of the miners, and weighing the advantages on one side against the risk on the other, complete its purchase, take the title, and risk also, and pay the purchase price; but, if it did so, it should not stay the hand of inquiry, or estop investigation into the truth. One who is really an innocent purchaser occupies a favorable position. He is in a situation to concede fraud, but to bar inquiry. He may say: "Yes; the title I hold is founded on malfeasance and villainous conspiracy, but yet I command a halt, and stop investigation, while I hold securely the fruits of conspiracy." The law does place an honestly innocent purchaser in that position; but, before it does so, it demands of him clean hands, unsoiled and unstained. We do not believe one with the notice which defendant had in this case should be regarded as an innocent purchaser. The

temptation to buy was great. The land was well known for its mineral deposits, and subject to the mineral laws, unless it could be acquired under this agricultural grant.

"In actual notice, [such as was obtained by the president of the defendant company on the land,] information is not inferred by any presumption of law. The personal communication of it is a fact, and, like any other fact, is to be proved by the evidence." "The information may be so full and minute and circumstantial that the party receiving it thereby acquires complete knowledge of the prior facts affecting the transaction, or it may fall far short of conveying such knowledge." 2 Pom. Eq. Jur. § 595. "Actual notice need not be full, circumstantial information of every material fact affecting the right of the person receiving it. It is enough if it be information directly tending to show the existence of the fact." *Barnes* v. *McClinton,* 3 Pen. & W. 67; *Tillinghast* v. *Champlin,* 4 R. I. 173, 215. "When A. is dealing with B. for the purchase of land, which he knows, sees, or is told to be in possession of a stranger, C., the law presumes that C.'s real interest and claim was communicated." Note 2, Pom. Eq. Jur. § 596. "Whenever A. is dealing concerning certain property with B., who acts as grantor, a definite statement made to A. by a third person, C., that he has or claims some conflicting interest or right, legal or equitable, in the subject-matter, is a sufficient actual notice to affect A.'s conscience. The statement need not be so full and detailed as to communicate to A. complete knowledge of the opposing interest or right; it is enough that it is so definite as to assert the existence of an interest or right as a fact." 2 Pom. Eq. Jur. § 599. Authorities to this point could be multiplied. If A. has been swindled out of his farm, and conveyed it to B., and C. is about to buy of B., it is not necessary that A. should detail to C. all the facts which will make A.'s case when he brings his proceeding to set aside the fraud. It is enough that A. tell C. of the fact that he has been defrauded, and then C. proceeds at his peril. C. need not buy; in good morals, he should not do so, for his act in buying tends to prevent A. from recovering his rights. One who buys with notice is warned in advance, and should not be allowed to buy, and be protected as an innocent purchaser, because he has, after notice, taken the risk, and judged incorrectly as to the ability of the person defrauded to make his case.

When the president of this defendant company was on the ground, and was called upon at San Francisco by the miners, and informed that the land belonged to the government, that they claimed rights under the United States mining laws, it was the duty of the defendant to pause right there, and it should not now be allowed to foreclose inquiry, to cut off investigation, because it would not be warned. This much is clear as to actual notice. It is not claimed or pretended here that notice to a mere promoter, before organization, of a corporation, or to one or more stockholders less than the whole number, will bind a corporation; but it is held that the facts in proof warrant the conclusion that Ballou, as president, Grafton, as attorney, Gillette, as a mining expert, Welch, as a large shareholder, went out as agents of the company to make an examination and inspection of the property before the conveyance was made to it, or the purchase money fully paid, so that the company might know the true value of the property before finally concluding the purchase, and whether to conclude it or not; and the company is bound by the notice received by them, and the facts coming to their knowledge, while making such examination and prosecuting such inquiry.

Independently, however, of this view of the evidence, the defendant, as a purchaser, would be charged with notice of all that appears on the face of the patent; would thereby be put on inquiry, and charged with notice of the facts which such inquiry would develop. The patent would, by its terms, bind the defendant to examine the grant of Ramirez, his application before the surveyor general, the action of that officer thereon, the confirmatory act,

the action of Burdette, and this is sufficient to arouse the grave suspicion of any man of ordinary prudence. "Every person is presumed to read the deed under which he holds." "When a purchaser cannot make out a title but by a deed which leads him to another fact, he shall be presumed to have knowledge of that fact." 2 Devl. Deeds, § 1002. "It is a familiar principle that every person taking a deed is charged with notice of all recitals contained in the instruments making his chain of title. The principle of equity is well established, that a purchaser of land is chargeable with notice, by implication, of every fact affecting the title which would be discovered by an examination of the deeds or other muniments of title of his vendor, as to every fact which the purchaser, with reasonable prudence or diligence, ought to become acquainted. If there is sufficient contained in any deed or record which a prudent person ought to examine to induce an inquiry in the mind of an intelligent person, he is chargeable with knowledge or notice of the fact so contained." Devl. Deeds, § 1000, and note 4. The note contains a citation of numerous cases which fully support the text. "The same rule as to recitals in deeds is also applicable to recitals in patents from the government. A person who traces his title to a patent in charged with the facts in the recitals." Devl. Deeds, § 1003, and note. See, also, *U. S.* v. *Land-Grant Co.*, 21 Fed. Rep. 24. "Any description, recital of fact, reference to other documents, puts the purchaser upon an inquiry. He is bound to follow up this inquiry, step by step, from one discovery to another, from one instrument to another, until the whole series of title deeds is exhausted, and a complete knowledge of all matters referred to therein is obtained. He is conclusively presumed to have prosecuted the inquiry to its final result. An imperative duty is laid on him to ascertain all the instruments which constitute parts of his title, and to inform himself of all they contain." 2 Pom. Eq. Jur. § 626. *Brush* v. *Ware*, 15 Pet. 104, is a very instructive case. It appeared Hockaday, a soldier of the Revolution, was entitled to lands for military service. He died. His administrator sold his claim. On the claim, certificates were issued, and finally warrants. Brush bought two of the warrants and entered land thereon. He obtained patents for the land. The heirs of Hockaday brought suit against Brush, and it was held he was not an innocent purchaser. The court say: "The law requires reasonable diligence in a purchaser to ascertain defects in his title." "When a purchaser cannot make out his title but through a deed which leads to a fact, he will be affected with notice of such fact." The court held that the holder of the patent in that case was bound to know the administrator had no power to assign, and so the patent was void.

Even though the defendant was not bound by the knowledge obtained by Ballou, Grafton, and Welch, upon the visit to the ground, February 20th, it would be compelled by the recitals in the patent to look into the grant papers, and especially that relating to the Big copper mine. Such inquiry would have disclosed, because it was so recited in the patent, that the claim to the Big copper mine, based on the alleged right under the mining ordinances given by the Mexican government to Moradillos, was not recommended for confirmation, but that the surveyor general declined to exercise jurisdiction over it. It could not have believed when the surveyor general said, "No authority is vested in this office to adjudicate on claims to mines," and "No action has been had by this office in the premises," that notwithstanding this disclaimer by the surveyor general, carried by recital into the patent, that he had recommended the conveyance of the mines, and that they were so conveyed, in opposition to and overriding the recitals in the patent.

Notwithstanding the notice, and the infirmities in title apparent in the various documents upon which the patent rests, did the defendant have the right to disregard them all, and repose upon the act of the land-officer, and so to buy and conclude all inquiry as to facts behind the patent, and upon which

it is based? That must depend upon the weight to be given to the action of these department officers. Upon that point, the case of the *U. S.* v. *Minor*, 114 U. S. 238, 5 Sup. Ct. Rep. 836, is in point, and we think conclusive. The action in that case was to set aside a patent issued to John Minor. The ground of the proceeding was an alleged fraud by the grantee in making affidavits to residence and improvement, when in fact he had neither resided upon the land nor improved it. It was contended by the defendant that the action of the land-officer of the department was in the nature of a judicial act, and conclusive. The observations of the court are quite pertinent here. Speaking of the land-officers, the court says: "For the truth of these statements, they [such officers] are compelled to rely on the oaths of the parties asserting claims, and such *ex parte* affidavits as they may produce. In nine cases out of ten, perhaps in a much larger percentage, the proceedings are wholly *ex parte*. In the absence of any contesting claimant for a right to purchase or secure the land, the *party applying has it all his own way*. He makes his own statement, and he produces affidavits. * * * In cases where there is no contesting claimant, there is no adversary proceeding whatever. The United States is passive; it opposes no resistance to the establishment of the claim, and makes no issue on the statement of the claimant. When he proceeds, therefore, by misrepresentation, by fraudulent practices, there would seem to be more reason why the United States should have remedy against that fraud—all the remedy the courts can give—than in the case of a private owner of a few acres of land on whom a like fraud is perpetrated." The court then considers whether a ruling held by the court below in deciding the case is applicable; and in referring to *U. S.* v. *Throckmorton*, 98 U. S. 61, explains that case to have been, where the action of the land-officers was predicated upon the decision of the California commission, a judgment judicial in character. The court then proceeds: "Here, no one question was in issue; no issue at all was taken; no adversary proceedings were had; no contest was made. The officers, acting on such evidence as the claimant presented, were bound by it. They had no means of controverting its truth, and the government had no attorney to inquire into it. Surely the doctrine applicable to the conclusive character of the judgments of courts, with full jurisdiction over the parties and the subject-matter, made after appearance, pleadings, and contests on both sides, cannot be properly applied to the proceedings of the land-office in such cases. * * * We have steadily held that though, in the absence of fraud, the facts were concluded by the action of the land department, a misconstruction of the law, by which alone the successful party obtained a patent, might be corrected in equity, much more so when there was fraud and imposition." In 1876 the supreme court of the United States, in *Tameling* v. *Freehold Co.*, 93 U. S. 662, consider the distinction between the determination of the commission in that state, and the action of the surveyor general in New Mexico. Mr. Justice DAVIS, in giving the opinion of the court in the case, referring to the tribunal in California, says: "Congress required that all titles to real property in California, whether inchoate or consummate, should undergo *judicial* examination. * * * But congress legislated otherwise, for the adjustment of land claims in New Mexico. * * * It will thus be seen that the modes for the determination of land claims of Spanish and Mexican origin were radically different." It is thus apparent, on authority, that the functions of the surveyor general, exercised in the case before us, were not judicial. There were no adversary parties; no pleadings; no issues; no attorney on either side to ascertain the facts, subpœna and examine witnesses, and cross-examine those of his adversary. None of the safeguards thrown about a judicial proceeding exist. The surveyor general, on behalf of the government, did not act as a court, with adversary parties, an issue, and attorneys, but

ministerially. In *U. S.* v. *Stone*, 2 Wall. 525, the supreme court say: "The patent is but evidence of a grant, and the officer who issues it acts ministerially, and not judicially."

More faith and credit should be given to the solemn judgment of a court having jurisdiction than to the acts of the land-officers who made this survey, and who issued the patent. To hold that defendant, after receiving notice, might discharge itself of the legal effect thereof by relying on the patent and survey, and by purchasing, notwithstanding the notice, and thus place itself in the position of an innocent purchaser, would be to give to the act of the officers who make the survey and issue the patent as much legal and binding force as a judgment of a court in adversary proceedings. Suppose some officer of the United States, authorized in the premises, had called upon the defendant's board of directors, while in session, negotiating for the purchase of the grant in question, and then had notified the defendant, through its board, that the government was not satisfied with the survey, that it had been fraudulently made, so as to extend the boundaries, and that, if defendant bought, it must do so at its peril, what would be the legal effect of such a notice if so given? Could the defendant, under such circumstances, take up the grant papers, the survey, and Burdett's action thereon, and the patent, and say: "Here is a patent. It is the highest evidence of title. To it full faith and credit should be given. It is not probable the patent can be successfully assailed in a direct attack, and so the purchase will be made and the risk assumed,"—and thereby, because it chose to place such great faith in the patent, place itself in the position of an innocent purchaser? If it could, then there can be no such a thing as a direct attack on a survey to overthrow it for fraud, if the land described in it is in the hands of one who has paid value, and read the patent, and presumed the notice given to him was not well grounded. It seems to us there is a clear distinction between the weight which should be given to the judgment of a court having jurisdiction and adversary parties, and that to be given to officers intrusted with duties not so clearly judicial in character. If the acts of the officers of the land department are to have the force and effect of judgments in a court, with adversary parties before it, practically the power of a court of equity would be limited, in proceedings to set aside for fraud or mistake, to those cases where the land was yet in the hands of first holders; because, under such a rule, the reading of the patent, and presuming it to be correct, would place the party contracting, after his purchase, as an innocent purchaser, beyond the reach of a court of equity. It seems to us the rule is that when the purchaser, before the conclusion of his purchase, or the payment of the purchase money, has notice of an alleged equity in another, it then becomes inequitable for the purchaser to buy, and thus embarrass the true owner in the assertion of his right.

The action of Pelham, and of the confirmatory act, are not in this proceeding to be vacated; but it is the act of the officers in carrying such act into effect which is attacked. If Pelham's act is a judgment, it fixes the land west of the spring; and it would be a hard rule to say the survey is a judgment which cannot be attacked in a direct proceeding. Such a principle would conclude the government where the confirmation was for the N. E. $\frac{1}{4}$ of a tract, and the patent, by fraud or mistake, conveyed another and different tract, as, for instance, the S. W. $\frac{1}{4}$. If the confirmation is a judgment, it is for land west of the spring, and there is no power to convey land east of that point. The action of the officers in this case, in issuing a patent, does not protect one who buys with notice, either in fact, or from the record, which he is bound to examine; so that he cannot be affected by notice of fraud in the survey. Under the circumstances of this case, the defendant is not an innocent purchaser.

The application for perpetual injunction will now be considered. There is a branch of this case not much discussed in the briefs filed, and which is of as

high importance as any other contention in the record. It arises on the following allegations of the supplemental bill: "That said defendant is now and has been in possession of large portions of said tract of land mentioned and described in said original bill of complaint as being the property of the United States, and by said fraudulent survey now included and embraced within the boundaries mentioned and described in the patent of the United States, as set forth in said bill of complaint; and that said defendant is now in possession of many mines, leads, lodes, and veins of mineral-bearing quartz or rock belonging to the United States, and situated upon the said tract of land, the property of the United States. The said mines, leads, lodes, and veins are very rich and valuable for gold, silver, copper, and other valuable ores. The said defendant claims said land, with its mines, leads, lodes, and veins of mineral-bearing rock and mineral deposits, as your orator is informed and believes, by and under the said patent of the United States." After making other averments, there is a prayer that defendant be forever prohibited and enjoined from mining or using or appropriating said ores. The defendant, in its answer to the supplemental bill, admits that it is so mining at what is known as the "Big Copper Mine," and claims said mine to be within the lines of the land conveyed to it, and that, under the patent and survey, it is the legal owner of such mine, and all other minerals within the said tract, and has the legal right to hold, mine, control, and use the same, as against the government of the United States. This supplemental bill, and the admissions in the answer thereto, present an entirely different question from the others which are heretofore discussed. The supplemental matter proceeds in part upon the theory that, even though the whole relief prayed for may not be granted, yet, if the court should hold that the survey and patent cannot under the evidence be set aside, it then must give construction to the patent, and say to whom the mines of gold, silver, and copper lying within the grant lines belong, and whether the defendant shall be enjoined perpetually from working them, and especially from mining in the Big copper mine, which defendant admits it was working when the supplemental bill was filed. This question must depend upon the rights which passed to Ramirez by the patent from the United States; and, as that patent only relinquished to him his right as it existed at the date of the session, it is necessary to examine briefly the law of Mexico, to determine what, as between Ramirez and that government, he then actually owned,—whether only the surface of the land; or that, and also the mines of gold and silver beneath the surface. Certain decrees were in force at the time of the separation of Mexico from Spain, whereby the mines of gold, copper, and silver were held by the crown of Spain. Upon the separation, which resulted in creating Mexico a separate government, the title to all mines within her territory passed to and vested in the Mexican government, including therein what is now New Mexico. A grant of land by the Mexican government did not carry such mines. It did not require a reservation by the government of such mines to prevent them from passing. No interest in such mines, whether in granted or ungranted land, could be acquired by the individual citizen, under the Spanish or Mexican law, except through mining ordinances. The law of those countries recognized the title to all such mines, whether in public or granted land, as in the government, and not subject to be passed out of it by a mere grant. Rock. Sp. & Mex. Law, 124-127, 130, 131, 411; Hall, Mex. Law, §§ 1210-1213, 1235; *Moore* v. *Smaw*, 17 Cal. 199, 12 Min. R. 418, 424-428. We conclude, then, that by the grant of the land in controversy by the Mexican government to Jose Serafin Ramirez of the Canon del Agua no interest and title in and to such mines therein contained was vested in him; and as it does not appear by the record that any individual interest in such minerals had been obtained by him, or those claiming under him, by virtue of the mining ordinances of the Mexican government prior to the cession of the territory of New Mexico to the United States,

that these minerals were at that date the property of the Mexican nation, and by the cession passed, with all other property of Mexico within the limits of New Mexico, to and became the property of the United States. *Moore* v. *Smaw*, 17 Cal. 199.

When, then, the lands contained within the limits of this grant passed, by its cession, under the dominion of the government of the United States, the title to such minerals therein contained became vested in the government of the United States. Was such title to those minerals within the Ramirez grant divested by the act of confirmation, passed June 12, 1866? Ramirez had no claim to any more interest than he had obtained by virtue of the grant. It was only the right in the land which had passed by the terms of the grant to the grantee, and which, as we have seen, did not include such minerals therein contained, that congress was asked by him to confirm. The Spanish and Mexican governments reserved the right to the minerals in their lands, unless expressly granted, and they were not by the Mexican government expressly granted to Ramirez. The treaty under which Ramirez had the right to have his interest in the land in question confirmed by our government only contemplated the confirmation by congress of such title thereto as had been conveyed to Ramirez by the government of Mexico, and which did not confer upon him the title to such mines therein contained. These Ramirez did not own when confirmation by congress of this grant was asked, and given by that body. If such confirmation passed the title to these minerals to the grantee, then it not only made good the grant made by Spain and Mexico, but also conveyed additional rights and interests to which he was not entitled, and for which he had not asked, and which, it is believed, was contrary to the whole public policy of the government in respect to its mineral lands and mineral interests. This will be made more apparent by an examination of our laws respecting this interest in the mineral lands of the government. From the date of the ordinance of May 20, 1785, providing for the disposal of the public lands in the "Western Territories," and reserving the interest of the government in the minerals therein, to the present time, through all the acts of congress in any way affecting the public domain, this interest in the mineral wealth of the public lands has been carefully guarded, and special legislation, as applicable to mineral lands, in contradistinction to all other lands, enacted for its protection and preservation; while our present laws governing the acquirement of mineral lands clearly contemplate the disposal of such lands in small quantities, and not in large bodies or tracts, so as to encourage and induce prospectors to make discoveries, and extend and increase the means of their development when made, and the consequent enrichment of the country. Donald. Pub. Dom. c. 26, p. 306 *et seq.*

In his report as secretary of the interior, Mr. Ewing, on December 3, 1849, said: "The right to the mines of precious metals which, by the laws of Spain, remained in the crown, is believed to have been also retained by Mexico while she was sovereign of the territory, and to have passed by the transfer to the United States. It is a right of the sovereign in the soil, as perfect as if it had been expressly reserved in the grant; and it will rest with congress to determine whether in those cases where land duly granted contains gold, this right shall be asserted or relinquished. *If relinquished, it will require an express law to effect the object*, and, if retained, legislation will be necessary to provide a mode by which it shall be exercised." In *Moore* v. *Smaw*, 17 Cal. 216, what seems to us to be the true doctrine, amply sustained by authority, is stated as follows: "The minerals were vested under the Spanish monarchy in the crown, and—after the separation from Mexico, in that nation—did not pass, as we have already stated, by the ordinary grant of land *without express words of designation.* Such grant transferred only an interest in the soil, distinct from that of the minerals. The interest in the minerals was conveyed through the operation of the mining ordinances, by registry of discovery, or by pro-

ceedings upon denouncement, when a mine once discovered had been forfeited or abandoned.   *   *   *   They constituted, therefore, at that time, the property of the Mexican nation, and by the cession passed to the United States." "According to the common law of England, mines of gold and silver were the exclusive property of the crown, and did not pass under a grant by the king under the general designatión of lands or mines." *Hicks* v. *Bell*, 3 Cal. 220.

It thus follows, at the time of the session, that there was a dual interest in the property of the Ramirez grant,—his title or equity in the land, and the paramount title which the United States held in the mines.   What title to the mines, under his grant, could Ramirez have asserted against the Mexican government?   None.   Neither could he have asserted any against the United States as to the mines.   The past policy of the government, which has continued without interruption to the present, has been to preserve and protect its interest in the mineral wealth in the public domain.   A *résumé* of the legislation of congress respecting the mineral lands will be found in Donald. Pub. Dom. cc. 26 and 32.   In *Deffeback* v. *Hawke*, 115 U. S. 401, 6 Sup. Ct. Rep. 95, is a very full recital of congressional legislation respecting mineral lands.   The pre-emption act of 1841 excepts from pre-emption and sale "lands on which are situated any known salines or mines."   The act extending to California the privilege of settlement on unsurveyed lands contains a clause that the provisions of the act "shall not be held to authorize pre-emption and settlement of mineral lands."   Similar exceptions were made in grants to different states, and in grants to aid the construction of railroads.   California was granted 10 sections of land for the purpose of erecting public buildings of that state, but there is a proviso that "none of said selections shall be made of mineral lands."   In the grant to the Union Pacific Railroad and its associated companies, all mineral lands other than coal and iron are excepted from the grant.   A similar exception is made in grants for universities and schools; and, in the law allowing homesteads, mineral lands are not liable to exemption. It is believed a detailed examination of the several acts of congress will fully establish that in June, 1866, when this grant was confirmed, that it was the settled policy of congress to reserve and protect the mineral interest of the government, and, as time advanced, this policy became more firmly established.   So clearly does the legislation of congress evince an intent to reserve the mineral wealth from the operation of the general laws respecting lands, that the supreme court of the United States, after a review of this clearly-defined congressional policy, say: "It is plain, from this brief statement of the legislation of congress, that *no title* from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, copper, or cinnabar can be obtained under the pre-emption or homestead laws, or the town-site laws, or *in any other way* than as prescribed by the laws specially authorizing the sale of such lands, except in the states of Michigan, Wisconsin, Minnesota, Missouri, and Kansas."   This early and continuous manifestation by the law-making department of its purpose to reserve mines should weigh heavily in determining whether, under a general act of confirmation, they intended to direct the conveyance of well-known and long-established mines of gold and silver, thus placing a claimant under a Mexican grant not only in a better position than he had a right to ask, but in a better position than grant-holders from the government.   There are California and perhaps other cases holding to the contrary, notably *Moore* v. *Smaw;* but a careful study of them will prove that there were circumstances in the grant confirmation indicating an intent not disclosed in this case.   Here it is well proven that all the country about San Francisco, and east and north-east of the spring, was, in the language of the court in *Deffeback* v. *Hawke, supra,* "well-known mineral land," —not only to Ramirez, who had mined all about that region, but to hundreds of miners engaged at and in the region from 1842 continuously down to the

present day. It is not to be considered in the light of a grant where the mines were undiscovered and unknown, but in the light of a conveyance, covering a valuable mineral belt, mined over for over half a century, and with miners working openly and notoriously with claims for years, at the very time of the confirmation, survey, and patent; and right at this point the thought will intrude itself that it is passing strange that with this as a well-known mining camp, and the survey as embracing mineral lands well known and very valuable, that such facts were not reported by the surveyor general with the survey, for the consideration of the department, when the survey was extended to embrace mineral land.

The supreme court of the United States in *Deffeback* v. *Hawke, supra,* quite clearly make a distinction between the rule which should be applied to lands *well known* to be valuable for gold and silver mines, and those where there is at the time of the patent no reason to anticipate such a condition. The policy of this government and that of Mexico we believe to be substantially alike in respect to such mineral. In Mexico, such lands and the mines therein were governed by the mining ordinances, and were taken out of the operation of the general laws for the disposition of agricultural lands. So, also, here, one set of laws apply to the sale of land not mineral, and another to the sale of those known to be full of gold and silver. We think the patent sought to be affected in this case stands on an entirely different principle from those referred to in either *Moore* v. *Smaw,* the *Tameling Case,* or the *Maxwell Land-Grant Case.* In the first of these cases, the patent seems to have been the result of a judicial inquiry. The court in that case say, (17 Cal. 223:) "The object of the act is to ascertain and *settle* private land claims in the state of California. This object is declared in the first section. It is not merely to ascertain, but to *settle,* them; that is, to place them beyond controversy." In the *Tameling Case,* 93 U. S. 662, in referring to the same act, the court say: "It will thus be seen that the modes for the determination of land claims of Spanish and Mexican origin were radically different. Where they embraced lands in California, a proceeding essentially judicial in character was provided, with the right of ultimate appeal. No jurisdiction over such claims was conferred on the courts in New Mexico." It was principally upon this theory that *Moore* v. *Smaw* was decided. It is true that an additional view was also stated on another point; but the soundness of that view, with due respect to the learned court that made the ruling, may well be doubted. So far as it was there held that the principles which apply against a private individual grantor shall also apply to public grants against the government, we are inclined to question its legal accuracy, and to believe that a grant from the government, unlike that of an individual, should be construed strictly against the grantee, and not liberally in his favor. "According to the common law of England, mines of gold and silver were the exclusive property of the crown, and did not pass in a grant of the king under the general designation of lands or mines." It is also the doctrine in the case of *Queen* v. *Earl of Northumberland,* 1 Plow. 310, that, while mines may pass by the king's patent, they will not do so without the use of "apt and precise words." The great body of our law comes to us from that source, and we can see no reason why this construction as to patents by the government should not also be adopted. "It is an old principle of law that exceptions in a deed and every uncertainty are to be taken favorably for the grantee; but this rule has no application to *grants* of *the sovereign.*" 2 Devl. Deeds, § 848. See also there a large citation of authorities under note 4. "The manner of granting by the king does not more differ from that by a subject than the construction of his grant when made. (1) A grant made by the king *shall* be taken most beneficially for the king, and *against the party,* whereas a grant of the subject is taken most strongly against the grantor." 1 Bl. Comm. 347. "Public grants are to be construed strictly." *Railway Co.* v. *Railway Co.,* 97 U. S. 497; *Bridge* v. *Bridge,* 11 Pet. 544. Other

authority to the same effect is abundant, so we feel constrained to hold that, as to grants and patents by the government, a different rule of construction is to prevail from that which obtains against a private grantor. Again, in the California case, there is nothing in the record to disclose that the land granted was well known, either at the time of confirmation or patent, to be mineral; neither was it so known in the grant considered in the *Tameling Case*, nor the Maxwell grant, so far as we have been able to ascertain. This case, in an important feature, bringing it, as we believe, within the principle ruled in *Deffeback* v. *Hawke*, is to be distinguished from those cases. This is a direct attack by the government itself upon the survey, to vacate it on the ground of fraud and mistake, and also, on the supplemental bill, on the affirmative claim by the United States to the mines of gold and silver, and especially to the Big copper mine. This supplemental bill stands partly on the ground that the patent embraces lands notoriously known to be mineral at the time of confirmation. It is an attempt, under a patent for lands claimed only for agriculture and pasturage purposes, to hold numerous and valuable mines, and a mineral tract which from its richness became so well known as to attract a population of from one to six thousand people, and about which the grantee himself knew for a period of over twenty years. If the principle of strict construction of a patent evei applies to a confirmation, it should, under the facts in this case, do so here.

In *Mining Co.* v. *Mining Co.*, 2 Nev. 168, 263, the supreme court of Nevada says: "The doctrine of the common law that he who has a right to the surface of any portion of the earth has also the right to all beneath and above that surface has but a limited application to the rights of miners and others using the public lands of this state. Necessity has compelled a great modification of that doctrine. The departure from those old and established doctrines of the law will doubtless lead to many complications. To adhere to the common-law rules on this subject is simply impossible. To attempt to carry out common-law doctrines on this point would either give all the houses in Virginia to the mining corporations, or else all the most valuable mines to those occupying the houses. The well-established custom of miners to locate veins of mineral, claiming to follow them with all dips, spurs, and angles, without reference to occupancy of the surface, has compelled a departure from common-law rules." And in the case of *Mining Co.* v. *Ish*, 5 Or. 104, it was held by the supreme court of Oregon that a patent from the government of the United States for lands as agricultural lands, but which contained deposits of precious metals, passed no interest in or title to the minerals therein contained. That court says: "But Ish obtained no interest in the mining claims on the lode by the patent. True, by the patent he obtained a given quantity of agricultural lands, and the lode is situate upon said lands, but the known deposits of precious metals did not pass by the patent, for they are expressly reserved from sale under the pre-emption and other land acts." The law under which this case was decided by that court was enacted by congress July 26, 1866,—only a month and fourteen days after the passage of the act of confirmation of the grant of land in controversy in this cause,—and by the act of July 26, 1866, all mineral lands of the United States government are expressly reserved from sale or disposition under the homestead or pre-emption or other land acts; showing the policy of the government to be to protect and guard with special care its mineral interests in the public domain, by specially excepting this class of lands from all others, and providing a special mode of their disposition, distinct from the method of disposition of the remainder of the public domain.

It does not seem to us that congress could have intended to deal more liberally with Ramirez and his grantees, by the act of confirmation of the grant in question here, than by the remainder of the body politic, as shown by the whole legislation in reference to the mineral lands of the government. Be-

sides, if a patent of the lands would not convey the interest of the United States in the mineral therein contained, as was held in the case of *Mining Co.* v. *Ish, supra,* unless such patent were issued under the mineral land laws of the government, or in cases where the minerals are in terms named as granted, and it requires an express law to effect the relinquishment of the government's title to its mineral interest in the lands of the public domain, as was asserted by Mr. Ewing, as secretary of the interior, as early as 1849, then it would seem that the mere relinquishment of the land described by the grant in controversy in this cause to Ramirez cannot be held to carry with it the title to the minerals found within the grant limits; but that by the grant, and its confirmation in the manner such grant was confirmed, only the right to the surface or soil of the land passed to and became vested in the grantees, and that the title to the gold and silver mines therein contained remained in and still is the property of the United States. Especially should this principle apply where the lands claimed, as in this case, were at the confirmation, if the grant is properly surveyed, well-known mineral lands. It may be that this view, if maintained as the law in this case, will result in making the government the owner and possessor of interests in land in connection with individuals; but, if so, that is a matter to be dealt with by another branch of the government, and with which we have nothing whatever to do. We are to declare the law as it is, and let the results be met and disposed of by that department of the government upon which the responsibility for its enactment rests. There is no reason to apprehend that the government intended to deal more generously with Ramirez than with others of her native-born citizens. What claim had he that the government should voluntarily give him a grant he did not already possess? If under the law of Mexico, by which he acquired his right, the gold and silver mines were not included, as we think they were not, why should the value of his right be greatly enhanced by adding thereto, in the nature of a new grant by the United States, rich mineral deposits? Was such the intention of congress in the confirmatory act? The title to the act of confirmation is conclusive on that subject, as it may be looked to in construction. It is "An act to confirm the title of Jose Serafin Ramirez to certain lands in New Mexico." It is not an act to grant to him a new thing or right, but to recognize and confirm an old one. Congress was bound, under the treaty of Guadalupe Hidalgo, to protect him in existing rights, but not under the slightest obligation to give him an additional one. In passing this act, congress was not engaged in the duty of looking up persons entitled to gratuities for some beneficial service rendered the government, as in granting private pensions, but was examining into its duties under a treaty with a sister republic, and in that way discharging only a political duty. Who can suppose for a moment, if a preamble to the bill had read, in substance, this way: "Whereas, Serafin Ramirez holds a grant to land from the government of Mexico, which, under treaty obligations, congress is bound to confirm; and whereas, there is under the surface on said lands rich and valuable deposits of gold and silver, which did not pass to said Ramirez from Mexico by said grant, the title to which is now vested in the United States, but which Ramirez desires to possess to increase his wealth: therefore, as a gratuity to him, be it enacted that the congress of the United. States grant unto said Ramirez all the mines of gold and silver under the surface on said land,"—that a single member of that honorable body would have entertained it for a moment? And yet if these mines can be carried to the grantee on the theory that the act of congress, and the patent thereunder, operate as an original grant, that is the preamble which should accompany such legislation. We believe that reason, justice, and law alike are against any such conclusion, but, to the contrary, they all say that congress did not give to Ramirez new rights, but recognized, confirmed, and established only his old ones.

This construction of the confirmatory act is greatly strengthened by the proceedings disclosed in the record. In his application before Surveyor General Pelham, Ramirez says the land he asked for was granted to him "under the *colonization laws* of Mexico and Spain, in force at the time the land was granted." He did not ask this land of Mexico as mineral lands, under the mining ordinances of Old Mexico, but asks it for agriculture and pasturing animals, and as a place whereon he may smelt ore. At the same time, Ramirez invoked the action of the surveyor general as to a certain mine, and filed papers respecting the same, so that in fact his application before the surveyor general was dual; one relating to the land, and the other respecting the mine. The surveyor general, in his report for the action of congress, expressly denies his official power to take action respecting mines. In his report he says: "On the thirteenth of February of the same year (1844) the *grant* was confirmed to him," etc. "The claimant also files with the papers in this case a grant made to his great-grandfather; but, as no authority is vested in this office to adjudicate on claims to mines within the territory, *no action has been had by this office in the premises.*" "The grant *to the land situated in the Canon del Agua is made* according to the laws in existence at the time it was made, * * * and is fully covered by the treaty of Guadalupe Hidalgo." "It is therefore approved, and respectfully transmitted for the action of congress in the premises." The word "it," as used, clearly does not refer to the claim for the mine; but does refer to the grant of the land. He notifies congress that two claims are before his office,—one based on a claim alleged to have been made, in the language of the surveyor's report, "to his [Ramirez'] great-grandfather," being a mine; and the other, a grant of land to Serafin Ramirez in person,—one an alleged grant to Don Francisco Dias de Moradillos for a mine; the other, to the alleged great-grandson, years afterwards. As to the mine claim, there was no inquiry by the surveyor general about its genuineness, or in regard to the important question whether in fact Ramirez was the great-grandson, or whether at the time of the treaty the right to the mine under the Moradillas claim was not abandoned, extinct, and of no legal or equitable force; but, on the contrary, his report shows that the surveyor general turned away from this inquiry, refused to make it for want of official power, and only recommended the confirmation of the grant made to the alleged grandson, Ramirez. The title of the confirmatory act shows the purpose of congress only to confirm what the surveyor general recommended. And the words of the act are conclusive: "Be it enacted," etc., "that the grant to Jose Serafin Ramirez of the Canon del Agua, as *approved by the surveyor general* of New Mexico, is hereby confirmed." The mind of congress, so to speak, was upon the official act of the surveyor general, and upon the words of his recommendation. The legislative intention was to do what he had recommended to be done. The intention of congress was not to confirm the mineral grant alleged to have been made to Moradillos, for that had not been sent forward for confirmation, but to confirm the land grant which had been sent forward for approval. It was the land grant, *as approved* by the surveyor general, which congress confirmed, and not the mineral grant, which that officer expressly declined to approve. The defendant, in its answer to the supplemental bill, admits that it was taking out ore in the very mine as to which the surveyor general declared he had no power to act, and defendant claims the right to do so under the land grant. The defendant does not justify the act of appropriating these ores on the ground that the land is mineral land, part of the public domain, and possession under the mining laws of the United States, but claims under the Ramirez land grant. This is the correct reasoning on that subject, based on the facts in our opinion. Ramirez presented for confirmation two grants; one, of an alleged mining claim to his alleged great-grandfather. The surveyor general made no investigation into the facts of this claim, or as to its equities, but declined to do so for want of

jurisdiction, and so informed the commissioner of the general land-office, and, through him, congress. Ramirez never appealed from this decision, nor asked or procured a reconsideration or review thereof; so the claim under the alleged mineral grant, on the record, stands decided against the defendant, and therefore it can hold no right under the alleged grant to Moradillos; and the fact that congress confirmed an entirely different grant, made under different laws, to another person, years afterwards, which was claimed to be grazing and agricultural lands, does not carry with it the gold, silver, and copper below the surface. In *McGarrahan* v. *New Idria Co.*, 49 Cal. 331, it is held: "The patent is evidence of the series of proceedings recited in it, and is a solemn record of the action and judgment of the government with respect to the title of the claimant." If that be so, the patent discloses that the department ruled it had no jurisdiction to determine title to the Big copper mine, and so cannot carry title thereto to defendant.

The lands ceded by Mexico were held by virtue of the cession, and passed to the United States, precisely as they were held by the republic of Mexico, charged with the same equities. Title to these lands was somewhere,—in some legal entity capable of receiving and holding lands, and that entity was the United States government, in its organized capacity. This title was so held by her, charged, under the treaty, with the rights therein owned by citizens of the Mexican government, and no higher right in favor of such citizen. Whatever the government of Mexico would have recognized in such citizen respecting such land, and whatever conveyance or concession in law or equity was due from Mexico as to such lands, was due by the treaty from the United States. If the grant held by the Mexican citizen for land only gave him the right to the surface, and not the gold and silver under it, he stood after the cession clothed with just that right, and no greater, against the United States. The surveyor general's office in New Mexico was not established to convey the gold and silver mines belonging to the general government, or to recommend their conveyance. A patent executed by the president for a Mexican grant, in the absence of a law of congress, would be void. The law is the measure of the president's power to convey. If it says, "Convey only the surface, and not the gold and silver mines," the president cannot enlarge upon the congressional act, and pass title to such mines out of the government. In *McGarrahan* v. *Mining Co.*, 49 Cal. 331, it is held: "Neither the president nor any officer has other power to dispose of the public domain, or to sign or cause the seal of the land-office to be fixed to patents, than such as is conferred by statutes of the United States.", See, also, *Parker* v. *Duff*, 47 Cal. 554. So, when the surveyor general of New Mexico decided against his jurisdiction to recommend a confirmation of the mine described in the grant to Maradillos, and when congress confirmed the grant to Ramirez as recommended by that officer, it seems to us that this enactment was confirmatory of the whole action of the surveyor general on the entire petition of Ramirez, and excluded the Big copper mine; and even though the patent assumed, as it does not, to convey the same, to that extent it would be void for want of power in the executive to convey, on the ground that the patent conveys only what was confirmed. This would be true, also, of the other gold and silver mines, if the legal effect of the confirmatory act was only to affirm title in the land, and not the mines. In such case the patent as to the mines would be void, as the president had no power by patent to convey what congress did not confirm. It seems to us, in acting on Ramirez's claim, congress should not be regarded as making a new grant, but that it should be considered only as performing treaty obligations, and as carrying to the grantee just the title he held at the time of the cession; and that, in giving construction to the words of the patent, they should be interpreted in the light of the obligation to be performed under the treaty, and in harmony with the legislative intent, manifested in

the terms of the confirmatory act, construed by the action of the surveyor general. Any other construction puts the United States in the attitude of conferring upon the grantee a title which he had no legal or equitable right to ask, which he did not demand, which was not contemplated by the treaty; and of thrusting upon the grantee, out of the property of the United States, a gratuity worth half a million dollars. Congress, in confirming the grant as reported, intended that a patent should issue conveying the right confirmed; not other and different property. We believe, in construing the patent in this case, the treaty obligation, the right intended to be, and which was, established by the act of confirmation, the words of the act, the terms of the grant, all must be considered. In this case the patent does recite that the grant claim was filed before the surveyor general, his action and recommendation thereon, and the act of congress confirming the same; and manifestly, by its own terms, conveys only what was thus granted and confirmed. The recital in the patent of the act of the surveyor general, of the confirmatory act, makes them a part of the instrument, and, in construing any contract or conveyance, every part and word must be considered, and force given to all. So, also, is the report of the surveyor general, copied into the patent, and upon the same legal rule, it must be given effect as a part of the instrument, and as some evidence of intention; and so, in the face of the patent, the grantee is informed, repeating its language, "that there is no authority vested to adjudicate upon claims to mines," and that therefore "no action is taken in the premises;" that is, as to mines, this title is in no way touched, but the grantee is remitted to whatever legal right the law will give him unaided by the patent. How it could be claimed that this mine goes with, and by virtue of, the patent, when there is an affirmative denial of the authority of the surveyor general as to mines written in the face of the patent, is not perceived. It seems to us reasonably clear that it is neither a safe nor proper rule of construction to look alone to the words of the patent. In case of a private grant, the grantor has power to bind himself to any extent he wishes, but the executive cannot, in issuing a patent, add therein a right not given by the law authorizing that instrument, or rise above the law, and by his own unaided act convey a new and additional right. That this view was evidently taken in the *Maxwell Land-Grant Case* is very clear, as in that case not only the act of confirmation, but the title papers and surroundings, were considered in giving construction to the patent.

Another consideration which should not be overlooked is that in this case the act of confirmation and patent provide only for a relinquishment to Ramirez. A relinquishment of what,—of only the thing asked for, or that and more? To say that the relinquishment is to be for an interest or a right not asked for, or considered by the surveyor general, would be to say that when congress confirmed the grant as approved, it did not mean as approved, but did mean to constitute the act of confirmation authority for an original grant. As congress was not asked to make an original grant, we do not believe it intended to make one, but only to authorize a patent carrying to Ramirez such title and interest as he held from the Mexican government at the time of the cession, and such as he could rightfully have asked the Mexican government, under its laws, to regard and protect; and as, under the instrument presented to the surveyor general, the Mexican government would not have protected him in the possession of valuable mines of gold and silver, it is not believed that congress intended to do more than the Mexican government would have done upon the title paper held by Ramirez.

As a result of what has been said, the defendant, upon the averments of the supplemental bill, and the admissions in the answer thereto, had no right, as against the United States, to appropriate, occupy, and hold, and extract ore from the Big copper mine; and so the supplemental bill should have been sus-

tained, instead of being dismissed, and an injunction should have been decreed against the defendant forever enjoining it from appropriating the mineral in said mine.

In the consideration of the questions involved, we have not been unmindful of the importance of land titles, and of the duty of the court to establish and maintain such legal and equitable rules as to give stability to property, and protection to personal rights. Especially has this been before us in considering the acts of the officers of the land department. Such acts are wholly unlike those of a court having jurisdiction over the parties and subject-matter in controversy. In the latter, there is an adversary party brought in upon notice; with the whole power of the judicial machinery to compel the attendance of witnesses, make discovery, and disclose the truth; with adversaries face to face, represented by counsel, scrutinizing every question and act. In such a case the decision is in the full light of open investigation, and one finding a judgment under such circumstances might well conclude that it was properly rendered, and could not be inquired into, and that he might safely buy upon the faith of it; but to apply that rule to those officials who act in making a survey, or in the execution of a patent, would cut off investigation, preclude inquiry, and, instead of building titles on truth and justice, might establish them on the basis of frauds and estoppels. In the acts of such officials there is no notice to adverse parties, no pleading, no attorneys to appear, examine, and cross-examine, and none of the safeguards against mistake or injustice such as surround the proceedings of the judicial tribunals. Under our system of government, such officers frequently change, and often bring inexperience to their duties. The officers in the territories are far removed from their superiors at Washington, and personal communication is difficult and unusual. Between the confirmation of a grant, its survey, and the patent therefor, long periods in the past have often intervened, and are likely to do so the future. Acts partly performed by one officer frequently devolve upon his successor, who takes up the duty thus imposed in ignorance of the facts, usually with but little experience, and with the probability of change in place before him, incident to our system. Courts should be cautious not to hedge about acts performed by such officials with estoppels against investigation and inquiry, giving them the force and dignity of judgments, lest in the anxiety to maintain titles the foundation may be established for fraud and injustice. It is of the utmost importance that honest titles be so firmly established that they cannot be overturned, and that merely whimsical or capricious attacks upon them shall not prevail. It is equally important, when the proof of fraud is clear and convincing, that a court of conscience overturn the wrong, and establish the right, if that can be done without interfering with the rights of innocent purchasers who have bought in good faith without notice. To give effect to proof when clear and convincing is as much a duty as to refuse relief when the evidence is weak and unsatisfactory. Each case must stand upon its own merits. In this cause we have analyzed the evidence, and it is so clear, and so unerringly points to the fraud charged in the bill of complaint, that we should not turn away from it, close our eyes to its significance, or disregard its conclusions, for fear of disturbing the defendant's title. To do so would be to concur in the wrongful inversion of the grant in question; to permit the foundations of a title to be built upon a fraudulent conspiracy involving Miller and Clark, officials, whom the evidence proves to have been faithless to the confidence and trust reposed in them. We fully concur in all that the supreme court of the United States says in the *Maxwell Case* respecting the care which the court should exercise not to unduly disturb titles; but, believing this to be a case both clear and satisfactory, it is the duty of the court, under the evidence, to interpose and grant relief.

This case was argued at the January term, 1886. The record submitted consists of over 700 closely printed pages, with numerous maps and plats in

addition, and the evidence of a large number of witnesses, each one often giving evidence upon several subjects, and the whole thrown together in a record without much reference to form or system.    To delve through such a record, select out and systematize the evidence of the several witnesses so that all the proof on each point could be read and weighed by itself, and to classify the questions involved, both of law and fact, so that they could be separately examined, considered, and determined, has been an arduous and responsible work, performed when other duties were pressing for consideration.    The magnitude of the task involved in such a record, with the daily demands of work at *nisi prius*, has necessarily postponed the rulings of the case until the present time.    While anxious to reduce the opinion within narrow limits, the great interest and importance of the questions involved,—many of them matters of fact, some of them comparatively new,—has made it a duty to consider them all with care, and to give the reasons for the conclusions reached.    As a result of such examination and consideration, it is held by the court that the fraud and mistake alleged have been clearly and satisfactorily proven; that the defendant is not an innocent purchaser; and that the supplemental bill should have been sustained in the court below; and that for these errors the case must be reversed, with direction to the court below to set aside and vacate the decree dismissing the bill, and for further proceedings in accordance with this opinion.

BRINKER, J.    I concur in the result.

REEVES, J., (*concurring*.)  On the twelfth day of February, 1844, Jose Serafin Ramirez petitioned the governor of New Mexico for the grant of a tract of land known as the "Canon del Agua," near the *placer* of San Francisco called the "Placer del Tuerto," and distant from the town about one league, and further described and bounded as follows: "On the north, the road leading from the Placer to the Palo Amarillo; on the south, the northern boundary of the San Pedro grant; on the east, the spring of the Canon del Agua; on the west, the summit of the mountain known as 'My Own.'" Santiago Flores, first justice, etc., certified that he had, according to the decree of Gov. Martinez, put Ramirez in juridical possession of the land known as the "Canon del Agua," in the *placer* of San Francisco, with the boundaries set forth in the petition as follows: "On the north, the road of the Palo Amarillo; on the south, the boundary of the Rancho San Pedro; on the east, the spring of the Canon del Agua; on the west, the highest summit of the little mountain of El Tuerto, adjoining the boundary of the mine known as inherited property;" dated February 15, 1844.

In 1859, Ramirez filed in the office of William Pelham, surveyor general of New Mexico, notice of his claim to the Canon del Agua grant, in which he says that the quantity of the land he claims is "5,000 varas square, making one Castilian league, and bounded on the north by the Placer road that goes down to the yellow timber; on the south, the north boundary of the San Pedro grant; on the east, the spring of the Canon del Agua grant; on the west, the summit of the mountain of the mine known as the property of your petitioner,"—reciting that his claim did not conflict with any other lands granted by the governments of Spain and Mexico.    The adjudication of this claim before Surveyor General Pelham seems to have been formal and regular in all its parts. The case is entitled "*Serafin Ramirez* vs. *United States.*"  In the entry of the proceedings it is recited that the case was set for trial on the tenth day of January, 1860; that the witnesses were present, and duly sworn, and their evidence recorded, and, continuing the recitals, the entry sets forth Ramirez's derivation of title to the land, viz.: that on the twelfth day of February, 1844, Ramirez petitioned Mariano Martinez, the political and military governor of New Mexico, for a tract of land known as the "Canon del Agua," situated in the county of Bernalillo, with the boundaries therein set forth; that on the

thirteenth day of February, of the same year, the grant was confirmed to him by the departmental assembly of the province of New Mexico, and possession given on the fifteenth day of February by Santiago Flores, justice of the peace, and further stating that Ramirez had filed with the papers in the case a grant made to his great-grandfather, of which himself and his brothers were declared by the assembly granting the land to him to be the proper legal heirs; but goes on to declare that, as no authority was vested in the surveyor to adjudicate upon claims to mines within the territory, no action was taken in the premises, and then proceeds as follows: "The grant to the land situated at the Canon del Agua is made according to the laws in existence at the time it was made, and has been proven to have been in quiet and undisturbed possession of the applicant from that date up to the present time, and is fully covered by the treaty of Guadalupe Hidalgo of 1848. It is therefore approved, and respectfully transmitted for the action of congress in the premises." Dated Santa Fe, N. M., January 20, 1860. Signed, William Pelham, surveyor general. On January 11, 1861, the above report was transmitted to congress, and on June 12, 1866, congress confirmed the grant to Ramirez of the Canon del Agua, as approved by Surveyor General Pelham. This was not a floating claim to land that might be removed from one locality to another at the pleasure of the holder, but it was a claim to a particular tract of land with fixed boundaries, and known as the "Canon del Agua Grant," about one league from the town of San Francisco. From the inception of the grant in 1844 to its confirmation by congress in 1866, as approved by Pelham, no change was made in the boundaries, nor were the calls for course and distance brought into question by Ramirez during his long residence of 20 years or more on the land. It is understood that the town of San Francisco is sometimes called the "Placer," or "Plaza," or the "Placer del Tuerto," and that Palo Amarillo, or the "Yellow Timber," is the same place throughout. The southern boundary of the Canon del Agua grant is the northern boundary of the San Pedro grant, or Rancho San Pedro; and without exception, and in the same language, the Canon del Agua grant is bounded on the east "by the spring of the Canon del Agua. The boundary on the west is the summit of the mountain known as 'My Own,' or the highest summit of the little mountain of El Tuerto, adjoining the boundary of the mine know as inherited property, or the mountain of the mine known as the property of your petitioner."

It is contended by Ramirez that the mine called the "Big Copper Mine" is the one claimed by him as inherited property from his great-grandfather, Diaz de Moradillos. It appears from Exhibit B, attached to the complainant's bill, that on April 12, 1846, formal registry was made of a mine described as situated in the Placer del Tuerto by Mariano Varela and Luis Aguilar, called the "Nuestra Senora de los Dolores." It further appears from Exhibit P, filed with defendant's evidence, that the mine applied for by Jose Caceldo Lopez de Viera, as attorney of Don Francisco Diaz Moradillos, was the "Santo Tomas de Villanueva Lode," in the Tuerto mountains, about eight leagues from Las Muertas, and which counsel for defendant contends, in his brief, would locate it about where the Big copper mine is situated. The description given of these mines shows that they cannot be the same mines. The vein of the Nuestra Senora de los Dolores, registered by Varela, or Barela, and Aguilar in April, 1846, is described as running from north to south; the vein of the Tomas de Villanueva mine is described as running from east to west. The claim of Jose Serafin Ramirez to this mine by inheritance from his grandfather, Moradillos, is denied by his brother, Melquiades Ramirez, who testified, as a witness in the case, that he never knew of any grandfather or great-grandfather by the name of Don Francisco Diaz de Moradillos. This witness proved that he knew Mariano Barela and Antonio Jacquez in 1846, and said that they and their associates worked a mine which lies south-east from the town of San Francisco, and about one and a half miles from that town. That the

mountain in which this mine is situated is called by different names. It was called "La Sierritta del Tuerto," "La Sierra de Bonanza," or "La Sierra del Placer." Ramirez further testified that in 1853 or 1854 he and his brother worked this mine, claiming it by denouncement as an abandoned mine, and said that he never heard his brother make any other claim to it; that they worked it from 1853 or 1854 to 1863; that it was called "the Big Copper Mine;" and that it is the same that was worked by Mariano Barela and Aguilar and their associates in 1846. This witness further stated that this mine was never claimed by him as belonging to any grandfather or great-grandfather in his family. He denies that he made the oath or statement purporting to be made by him and his brothers, Jose Serafin and Serto to the effect that they declared that Francisco Diaz de Moradillos was their grandfather; that he (witness) never signed it; and that his brother Serto could not write. Witness Antonio Jacquez identified the Big copper mine as the same mine that he and his associates, Barela and Aguilar, worked in 1846, and that they continued to work it until the forces of the United States came into New Mexico. It is alleged in complainants' bill that the land described in the survey includes valuable gold, silver, and copper, and other ores, and which the defendant in its answer admits, but claims the land, with its mines, under the grant from Mexico and the patent from the United States.

By the laws of Spain and Mexico, farming, stock-raising, and mining were different branches of industry. A distinction was also made between lands suitable for farming or planting, on account of the facility for irrigation, and lands proper for stock-raising. Mines were reserved to the crown or the government, and did not pass with the grant of the land unless mentioned in the grant, or unless by prescription. Rock. Sp. & Mex. Law, c. 5, pp. 49, 50, § 4; Id. p. 165, 166, 172, 174, §§ 5, 6; Id. p. 176. Also, Hall, Mex. Law, pp. 356, 511, § 1668; Id. p. 104, § 263; Id. p. 123, § 364. See report of Hon. Thos. Ewing, secretary of the interior, 1849, in Rock. Sp. & Mex. Law, 410. Also, 1 Bl. Comm. 274, as shown by Rockwell, 514; "Forfeiture or Renouncement of Mines," Rock. 313; Id. § 11, p. 320; and Hall, p. 376, §§ 1288-1290, etc. The mines were disposed of according to such ordinances and regulations as might be from time to time adopted. Rock. pp. 49, 50, 410, 411. Also, Hall, p. 356. Lands were classified for distribution, and in order to fix the different values. Similar provisions are found in the laws of the United States. Rev. St. § 2325. This was a matter of revenue to the government in all such cases. Hall, Mex. Law, p. 79, § 203; Id. p. 80, § 208; and Id. c. 23, p. 98. The statutes asserting paramount title in the United States to mineral lands are in harmony with the laws and practice of other countries on the same subject. It is known to be the practice of this government in the grant of lands to the states, and to corporations to aid in the construction of railroads, and for other purposes, not to include mineral lands, but such lands are reserved to the United States, unless it is otherwise provided in the act making the grant. Rev. St. U. S. c. 6, tit. "Mineral Lands and Mining Resources," p. 430, § 2346. Mineral lands are also reserved from entry and settlement by the pre-emption and homestead statutes, but open to purchase by citizens of the United States. Rev. St. U. S. §§ 2258, 2302, 2318. A claim for mineral lands must be accurately described by reference to natural objects or permanent monuments, and the description must be incorporated in the patent. Id. § 2325. Under the laws of Spain and Mexico, the surveys of the public lands were made in squares, noting streams of water and lakes, pools, mountains, mineral regions, salt regions, climate of the locality, the character of the soil, and everything else which might give an idea of the improvement of which they might be susceptible. Hall, Mex. Law, p. 122, §§ 354, 357; Id. p. 72, § 173. The statutes of the United States contain substantially the same provisions. Rev. St. tit. "Survey of the Public Lands," § 2395, and subds. 7, 8.

Rights acquired before the treaty of Guadalupe Hidalgo were recognized by our government, and provision has been made to ascertain and protect those rights, and also to protect the rights of the government under the treaty. For that purpose congress on the twenty-second day of July, 1854, passed the act to establish the offices of surveyor general of New Mexico, Kansas, and Nebraska, to grant donations to actual settlers, and for other purposes.   By section 8 of this act, it was made the duty of the surveyor general, under instructions of the secretary of the interior, to ascertain the origin, nature, character, and extent of all claims to land under the usages and customs of Spain and Mexico, and report on the claims that originated before the cession of the territory to the United States by the treaty of 1848, denoting the various grades of title, with his decision as to the validity or invalidity of the same under the laws, usages, and customs of the country before its cession to the United States.   10 St. at Large, p. 308.   This report was necessary for the intelligent action of congress, by furnishing what was intended to be reliable information, with a view to confirm *bona fide* grants, and to give full effect to the treaty between the United States and Mexico.   Lands covered by these claims were reserved from sale, and donations granted by the statute, until congress acted on the said claims; that being the last or final action on the claims, and so called to distinguish it from the previous action of the surveyor general and officers of the land department of the government.   The donations above referred to were lands granted to actual settlers, but not extended to lands covered by *bona fide* grants before the treaty with Mexico, and not extending to mineral and other lands reserved from settlement.   10 U. S. St. at Large, 309.   In *Moore* v. *Robbins*, 96 U. S. 530, the court says: "The decisions of the officers of the land department, made within the scope of their authority, on questions of this kind, [a contest between a purchaser at a public sale by the officers of a land-district, and another who set up a prior preemption right,] is in general conclusive everywhere, except when reconsidered by way of appeal within that department; and that, as the fact on which their decision is based, in the absence of fraud or mistake, that decision is conclusive, even in courts of justice, when the title afterward comes in question; but that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, and to relieve against frauds and impositions."   In *Shepley* v. *Cowan*, 91 U. S. 340, the court said: "If they [the officers of the land department] err in the construction of the law applicable to any case, or if fraud is practiced upon them, or if they themselves are chargeable with fraudulent practices, their rulings may be reversed or annulled by the courts."

The land department directs the administration of the land laws generally, and especially it has full power and authority to issue all needful rules and regulations for fully carrying into effect the provisions of the act of July 22, 1854.   Under authority of this act, the commissioner of the general land-office, on August 21, 1854, instructed the surveyor general of New Mexico to collect information from authentic sources in reference to the laws of the country as to minerals, and ascertain what conditions were attached to grants of land embracing mines, whether absolute or not, and in every case to ascertain from the parties, and to require testimony, as to whether the tracts claimed were mineral or agricultural, and to make the necessary discrimination in his proceedings.   Instructions to Surveyor General Pelham, August 21, 1854.   As before stated, Pelham declined to adjudicate upon claims to mines, for want of authority, as he says.   The survey made by Deputy-Surveyor Griffin includes a body of land of more than ordinary value.   In his description of this land he says it includes the greater part of the Sierritta del Tuerto mountains; that the cultivable part of the land is of excellent quality, with considerable pine timber suitable for lumber, with abundant timber and fuel for ordinary purposes, and good grass on almost every part of the grant.

.There is abundant water at the Tuerto. The Sierritta del Tuerto is rich in the precious metals, particularly in gold and copper. Neither the act of congress confirming the grant to Ramirez, as approved by Surveyor General Pelham, nor the patent from the United States to Ramirez, contains the above description of this land. Surveyor General Pelham approved the grant to Ramirez for the land situated at the Canon del Agua, and transmitted his approval for the action of congress, and congress confirmed the grant to Ramirez as approved by Pelham, surveyor general of the territory, as above mentioned.

It is admitted by the defendant in its answer, and shown by Deputy-Surveyor Griffin in his report accompanying his survey, that he disregarded the call for course and distance, and was governed by landmarks and natural objects in making his survey. The principle that landmarks and natural objects will control the calls for course and distance when inconsistent must be understood in a reasonable sense; the intention being to establish the grant if it can be done by any of the calls, and not to defeat it by rejecting all of the calls. In defense of the survey made by Griffin, it is contended by counsel for the defendant that the mine claimed by Ramirez, and the mountain given as the western boundary of the Canon del Agua grant, lie entirely eastward of the Canon del Agua springs, instead of west, as claimed by the complainant, and that there was a mistake in the calls of the boundaries of the grant, and that the natural objects did not lie in the exact position as called for by Ramirez in his petition for the grant, and the act of juridical possession. Though the evidence is in some respects conflicting, it appears with reasonable certainty that there is a mountain to the west called the "Little Tuerto," answering to the call for the western boundary of the Canon del Agua grant. With this mountain to control the call of the survey of the western boundary of the grant, and the Canon del Agua spring to control the survey of the eastern boundary, it is evident that so much of the survey made by Griffin as lies east of a line drawn due north and south, passing through the spring, is improperly included within the boundaries of the Canon del Agua grant as approved by Surveyor General Pelham, and confirmed by congress.

The principle is well settled that the United States has the same remedy in equity to set aside a patent obtained by fraud that an individual has to set aside his deed obtained by fraud. It is true, the decisions referred to were rendered in cases arising out of the homestead and pre-emption laws; but the same principle would seem to be applicable to patents issued on the confirmation of Spanish and Mexican grants obtained under like circumstances. In California the adjudication of land titles was not the same as in this territory. The decisions of the land department can only bind adverse claimants with notice or parties claiming under them. That there were adverse claimants to the land included in the survey and in the patent to Ramirez was afterwards shown by a petition signed by a great number of citizens, and addressed to the secretary of the interior, asking that legal proceedings be instituted in the name of the United States for the purpose of vacating the patent to Ramirez. The grounds for this request were: (1) That the survey as patented included the tract of land on which was situated the town of San Francisco, and which, as they state, was in existence at the date of the treaty by which New Mexico was acquired by the United States. They further state that though there was no direct grant from the Mexican government to the town, yet, as it was settled in accordance with the laws, customs, and usages of Spain and Mexico, it acquired all the rights, privileges, and immunities that pertain and belong to a Spanish or Mexican town, which was the right to the commons adjoining the town for the distance of one league in each direction from the center of the main square or *plaza* of the town, for the use and benefit of its inhabitants. (2) That the survey is erroneous, in that it includes a large tract of land not within the boundaries of the grant as con-

firmed, and which is public domain. The inhabitants of the town of San Francisco were engaged in commercial pursuits, and the town was a place of some importance long before the cession of the country to the United States. One witness testified that the population of the town was not less than 1,000; the names of many of the prominent merchants living there at that time are given; there was a chapel for divine worship; lots of ground for building and residence were acquired on application to the alcalde, as seems to have been usual at the time in other towns of the country. Tr. pp. 140, 141, 160, 162.

The act of July 22, 1854, made it the duty of the surveyor general to report all pueblos in the territory, showing the extent and locality of each, the number of inhabitants, and the nature of their titles to the land. 10 U. S. St. at Large, pp. 308, 309. The supreme court of California, in *Welch* v. *Sullivan,* 8 Cal. 165, 187, said: ."Each pueblo was entitled in property to certain tracts of land within the limits of the town, to be set apart by them, called 'commons,' 'pasture grounds,' and 'municipal lands,' by virtue of their organization as pueblos." To the same effect is the decision of the supreme court of the United States in *Townsend* v. *Greeley,* 5 Wall. 326, 337, and *Grisar* v. *McDowell,* 6 Wall. 363. It is further held that these rights were not divested by the treaty of Guadalupe Hidalgo. Mr. Hall, in his treatise on the laws of Mexico, contends that the courts erred in holding that four square leagues of land was the quantity assigned to a town, but says that the quantity was in the discretion of the viceroys and governors. Chapter 7, tit. "Pueblos or Towns," § 118, etc.

It may be doubted whether the survey made by Griffin ever had the deliberate sanction of the officers of the land department. Commissioner Burdett at first refused to approve the survey, because of the manifest difference between the calls for boundaries contained in the original title papers and their location by Griffin. Commissioner McFarland became satisfied that the land-office erred in deciding that the survey conformed to the boundaries of the grant as confirmed by congress, its action being based on testimony entirely *ex parte* in character; and he proceeds to show that the survey locates the road on the north-west, when, according to the grant, it should be north; and the spring on the south, when it should be on the east; and the San Pedro grant on the west, when it should be on the south,—the remaining boundary, according to the grant or juridical possession, being "the highest summit of the little mountain of El Tuerto, joining the boundary of the mine known as 'Inherited Property,'" which was on the west. Commissioner Burdett finally approved the survey, but he did so, as shown by Commissioner McFarland, on testimony *ex parte.* The above statement was made by Commissioner McFarland after the patent was issued, when the land department had no control over the title; and his statement is referred to as showing his reasons for recommending suit to vacate the patent, and which appear to be well founded. Mr. Griffin admits that the survey was not made in accordance with what he regards as the correct rule of surveying, but he said it was made under instructions of the surveyor general.

This is not a suit asserting a claim to lands reserved from sale or donation under the treaty between the United States and Mexico, but is a suit to vacate the patent based on the survey made by Griffin, and which includes other and different lands from the lands granted to Ramirez as approved by Surveyor General Pelham, and approved by congress. But it is contended by counsel for defendant, in their brief, that a patent issued by proper authority raises the presumption that all prequisites have been complied with. This, like all presumptions, is not conclusive in all cases. Fraud or mistake in obtaining a patent is recognized as an exception to the rule. *Moore* v. *Robbins,* 96 U. S. 530; *Hughes* v. *U. S.,* 4 Wall. 232. But the defendant is not in a position to deny the right of the complainant to redress while said defendant is claim-

ing the benefit of a mistake, as alleged, in the boundaries of the grant to Ramirez.

Another ground of defense set up in the answer of defendant is that said defendant purchased the land in good faith, and without notice of any fraud. The defendant was affected with notice of Ramirez's title, under which said defendant claims by the boundaries set forth in his grant, and the accompanying title papers, and by Pelham's approval of the grant according to said boundaries, and by its confirmation by congress, and by the recitals in the patent from the United States to Ramirez. The defendant was also charged with notice that mineral lands did not pass under a grant for agricultural or pastural or grazing lands. The chain of title under which defendant claims shows that the land contained mines and valuable ores. The United States is bound, under the treaty with Mexico, to protect the inhabitants of the town of San Francisco in the enjoyment of the commons and pasture lands belonging to the town; of which treaty, and the laws regulating land grants, the defendant, and the parties it claimed under, were charged with notice. If it could be shown that these proceedings did not give full notice, they were sufficient to put the defendant and its agents on inquiry, and to charge them with knowing all that they might have known by further investigation; besides, the patent protects the rights of adverse claimants.

It is not necessary in the case to invoke the rule that neither laches nor limitation is applied to the government. The rule as applied to individuals will protect the government. The facts were brought to the notice of the attorney general in August, 1881, and the suit was filed in the clerk's office in September following. The petition of the citizens to the secretary of the interior, and the correspondence between the government officials, seem to have led to the investigation that follows, and to the discovery of the fraud. The suit was brought in a reasonable time after notice of the fraud. *Meader* v. *Norton*, 11 Wall. 458; *U. S.* v. *Minor*, 114 U. S. 238, 5 Sup. Ct. Rep. 836; *Moore* v. *Robbins*, 96 U. S. 530.

The suit was properly brought in the name of the attorney general, in behalf of the United States; so far, at least, as the government is interested in the property as vacant land. *Mowry* v. *Whitney*, 14 Wall. 439; *U. S.* v. *Minor*, 114 U. S. 238, 5 Sup. Ct. Rep. 836. In *Moore* v. *Robbins*, 96 U. S. 530, the court said: "The courts are as open to the United States to sue for the cancellation of the deed, or the reconveyance of the land, as to individuals, and, if the government is the injured party, this is the proper course." *Insurance* v. *Weide*, 11 Wall. 439; *Hughes* v. *U. S.*, 4 Wall. 232; *U. S.* v. *Minor*, 114 U. S. 238, 5 Sup. Ct. Rep. 836.

The case before the court differs in its facts from a class of cases in which it is held that, for errors of judgment upon the weight of the evidence in a contested case before the officers of the land department, the only remedy is by appeal from one officer to another of the department. *Shipley* v. *Cowan*, 91 U. S. 340; *U. S.* v. *Minor*, 114 U. S. 238, 5 Sup. Ct. Rep. 836; *Throckmorton's Case*, 98 U. S. 61.

As the case is presented by the record, my opinion is that the survey and patent ought to be set aside and vacated, as prayed for in the bill of complaint. I concur in the opinion and judgment of the court.

HENDERSON, J., (*dissenting.*) I am unable to agree with the majority in the opinion delivered in this case. The record is very voluminous, and will not be reviewed in this dissent except in a brief manner, upon the grounds stated as reasons for withholding my assent to the opinion of the court. The original and supplemental bills are both grounded upon alleged frauds committed by the officers of the government, and by the grant claimants.

Ramirez was a claimant under a grant or concession from the republic of Mexico of 5,000 varas square of land lying in New Mexico, and situated within

certain boundaries called for in the concession.   After the passage of the act of congress establishing the office of surveyor general of New Mexico, and in obedience to that act, Ramirez filed his claim to the land, and submitted to the surveyor general his title papers and proofs to establish the *bona fides* of his claim and the validity of his title.   The records of the surveyor general's office show that the assertion of this title by Ramirez took the form and was in fact an adversary proceeding.   It was entitled "*Ramirez* vs. *The United States.*"   Proof was taken, and a decision had thereon by the surveyor general, approving and establishing the title, both as to its validity and extent, as fully as that officer had power under the act of congress to do.   The report of this officer approving the grant was forwarded to the general land-office at Washington, and, after approval by the commissioner and secretary of the interior department, it was submitted to congress, and approved *as recommended.*

The grant having been confirmed by congress, it became the duty of the general land-office to cause the grant to be surveyed, and, in pursuance of authority given to that department, a survey was ordered, so as to definitely set apart the lands to which Ramirez was entitled.   After taking some proofs in the form of affidavits by the surveyor-general, or a subordinate of his office authorized to act in his stead, a survey was made, and a plat thereof returned to the commissioner of the general land-office, who, after examination, set it aside, on account of some discrepancies between calls in the grant papers and the survey so made.   The surveyor general was ordered to make a further survey, which was done; but little change, however, was made between that and the first.   With this second survey before him, accompanied by a map or plat thereof, and after full opportunity to examine the affidavits taken before Griffin and Miller, as well as those taken by the special agent, Treadwell, he approved the survey, and in express words found that the surveyed limits or area contained in the grant thus surveyed was within the boundaries described in the juridical or actual possession delivered to Ramirez when he took formal possession under the Mexican government.   With the survey, plats, original title papers, and all the proofs taken from first to last in the case before him, knowing that one of the calls for courses contained in the original concession had been disregarded, the commissioner of the general land-office approved the survey.   The secretary of the interior also approved it, and thereupon the patent issued.

The grantee took no *ex parte* proofs to deceive the surveyor general.   Such affidavits as were taken were made by witnesses called upon by the officer of the plaintiff, in order to aid him in surveying the grant according to the true intent and purpose of the parties to the concession.   This officer was bound to look for the landmarks, in order to locate the grant.   At most, whether looking to the conflicting statements of the witnesses before Miller and Griffin, the special agent, Treadwell, or the record before us, it cannot be affirmed, in the light of the evidence, that any fraud or mistake was made in placing the Tuerto mountain east of the Canon del Agua spring.   The evidence preponderates, in my judgment, in favor of the survey, to the extent at least of locating the Tuerto mountain east, instead of west, of the spring.   I cannot discover in what way the United States has been, or could have been, defrauded, or its officers deceived, or in any way misled, when the facts were known, *at the time the survey was approved* and patent issued, as fully as the court has been advised by the pleadings and proofs before us.

I am forced to the conclusion that a bill would not lie at the suit of a private person or corporation to set aside a deed made under like circumstances as the patent is here shown to have been issued.   Some force must be given to the acts of the officers, acting within the scope of their admitted powers, and upon a subject-matter confided to them by express legislation of congress.   If, in any case before the department, a claim asserted by a citizen growing

out of a Spanish or Mexican grant case be said to be adversary proceeding, this is one. The title claimed by Ramirez was against the United States, not by purchase, or as a pre-emptor or homesteader, but in opposition to it, under a title paramount from a different sovereignty. The United States submitted itself to the jurisdiction of a tribunal of its own creation, and there can surely be no reason, in law or justice, for favoring it in such case, unless, under like circumstances, an action would lie at the suit of a citizen. Indeed, this view is taken by the supreme court of the United States in *U. S.* v. *Minor*, 114 U. S. 233, 5 Sup. Ct. Rep. 836. In *Vance* v. *Burbank*, 101 U. S. 514, it was held that, where there was a hearing, rehearing, and issues made and tried between the parties in such a case, the decision of the proper officers of the department is in the nature of a judicial determination of the matter in dispute. The later case of *U. S.* v. *Minor* in express words approves the doctrine announced in *Vance* v. *Burbank, supra.*

If, therefore, the facts disclosed in this record are sufficient to bring this case within the principles declared in *Vance* v. *Burbank* and *U. S.* v. *Minor*, there can be no escape from the conclusion that the bill should be dismissed, unless other and different grounds of relief can be shown. I have, I think, demonstrated from the confessed facts in the record that the claim filed and passed upon in the surveyor general's office was, both in form and substance, a suit against the United States to assert a title under an older and superior title to that acquired under the treaty of 1848; that proofs were taken, and, upon full consideration, in strict compliance with the laws of congress, the grant was approved; that the proceedings to ascertain the exact lands to which Ramirez was entitled were conducted by the plaintiff through its own officers; the first survey having been unsatisfactory, a second one was ordered, and, after a thorough knowledge of all the facts, the officers of the executive department approved the final survey, and patented the lands. If such a proceeding is not an adversary one, if the government was not an active adverse party in interest in such case, I cannot well imagine any state of case in which the United States could be an adversary party in that department. If, however, under any view of the facts, a bill will lie, and the government can escape that final determination, and come into court for the purpose of setting aside and canceling this patent, it will not be pretended that such relief will be granted, as against an innocent purchaser for value, without notice of the alleged frauds.

The defendant corporation, as appears by its certificate of incorporation, was organized as a corporation, with power to do business, on the twenty-second day of March, 1880. The certificate or articles show that this company was created under the General Statutes of Connecticut. By that general law, the filing of a certificate of incorporation, showing the name of the corporation, its capital stock, and other details, is made a condition precedent to its power of exercising or assuming any corporate franchises. Page 108, Gen. St. Conn. 1838. In other words, the filing of the certificate is the act of creating the artificial being known as a corporation. Before that is done it has no legal existence, and it follows that until that period it could neither bind itself nor be bound as a corporation by the act of any of its promoters. After this date, and before the purchase, it is not even pretended that notice was in any manner given of the alleged actual fraud charged in the bill. Not one line can be found in the evidence to warrant the conclusion that there was actual notice given to any of the defendant's officers in such manner as to impart legal notice to the corporation. It is true that Ballou, Welch, and Grafton were upon the grant in the month of January or February, 1880, but there is nothing to show that they were acting for or on behalf of the defendant. In fact, the defendant company was not then in existence. Take the statements and conversations of these persons with the miners then upon the grant, and what do they amount to as notice, in the most liberal and general sense? They claimed

rights under the United States adverse to the patentee, or his grantees, and were promised protection. This was notice to these persons and individuals that there were many people then upon the grant who had made mining locations within the surveyed boundaries of the land, and that such titles were claimed in opposition to the patentee of the United States. It might even be conceded, for the sake of argument and illustration, that notice to these persons was in legal effect notice to the defendant corporation, and still such notice would be wholly insufficient to bind the defendant, or to deny it the right to plead and rely upon its title as a grantee through mesne conveyances from the patentee. Taken in its broadest sense, there would be notice; not of any fraud or fraudulent contrivances on the part of the grantees to obtain a patent, and that the fraud so committed by the patentee induced the United States to confirm the grant, and to survey and patent the particular lands described in the patent. As between the United States and the defendant corporation, there is not the slightest evidence to induce a belief that the government had been deceived and imposed upon by the patentee. I cannot find any evidence tending to show that the United States had been defrauded by the survey.

But the majority think that the company is constructively put upon inquiry by the chain of title under which it holds, and is therefore affected with notice of the *incorrectness* of the survey. This line of reasoning is to my mind somewhat strained and forced, to a degree unwarranted by the authorities. Even if a purchaser be bound, as decided in this case, to look to all antecedent acts or documents leading up to the patent; and if, by an inspection of such elements of title, such as the original grant papers in this case, he should find that there is evidence or information to the effect that the lands granted were improperly surveyed,—then the purchaser is bound to take notice that there were frauds and perjuries committed by the patentee, and the witnesses who swore that the true boundary was to the east of the spring, because the landmark called for in the original papers was to the west, instead of the east. No authority has been cited to support such an extreme position, nor do I think a case can be found. Had not any citizen of the United States a right to conclude that the United States was bound and finally concluded by the patent? It was issued at the end of a long controversy with the government itself as a party. The patent does not injuriously affect any adverse claimant, whether as a citizen of the town of San Francisco or a mine-owner. Whatever legal validity there was in the possession or ownership of any class of property within the surveyed limits of the grant held or owned adversely to the patentee, is, in the express words of the patent, not concluded or bound by it. The patent does not preclude them from asserting in the courts whatever right they then owned, unless barred in some way since that time. The United States sued in her own right, and very wisely saved the titles of adverse claimants from the operation of the patent, notwithstanding it included lands, houses, and mineral rights of persons residing upon the granted premises. The naked question is therefore presented: Should the United States stand concluded on the facts shown in this record by her own solemn conveyance made in the manner recited? My answer is that she should be.

I concur in so much of the opinion and judgment as declares that the patent did not operate to pass the precious metals under the surface of the earth. There is nothing to show that Ramirez ever claimed the principal mine, over which so much controversy has arisen, *under the patent,* as his original source of title. The claim asserted by him for recognition by the United States arose under the mining ordinances of Mexico. That title was a separate and distinct estate from the agricultural grant he solicited and obtained from the government at a later period. Congress confirmed his claim for a grant, but took no action whatever to either grant or confirm him in a title to a mine.

The legal title to the mine or mines located upon the grant can be determined in a court of law; but until some sort of title to the mine has been in

some way established the United States can protect herself by injunction to restrain a mere claimant who has in no way lawfully appropriated the ground or the minerals by discovery and locations as prescribed by law. Such a title is essentially a legal one. Equity has no jurisdiction, unless to stay waste, or enjoin a wanton and destructive injury by a naked trespasser.

APPLICATION FOR REHEARING.

(January Term, 1888.)

LONG, C. J. The defendant has filed a petition for rehearing, assigning therein 12 reasons why the same should be granted.

The first, second, third, and fifth points made are but a repetition of those urged both in the oral argument and in the printed briefs, and already fully considered and determined. They present no new consideration, and are fully met by the opinion.

The fourth proceeds upon a misappprehension of the consideration stated in the opinion of the court. The court does not ignore what is claimed in the petition to be the well-established rule "that when there is any conflict between monuments and landmarks named in a description of property, and the courses and distances given, the latter must give way to the former," but on the contrary, from a careful consideration of the evidence, finds there is no such conflict, and so no reason for the application of any such rule.

As to the sixth point, the court takes the statement of George William Ballou, president of the defendant company, as to the date of organization, to-wit, January 28, 1880, as being the truth; and presents facts, circumstances, and information given to him as president, before the conveyance was made to defendant, sufficient, as we think, to constitute notice.

As to the matter presented under the eleventh specification, it would seem, if the defendant is not an innocent purchaser, the case should be considered on its original facts, independently of any presumptions arising from the patent. If defendant occupies the position of an innocent purchaser, buying and receiving conveyance for value without notice, he cannot be affected by the fraud, and that ends the inquiry about it as to that branch of the case. But we do not think the defendant is in position to be protected from inquiry, and to hold notwithstanding the fraud alleged and proven. Under the authorities already cited, it is not necessary that defendant should have knowledge before purchase of each and every fact necessary to be proven to make out a case on final trial. A familiar illustration of this principle is where bidders at a public sale are notified in general terms of some outstanding equity in a third party, without stating the evidence which will support the claim when brought into court. Under such circumstances, the purchaser is not bound to buy. He may do so, but if he does so, he assumes the risk. This is not a case, as it has impressed itself upon us, where mere doubt is cast upon the survey, but rather one where the evidence clearly proves it wrong, and willfully so.

The other questions raised on the petition relate to ruling on the supplemental bill, and may be considered. The averments of the bill and answer clearly make an issue as to the right to the precious metals, especially of the Big copper mine. Nothing appears in the record to show the exact points considered below, but it must be assumed all matters in issue were determined. The defendant in the issues does not place its possession and right to mine upon any claim under the mining laws of the United States, but does assert its right under the grant. It is not apparent how this issue, clearly on the face of the record, could be ignored. To have decided against the complainant would have estopped her by a solemn judgment from claiming the precious metals. The adjudication would constitute a bar to any future assertion of right to such minerals. The supplemental bill does not seem to have been in any way carried out of the record in the court below. An issue

is made upon it by the defendant, and it is thereby treated as properly in the case. It is urged the court should reconsider its position as to the legal effect of the confirmation. The language of the eighth reason in the petition for rehearing indicates some misapprehension as to the point decided. It is the intention of congress in the confirmatory act relating to the grant of Ramirez only which is passed upon. That the title to mines under the Mexican law at the date of the Ramirez grant did not pass by an agricultural grant is, it seems to us, so well established that it is beyond doubt. If the distinction between the construction which should be placed upon a public grant, and that which is given to a private grant from one individual to another, stated in the opinion, is correct, there can be but little doubt as to the construction which then, under such a rule, must be given to the act of confirmation. If it be true, as said by an eminent authority, "according to the common law of England mines of gold and silver were the exclusive property of the crown and did not pass under a grant by the king under a general designation of lands," it would seem the rule of construction heretofore stated is correct.

Blackstone has said: "A grant made by the king shall be taken most beneficially for the king and against the party receiving the grant." The supreme court of the United States has also said: "Public grants are to be construed strictly." Devlin on Deeds lays down the rule, and supports it with a very large number of citations, that the grant of the sovereign is to be construed strictly against the grantee. In the case of *Bridge* v. *Bridge*, 11 Pet. 536, cited in the original opinion which we are asked to reconsider, the principle above stated is clearly announced. Such able lawyers as Mr. Webster and Mr. Greenleaf were in the case, and the opinion was delivered by Chief Justice TANEY, who commences his opinion as follows: "The questions involved in this case are of the gravest character, and the court have given to them the most anxious and deliberate consideration. * * * " Considering the question of the construction to be applied, the able chief justice proceeds: "It would present a singular spectacle if, while the courts in England are restraining within the strictest limits the spirit of monopoly, and exclusive privileges in the nature of monopolies, * * * the courts of this country should be found enlarging these privileges by implication, and construing a statute more unfavorably to the public and to the rights of the community than would be done in a like case in an English court of justice. But we are not left to determine for the first time the rules by which public grants are to be construed in this country. The subject has already been considered in this court, and the rule of construction above stated fully established. In the case of *U. S.* v. *Arredondo*, 6 Pet. 738, the leading cases on this subject are collected together by the learned judge who delivered the opinion of the court, and the principle recognized that in grants by the public nothing passes by implication. The rule is still more clearly and plainly stated in the case of *Jackson* v. *Lamphire*, 3 Pet. 288." The same question was before the supreme court of the United States as lately as 1883, in the case of *Slidell* v. *Grandjean*, 111 U. S. 437, 4 Sup. Ct. Rep. 475, where it was said by Justice FIELD, who delivered the opinion of the court: "It is also a familiar rule of construction that where a statute operates as a grant of public property to an individual, or the relinquishment of a public interest, and there is a doubt as to the meaning of its terms, or as to its general purpose, that the construction should be adopted which will support the claim of the government, rather than that of the individual. Nothing can be inferred against the state. As a reason for this rule, it is often stated that such acts are usually drawn by interested parties, and they are presumed to claim all they are entitled to. The rule has been adopted and followed in this court in many instances in the construction of statutes of this description." And then come citations as follows: *Bridge* v. *Bridge*, 11 Pet. 420–536; *Railroad Co.* v. *Litchfield*, 23 How. 66–88; *Minot* v. *Railroad Co.*, 18 Wall. 206. And the court continues:

"The rule is a wise one; it serves to defeat any purpose concealed by a skillful use of terms to accomplish something not apparent on the face of the act, and thus sanctions only open dealing with legislative bodies."

Bearing in mind that, under the law, before confirmation of his grant Ramirez had no right to the precious metals under his agricultural grant, and applying the principle of strict construction to the confirmatory act, it seems to be perfectly clear that the mines of gold and silver did not, under the confirmatory act, pass to him, and especially so in view of the express declination of the surveyor general to act on his application for the mine.

The petition for rehearing is overruled.